# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA, the STATE OF NEW JERSEY, and the STATE OF NEW YORK, *ex rel.* JERSEY STRONG PEDIATRICS, LLC, | Civil Action No. 14-6651-SDW-SCM |
| Plaintiffs/Relator, | |
| vs. | |
| WANAQUE CONVALESCENT CENTER, WANAQUE OPERATING CO., L.P. and SENIORS MANAGEMENT NORTH, INC. | **FIRST AMENDED COMPLAINT** |
| Defendants. | |

## I.   <u>INTRODUCTION</u>

1.      Qui Tam Relator Jersey Strong Pediatrics, LLC brings this action on behalf of the United States of America, the State of New Jersey, and the State of New York to recover civil damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729-3733, the New Jersey False Claims Act, N.J.S.A. § 2A:32C, and the New York False Claims Act, N.Y. State Fin. Law § 187-194, against Defendants Wanaque Convalescent Center, Wanaque Operating Co., L.P., and Seniors Management North, Inc.

2.      Defendants own and/or manage Wanaque Convalescent Center (hereinafter "Wanaque"), a skilled nursing facility in Haskell, New Jersey.  Through Wanaque and its patients, Defendants have defrauded the United States of America, the State of New Jersey, and the State of New York.

3.      This case arises from Defendants' two-part scheme to fraudulently bill Medicare and Medicaid. First, Defendants expanded and manipulated the patient population at Wanaque.

Second, Defendants employ unscrupulous billing practices to wrongfully collect revenue from Medicare and Medicaid.

4.      Beginning in 2003, Defendants drastically increased their pediatric ventilator population.  During the expansion, Defendants admitted children without first ensuring there were adequate facilities and medical equipment to support the new residents.

5.      Defendants also filled beds that turned over with technology-dependent residents insured by Medicare or Medicaid to take advantage of the superior rate and speed of payment from Medicare and Medicaid.  Defendants' admissions policy disregards medical need and the availability of private insurance.  Defendants even refuse to admit children who are Medicare and Medicaid ineligible.

6.      Defendants give preferential treatment to applicants insured by New York Medicaid because it pays a per diem rate even higher than New Jersey Medicaid.  As a result, approximately 75% of Wanaque patients are New York residents.

7.      Defendants' scheme also decreases the number of beds that are available in New Jersey, a number that is regulated based on demand.  When Defendants admit a New York child over a New Jersey child, the New Jersey child has to remain in an alternate setting, such as in their home or at a hospital.  Consequently, the State of New Jersey has to increase the bed count cap because the in-state demand is artificially inflated.

8.      Underlying Defendants' desire to fill their beds with Medicare and Medicaid beneficiaries is Defendants' fraudulent billing practice.  In order to maximize the profitability of their patient population, Defendants bill Medicare and Medicaid as primary payer even when a patient has private insurance, or some other source of medical benefits, available.  Since payment of Medicare and Medicaid funds are conditioned on compliance with pertinent and material

regulations, including secondary payer laws, the claims arising from the aforesaid billing practice are false and fraudulent under the Federal False Claims Act, the New Jersey False Claims Act, and the New York False Claims Act.

## II.    **THE PARTIES**

9.      Qui Tam Relator Jersey Strong Pediatrics, LLC (hereinafter "Jersey Strong" or "Relator") is a New Jersey corporation.

10.     Jersey Strong is owned and operated by Dr. John Doe.

11.     Relator brings this action on behalf of the United States of America pursuant to 31 U.S.C. § 3730(b)(1).

12.      Relator brings this action on behalf of the State of New Jersey pursuant to N.J.S.A. § 2A:32C-5.

13.     Relator brings this action on behalf of the State of New York pursuant to N.Y. State Fin. Law § 190.

14.     Defendant Wanaque Convalescent Center is also known as "The Wanaque Center" and its pediatric unit is known as "The Caring for Children at the Wanaque Center."  Wanaque is licensed by New Jersey's Department of Health as a long-term care facility pursuant to N.J.A.C. 8:39. The facility is located at 1433 Ringwood Avenue, Haskell, New Jersey 07420.

15.     Defendant Wanaque Operating Co., L.P. is a for-profit partnership registered in New Jersey with a principle place of business located at 1433 Ringwood Avenue, Haskell, New Jersey 07420.  Defendant Wanaque Operating Co., L.P. is the licensed owner of Wanaque.

16.     Defendant Seniors Management North, Inc. is a Florida corporation with a principle place of business located at 1114 Wynwood Avenue, Cherry Hill, New Jersey 08002.    Upon

information and belief, Defendant Seniors Management North, Inc. is in charge of the administrative functions at Wanaque.

17.     Upon information and belief, all Defendants have an ownership and/or management interest in Wanaque.

## III.   <u>JURISDICTION AND VENUE</u>

18.     This action arises under the laws of the United States to redress violations of the Federal False Claims Act (hereinafter "FCA"), 31 U.S.C. § 3729-3733.

19.     Subject-matter jurisdiction is conferred by 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

20.     This Court has jurisdiction over Defendants' violations of the New Jersey False Claims Act (hereinafter "NJFCA"), N.J.S.A. § 2A:32C, and the New York False Claims Act (hereinafter "NYFCA), N.Y. State Fin. Law § 187-194, because Defendants' violations of New Jersey law, New York law, and federal law arise from the same transactions, occurrences, and scheme.  Moreover, Defendants' violations of the FCA, NJFCA, and NYFCA arise from the same common nucleus of operative facts.

21.     This Court also has jurisdiction under 31 U.S.C. § 3732(b), which grants jurisdiction over any action brought under the laws of any state for the recovery of funds paid by a state or local government if the action arises from the same transaction or occurrence as an action brought under 31 U.S.C. § 3730.

22.     This Court has personal jurisdiction over Defendant Wanaque Operating Co., L.P. since it is a New Jersey citizen with a principle place of business in New Jersey.

23.     This Court has personal jurisdiction over Defendant Seniors Management North, Inc. since its principle place of business is in New Jersey.

24.     All Defendants have permanent, continuous, and regular contacts with the State of New Jersey.  Each Defendant has a management and/or ownership interest in Wanaque, which is long-term care facility located in New Jersey and licensed by New Jersey's Department of Health.

25.     Defendants regularly and continuously solicit New Jersey residents for admission to Wanaque and, therefore, are subject to the jurisdiction of this Court.

26.     Venue lies under 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Defendants transact business within this district and the facts forming the basis of this Complaint occurred within this district.

27.     Prior to the institution of this action, the facts and circumstances of Defendants' violations of the federal FCA have not been publicly disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative, or General Accounting Office or Auditor General's report, hearing, audit investigation or in the news media.

28.     Prior to the institution of this action, the facts and circumstances of Defendants' violations of the NJFCA have not been publicly disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative, or General Accounting Office or Auditor General's report, hearing, audit investigation or in the news media.

29.     Prior to the institution of this action, the facts and circumstances of Defendants' violations of the NYFCA have not been publicly disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative, or General Accounting Office or Auditor General's report, hearing, audit investigation or in the news media.

30.     Relator is the original source of the information upon which this Complaint is based,    as    that    phrase    is    used    in    the    FCA,    NJFCA,    and    NYFCA.

IV.     **FACTS**

A.     **Overview**

31.     Wanaque is a skilled nursing and rehabilitation facility located in Haskell, New Jersey. The center provides long-term care to geriatric and pediatric residents. There are approximately 227 beds, with 92 designated for pediatrics.  Of the 92 pediatric patients, approximately 62 are ventilator-dependent. These numbers vary daily.

32.     The pediatric residents at Wanaque have a variety of complex medical conditions. Each require specialized medical treatment that is often coordinated between multiple physicians. Wanaque's purpose is to provide residential, educational, skilled nursing, and ancillary services like speech, occupational and physical therapy.

33.     The treating physicians have independent practices and are not employed by the facility.

34.     Dr. John Doe is a pediatric physician with over 30 years of experience in managing care for children with complex medical needs.  He is board certified in Pediatrics and Pediatrics Critical Medicine.  Since 1986, he has spent most of his career treating children requiring specialized medical care, specifically ventilator-dependent children.

35.     Dr. John Doe began treating residents at Wanaque in or around 2003.  His physician services were, and have always been, rendered through his own practice.

36.     Pursuant to his agreement with Defendants, Dr. John Doe independently billed the applicable health insurance carrier for his clinical/physician services.  Defendants submit a separate bill to the health insurer for their services.

37.     Also in or around 2003, the Defendants hired Dr. John Doe as a medical director. His primary responsibility was to oversee the pediatric ventilator population through its expansion. The ventilator unit eventually achieved a drastic increase in patients.

38.     The facilities at Wanaque could not keep up with the population growth. Many of the children required technology that Wanaque could not provide, such as back-up ventilator equipment and alarms. The staff to patient ratio was also inadequate.

39.     Wanaque was admitting patients without first ensuring that there were adequate facilities to support the new residents. Accordingly, the quality of care degraded to substandard levels. Morbidity and mortality rates increased throughout the expansion process.

40.     For example, on at least on occasion, Dr. John Doe had to ask a hospital to overnight a replacement tracheostomy tube for a patient it referred to Wanaque because Defendants did not have, and could not afford, the replacement tube.

41.     In addition to lacking equipment, Wanaque did not have adequate staffing to handle the expansion.

42.     In an internal memo dated February 2, 2004, a respiratory therapist at Wanaque describes three problems arising from the inadequate staffing: tracheotomy tubes were not being changed; alarms were not being answered in a timely manner; and, ventilator checks were constantly interrupted so therapists could be redirected to other wings. The memo further explains:

> In light of our efforts to expand the capacity of the ventilator unit we must continue to increase productivity as we maximize respiratory therapy hours in the west wing. This holds down the need to increase expenses by raising the number of therapists per shift. I hope your intervention in this matter will resolve this long-standing problem.

43.     Dr. John Doe also expressed concern to Arthur Stern (hereinafter "Stern"), the president of Defendant Seniors Management North, Inc.

44.     In a letter to Stern dated February 6, 2006, Dr. John Doe states:

> As you know, we have been able to admit more ventilator patients than ever before, with a census now at 34, double the number which I began caring for three years ago… [N]ew inexperienced staff are being placed in charge positions [sic]… I do not feel that the administrative support at Wanaque has kept pace with the increase in census.

45.     Issues related to the expansion persisted into 2007.

46.     In a memo dated February 23, 2007, the aforementioned respiratory therapist writes, "[a]s the ventilator unit continues to grow many of the old problems continue to mushroom!"  The memo explains that there were not enough respiratory therapists on staff to cover the 44 ventilator-dependent residents. The memo continues, "[t]he issue of observablity [sic] of many of the small active cognitive children in a semiprivate room setting remains a problem."

47.     This tumultuous expansion resulted in beds being filled by highly profitable patients insured by New Jersey Medicaid and New York Medicaid.

48.     Defendants receive a high per diem rate from New Jersey Medicaid and even higher rate from New York Medicaid.

49.     New Jersey's per diem rate for Wanaque is based on costs submitted annually for *all* patients in the facility.  By raising the number of costly ventilator-dependent patients, regardless of whether the facilities could handle these patients, Defendants also drove up the per diem rate it received from New Jersey for all patients.

50.     New York Medicaid pays even higher rates than New Jersey Medicaid.

51.     In addition to the high per diem rates, Defendants opt for the predictable approval process of Medicaid, instead of the slower and unpredictable approval process of private insurance and other payment sources.

52.     Medicaid generally approves coverage prior to or during admission.  Therefore, payment is essentially ensured throughout a patient's residency.

53.     In order to benefit from Medicaid and Medicare's rate and speed, Defendants also manipulate their patient population.

54.     Pursuant to Defendants' admissions protocol, entry is contingent on an applicant's Medicare or Medicaid eligibility.  As a result, children who do not qualify for Medicare or Medicaid are turned down even if they have private insurance.

55.     Defendants' admissions committee also gives preferential treatment to applicants insured through New York Medicaid since it pays the highest per diem rate.

56.     Given these practices, approximately 75% of the children at Wanaque come from New York, and all have Medicare or Medicaid.

57.     When long-term care beds are filled with out-of-state residents, New Jersey children are forced to receive more expensive care elsewhere.  Moreover, long-term care facilities like Wanaque cannot accept referrals when their beds are filled with out-of-state residents.  This not only drives up healthcare costs at the expense of taxpayers, but it thwarts New Jersey's ability to ascertain demand for such beds.

58.     On a periodic basis, the Department of Health conducts a survey of acute care hospitals, special hospitals, and other health care facilities in New Jersey to determine the number of children who require transfer to a pediatric long-term care facility.  N.J.A.C § 8:33H-1.2 and

1.5.   This number dictates how many pediatric long-term care beds will be permitted in New Jersey.

59.   By packing Wanaque with New York residents, New Jersey children with complex medical needs are forced to remain in hospitals or other settings, which artificially inflates the need for beds in the state.

60.   Defendants' scheme thus causes the demand for beds in the State of New Jersey to increase.

61.   Defendants expanded and manipulated their patient population in order to maximize the number of beds filled by Medicare and Medicaid beneficiaries.  Underlying the expansion and manipulation was Defendants' fraudulent billing scheme.

62.   Defendants indiscriminately bill Medicare and Medicaid as primary payer even when their services are payable by an alternative plan, like a private health plan or auto policy. This billing practice violates secondary payer laws and, as a result, the claims are false and fraudulent.

63.   Indeed, the profits generated by the false claims submitted to Medicare and Medicaid is what motivated Defendants' desire to expand its pediatric population regardless of the lack of resources.

64.   Many of the patients/residents at Wanaque have private health insurance, or another form of primary medical benefits, in addition to Medicaid or Medicare.

65.   Despite their obligation to seek other forms of payment prior to billing the government, Defendants systematically bill Medicare and/or Medicaid as primary payer thereby violating secondary payer laws.  As previously stated, Defendants generate steady profit margins by billing Medicare and Medicaid as the primary payer.

10

66.     Defendants also make little or no effort to ascertain whether their patients have another form of insurance.  When Defendants are apprised that coverage primary to government benefits exist or may exist, that information is disregarded, and Defendants nevertheless seek payment from the government benefits.

67.     Defendants' indifference for private insurance also disrupts the coordination of care for its residents.  In many instances, the only insurer on Defendants' records is Medicaid.  This limits the child's ability to receive outside, specialized care. Without the private insurance information, the attending physician is forced to refer the child to a Medicaid-approved provider. However, many medical specialists do not accept Medicaid.  This issue is compounded by the fact that many New Jersey providers are not approved for payment by New York Medicaid, which insures many of the residents at Wanaque despite the facility's location in New Jersey.

68.     Since Dr. John Doe is responsible for his own billing, he and his staff investigated whether there was a form of private insurance.  Usually, this was accomplished by simply calling the patient's parents.

69.     When Dr. John Doe or his billing personnel discovered private benefits, they would routinely relay the information to Defendants in order to demonstrate that Medicaid or Medicare were secondary.

70.     Defendants would generally ignore the insurance information provided by Dr. John Doe.

71.     Defendants advised Dr. John Doe that they would go exclusively through Medicare or Medicaid because private insurance was too bothersome.

72.     Dr. John Doe was terminated from his medical director position in 2008. He was permitted to continue to treat residents at Wanaque.

73.     Defendants are responsible for caring for one the most vulnerable population groups – children whose medical conditions render them bedridden and technology-dependent.

74.     Instead of safeguarding these children, Defendants have used them as a means to defraud the United States of America, the State of New Jersey, and the State of New York, all at the expense of taxpayers.

75.     The following examples are demonstrative of Defendants' fraudulent scheme, which                    extends                    beyond                    this                    sample.

**B.      "Minor A"**

76.     Minor A was a resident of New York.

77.     The Wanaque admission sheet for Minor A lists Medicaid as the primary payer and contains only her Medicaid number.  Moreover, no other insurance information is listed on the sheet.

78.     Minor A came under the care of Dr. John Doe, whose staff contacted the Minor's parents to ascertain whether there was private health insurance.  Her parent advised Dr. John Doe that Minor A was covered under an employer-based plan administered by Oxford Health Plans.

79.     Dr. John Doe submitted his claims to Oxford.

80.     The Oxford case manager advised Dr. John Doe that Minor A's providers, including Wanaque, were being paid by New York Medicaid.

81.     Dr. John Doe then contacted Jeffreys Barrett (hereinafter "Barrett"), an administrator employed by Defendants, to inform him of the private coverage and Oxford's response.  Barrett confirmed that Defendants were billing New York Medicaid for the services rendered at Wanaque to Minor A.

82.     Barrett advised Dr. John Doe to bill Medicaid.  Barrett even wrote a letter to the New York State Department of Health stating that Dr. John Doe's "specialized services should be billed through the New York Medicaid system."

83.     Dr. John Doe did not bill New York Medicaid.  Instead, he contacted the medical director at Oxford who authorized Dr. John Doe to receive payment as an out-of-network provider.

**C.     "Minor B"**

84.     Minor B is a resident of New York.

85.     The Wanaque admission sheet for Minor B lists Medicaid as the primary payer and contains only her Medicaid number.  No other insurance information is listed on the sheet.

86.     Shortly after Minor B's admission to Wanaque, Jean Bruzzone (hereinafter "Bruzzone"), an administrator employed by Defendants, requested that Dr. John Doe complete standard form LDSS-486-NYC, known as Medical Report for Determination of Disability.  This form must be submitted in order to obtain approval from New York Medicaid for long-term care. It is only necessary if Medicaid is being billed.

87.     Minor B was transferred to Wanaque from another facility.  The intake sheet from the other facility lists "GHI COMMERCIAL" as her insurer.  This sheet, along with other documents, were provided to Wanaque during Minor B's admittance.

88.     Dr. John Doe contacted Minor B's parent and confirmed that there was coverage through GHI.  Minor B's parent also forwarded a GHI health insurance card.

89.     Dr. John Doe submitted his claims to GHI who then issued reimbursement checks.

90.     During Minor B's stay at Wanaque, emergency care was rendered at a hospital. Since the hospital was forced to rely upon the information provided by Defendants, the only insurer listed on the hospital's intake sheet is New York Medicaid.

91.     In or around 2005, Dr. John Doe was contacted by an attorney seeking his aid in setting up a special needs trust for Minor B.  The attorney advised Dr. John Doe that he could submit his bills to the trust for payment.

92.     Dr. John Doe relayed this news to Linda Hollander (hereinafter "Hollander"), an administrator employed by Defendants.  Hollander repudiated the information and warned Dr. John Doe not to involve himself with Wanaque's billing.  Wanaque was going to bill Medicaid even though Medicaid would be secondary to the trust or private coverage.

93.     After speaking with Hollander, Dr. John Doe emailed Joseph Guy, MD (hereinafter "Dr. Guy") at the New York State Department of Health.  Dr. John Doe asked Dr. Guy how the benefits should be coordinated in light of the trust.  Dr. Guy confirmed that Dr. John Doe's services should be paid from the trust fund since it was an available resource.

94.     Dr. John Doe also forwarded Dr. Guy's instructions to Defendants.

**D.     "Minor C"**

95.     Minor C was a resident of New York.

96.     Shortly after Minor C's admission, Bruzzone asked Dr. John Doe to fill out a Medical Report for Determination of Disability for New York Medicaid.

97.     Prior to arriving at Wanaque, Minor C was enrolled in the Care-At-Home Medicaid Waiver Program administered by SKIP of New York.

98.     When SKIP contacted Defendants about Minor C's potential admission, they identified "GHI/HIP" as the primary insurer.  SKIP also advised Bruzzone that it is mandatory for the child to exhaust primary insurance benefits before making claims to Medicaid.

99.     Despite receiving this information, the only insurer listed on Wanaque's resident profile is New York Medicaid.

100.     Defendants' admissions committee did note Group Health Insurance (GHI) and Health Plan of New York (HIP) on their review form, but it erroneously described the HIP policy as terminated.  Likewise, it does not list the identification number for the GHI policy.

101.     Dr. John Doe contacted Minor C's parents about the private coverage.

102.     The parents confirmed that Minor C had two sources of private coverage: GHI and HIP.  The GHI policy was supplemental to the HIP policy.

103.     The note on the Wanaque form about the HIP policy being terminated was incorrect.

104.     Defendants never sought out the GHI policy number.  Even if they did, the GHI policy was supplemental to the HIP policy.

105.     Dr. John Doe brought this issue to Bruzzone's attention.  She disregarded the information and explained that Medicaid would be billed.

**E.     "Minor D"**

106.     Minor D was a resident of New York.

107.     Defendants' resident profile for Minor D lists two forms of insurance, New York Medicaid and Empire Blue Cross.

108.     Dr. John Doe contacted Bruzzone to obtain additional information on the Empire Blue Cross policy.  Specifically, the name of the plan administrator. Bruzzone advised that she never bothered to obtain this information because Defendants were billing Medicaid.

109.     Dr. John Doe then contacted Minor D's parents.

110.     Minor D's parent advised Dr. Joe that he was employed by UFCW - Local 1500. The union had a welfare fund administered by Maloney Associates, Inc. and not Empire Blue Cross.

111.    Dr. John Doe submitted his claims to Maloney and was paid out the union's welfare fund.

**F.    "Minor E"**

112.    Minor E was a New York resident.

113.    Shortly after Minor E's admission, Bruzzone had Dr. John Doe fill out a Medical Report for Determination of Disability so the facility could bill New York Medicaid.

114.    Minor E's parent advised Dr. John Doe of private coverage through Aetna and forwarded a health insurance card.

115.    Dr. John Doe shared the Aetna information with Defendants, but it was disregarded.

**G.    "Minor F"**

116.    Minor F was a New York resident.

117.    The only insurance listed on Defendants' resident profile for Minor F is New York Medicaid.

118.    Shortly after Minor F's admission, Bruzzone asked Dr. John Doe to fill out a Medical Report for Determination of Disability so the facility could bill Medicaid.

119.    Dr. John Doe contacted Minor F's parents who advised that Minor F had private coverage through Oxford Health Plans.  A copy of the health insurance card was also forwarded.

120.    Dr. John Doe shared this information with Defendants, but it was disregarded.

**F.    "Minor G"**

121.    Minor G is a New Jersey resident.

122.    Minor G was referred to Wanaque by a hospital.

123.     The hospital's intake lists three forms of insurance: a private United Healthcare policy, a private Aetna/US Healthcare policy, and New Jersey Medicaid.  The hospital's intake was provided to Defendants.

124.     The Seniors Management "Admission Authorization" form identifies Medicaid as the payment source, and no other forms of insurance are listed.  Likewise, Wanaque's "Pediatric Committee Chart Review" form identifies only Medicaid.

125.     Dr. John Doe contacted United Healthcare and inquired into Minor G's coverage.

126.     By way of letter, United Healthcare confirmed Minor G's coverage.  A carbon copy of the letter was sent to Defendants.

127.     Dr. John Doe also advised Defendants' of the private coverage through United Healthcare,            but            the            information            was            repudiated.

**G.     "Minor F"**

128.     Minor F is a New Jersey resident.

129.     At all times pertinent hereto, Minor F was admitted to a hospital.

130.     The aforesaid hospital attempted to have Minor F admitted to Wanaque, and forwarded pertinent records to Defendants.

131.     According to the hospital records, Minor F was insured under a Horizon PPO plan.

132.     After receiving the hospital records, Bruzzone contacted New Jersey Medicaid to ascertain Minor F's eligibility.

133.     Pursuant to Wanaque's "Pediatric Committee Chart Review," Minor F was deemed ineligible by New Jersey Medicaid.

134.   Minor F was refused admission to Wanaque and remained in the hospital.

## V.   APPLICABLE LAW

### A.   Medicare as Secondary Payer

135.   In certain cases an individual who is eligible for Medicare coverage also has a private source of medical benefits.  Congress endeavored to coordinate the provision of payment in situations in which an individual has overlapping Medicare benefits and private insurance coverage by enacting the Medicare Secondary Payer Act ("MSPA") in 1980.  42 U.S.C. § 1395y.

136.   As a cost-cutting amendment, the MSPA was designed to curb skyrocketing health costs and preserve the fiscal integrity of the Medicare System.  *Fanning v. United States*, 346 F.3d 386, 388 (3d Cir. 2003) (citations omitted).

137.   The MSPA and related regulations dictate when Medicare will pay a medical claim as the "primary payer" and when Medicare will pay as a "secondary payer."  Generally, under the MSPA and related regulations, the private insurance carrier is always the primary payer.  *See* 42 U.S.C. § 1395y(b)(1)(A),(B); 42 C.F.R. §§ 411.172, 411.101, 411.203.

### B.   Medicaid as Secondary Payer

138.   Pursuant to federal regulation enacted in 1980, Medicaid is considered the payer of last resort.  42 C.F.R. § 433.135-.139.

139.   Each state administers its own Medicaid program.  In order for a state to receive federal funding, its program must meet delivery, quality, funding, and eligibility standards promulgated by the Centers for Medicare & Medicaid Services ("CMS").

140.   Section 433 of Title 42 regulates fiscal activities with respect to state-ran Medicaid programs. 42 C.F.R. § 433.1. Subpart D, Third Party Liability, concerns the liability of third parties, such as commercial insurance companies, with respect to claims submitted to a Medicaid

program for payment. 42 C.F.R. § 433.135-.139. Similar to the MSPA, these federal regulations ensure that Medicaid is secondary to other available sources of benefits, including private health insurance or a trust fund. 42 C.F.R. § 433.139; *see also* 42 U.S.C. § 1396a(a)(25).

## C. Applicable New Jersey Regulations

141. New Jersey has promulgated licensure regulations to ensure the quality of long-term care facilities. N.J.A.C. 8:39.

142. The number of pediatric long-term care beds, including ventilator beds, is determined by a survey of acute care hospitals, special hospitals, and other health care facilities in New Jersey to identify all children who are medically ready for discharge and who require transfer to a pediatric long-term care facility. N.J.A.C. 8:33H-1.5. The number of beds is thus determined only by in-state need. N.J.A.C 8:33H-1.2.

143. Admission to long-term care facilities is also regulated. N.J.A.C. 8:39-5. Facilities participating in the Medicaid program must admit individuals on a first-come, first-serve basis. N.J.A.C. 8:39-5.2(a). Furthermore, the facility cannot discriminate based on method of payment. N.J.A.C.                                                                                       8:39-5.1(b).

## D. The Federal False Claims Act

144. Section 3729 of the FCA provides:

> Any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or, (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved, is liable to the United States of America for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the Government sustains                              because                              of                              the                              act.

145. In the context of the FCA, the term "knowingly" is defined as follows: "knowing" and "knowingly" mean that a person, with respect to information, (1) has actual knowledge of the

information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1).

146.    A claim includes any request or demand for money from the United States government. 31 U.S.C § 3729(b)(2).

147.    Under 31 U.S.C. § 3729(b)(1), no proof of specific intent to defraud is required.

148.    The Supreme Court has held that the FCA is intended to reach all types of fraud, without qualification, that might result in financial loss to the government and reaches beyond "claims" which might be legally enforced, to all fraudulent attempts to cause the government to pay out sums of money. *United States v. Neifert-White Co.*, 390 U.S. 228, 232-33 (1968). The term "false or fraudulent claim" should be construed broadly. *Id.*

149.    Although the archetypal qui tam action is filed by an insider at a private company who discovers his employer has overcharged under a government contract, courts have been willing to entertain FCA actions under numerous alternative theories. *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996) (internal citations omitted) (listing theories of liability); *See, e.g.*, *United States v. Hibbs*, 568 F.2d 347 (3d Cir. 1977) (discussing "false certification" cases where defendant falsely certified compliance with certain requisite conditions in order to fraudulently induce government payment); *United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295 (3d Cir. 2011) (finding FCA liability under an implied false certification theory where payment of federal funds was conditioned on compliance with certain regulations).

150.    The United States District Court for the Eastern District of Pennsylvania has already addressed FCA liability under the MSPA in *United States ex rel. Drescher v. Highmark, Inc.*, 305 F. Supp. 2d 451 (E.D. Pa. 2004). In denying the Defendant's 12(b)(6) motion to dismiss,

the District Court held that FCA liability may be triggered when a claim is submitted to a federal

program as the purported primary payer. *Id.* at 461.

151.     In *Negron v. Progressive Cas. Ins. Co.*, Civ. No. 15-577-NLH/KMW, 2016 WL

796888, this Court affirmed that a defendant can be held liable under the FCA by failing to comply

with the MSPA in submitting claims to Medicare or Medicaid despite the existence alternative

coverage.

**E.     New Jersey's False Claims Act**

152.     The NJFCA, N.J.S.A. § 2A:32C, is modeled after the federal FCA, 31 U.S.C. §

3729-3733.

153.     In pertinent part, The NJFCA provides:

> Any person who: (1) knowingly presents or causes to be presented to an
> employee, officer or agent of the State, or to any contractor, grantee, or other
> recipient of State funds, a false or fraudulent claim for payment or approval;
> (2) knowingly makes, claim paid or approved by the State; or, (3) conspires
> to defraud the State by getting a false or fraudulent claim allowed or paid
> by the State, is liable to the State for a civil penalty of not less than and not
> more than the civil penalty allowed under the federal FCA, plus three times
> the amount of damages which the State sustains.

N.J.S.A. § 2A:32C-3.

154.     In the context of the NJFCA, the term "knowingly" is defined as follows:

"knowing" and "knowingly" mean that a person, with respect to information, (1) has actual

knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the

information; or (3) acts in reckless disregard of the truth or falsity of the information. N.J.S.A. §

2A:32C-2.

155.     A claim includes any request or demand for money from the State of New Jersey.

31 N.J.S.A. § 2A:32C-2.

156.    No proof of specific intent to defraud is required.    N.J.S.A. § 2A:32C-2.

**F.    New York's False Claims Act**

157.    The NYFCA, N.Y. State Fin. Law § 187-194, is modeled after the federal FCA, 31 U.S.C. § 3729-3733.

158.    In pertinent part, the NYFCA provides:

> Any person who: (1) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspires to commit a violation of the NYFCA, shall be liable to the state or a local government, as applicable, for a civil penalty of not less than $6,000 and not more than $12,000, plus three times the amount of all damages, including consequential damages, which the State or local government sustains because of the act.

N.Y.                State                Fin.                Law                §                189.

159.    In the context of the NYFCA, the term "knowingly" is defined as follows: "knowing" and "knowingly" mean that a person, with respect to information, (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. N.Y. State Fin. Law § 188.

160.    A claim includes any request or demand for money from the State of New York or a local government.  N.Y. State Fin. Law § 188.

161.    No proof of specific intent to defraud is required.  N.Y. State Fin. Law § 188.

**VI.    COUNTS**

**COUNT I: VIOLATIONS OF THE FALSE CLAIMS ACT
AGAINST ALL DEFENDANTS**

162.    Relator incorporates the preceding and subsequent paragraphs of this Complaint as though set forth in full below.

163.     Relator's federal claims arise from Defendants' noncompliance with secondary payer laws, described in detail above, and are asserted under the *qui tam* provisions of the FCA, 31 U.S.C. § 3730.

164.     Defendants, by and through their officers, agents, and employees, submitted, and caused to be submitted, claims for payment to Medicare, New Jersey Medicaid, and New York Medicaid.  Each of these programs are, in-full or in-part, federally-funded.

165.     The foregoing claims were false or fraudulent because Defendants billed Medicare and Medicaid as the primary payer despite the existence of alternative coverage, thereby violating secondary payer laws, including the MSPA.  Defendants likewise violated secondary pay laws by failing to ascertain whether their patients were covered by a plan primary to Medicare and Medicaid.

166.     Defendants failed to disclose their noncompliance with secondary payer laws when seeking payment for their services from Medicare and Medicaid.

167.     Defendants acted "knowingly" – as defined by 31 U.S.C. § 3729(b)(1) – in submitting false claims to Medicare and Medicaid because Defendants: had actual knowledge that alternative coverage would pay for their services; deliberately ignored the existence of alternative coverage; or, recklessly disregarded the possibility that their services were payable by alternative coverage.  Defendants, moreover, acted knowingly in that they failed to make reasonable and prudent inquiries into their secondary payer compliance; specifically, whether their services were covered by a plan that was primary to the government benefits.

168.     As described above, Defendants failed to comply with secondary payer laws, including the MSPA, which prohibit Medicare and Medicaid from being billed when alternative coverage exists.  Despite violating these laws, Defendants implicitly certified their compliance

when they submitted their claims to Medicare or Medicaid, thus inducing payment from the government.

169.     Defendants' noncompliance with secondary payer laws was material to the government's decision to pay for Defendants' services, as corroborated by the following:

a.     Under the MSPA and secondary payer regulations, providers are required to gather accurate information to determine whether Medicare/Medicaid is the primary payer for each inpatient admission or outpatient encounter.  If alternative, primary benefits are available, then the provider is prohibited from billing Medicare/Medicaid.  *See, e.g.*, 42 U.S.C. 1395y(b)(6); 42 C.F.R. § 489.20(g).

b.      The MSPA authorizes the government to penalize providers that omit or provide inaccurate information relating to the availability of other health benefit plans on a claim form.

c.     Medicare/Medicaid Administrative Contractors ("MACs"), which are private health insurers that process claims on behalf of the government, are prohibited from paying a claim when another plan may be liable to pay for the services.  *See, e.g.*, 42 C.F.R. § 433.138. MACs, moreover, consistently/continuously/automatically deny claims submitted to Medicare or Medicaid when the MAC is apprised that an alternative, primary plan exists.

d.     CMS and state Medicaid programs contract with private auditors to strictly enforce secondary payer laws to prevent improper payments.  In 2016, for example, the CMS contractor identified $243.68 million and collected $106.29 million in improper Medicare

payments; state contractors, including those hired by New Jersey and New York, reported $68.1 million in Medicaid recoveries. [1]

       e.     As described above, a state official advised Dr. John Doe to bill a private trust, and not New York Medicaid, for services he rendered to Minor B.

170.    Had the government known of Defendants' noncompliance with secondary payer laws, Medicare and Medicaid would not have paid the claims.  Defendants' purported compliance with secondary payer laws was, moreover, material to Medicare and Medicaid's decision to pay for Defendants' services.

171.    As a direct and proximate result of Defendants' actions and omissions, the United States was damaged by the false claims submitted to Medicare.  As a partial funder of state Medicaid programs, the United States was likewise damaged by the false claims submitted to New Jersey Medicaid and New York Medicaid.

172.    The United States is therefore entitled to three times its damages, plus a statutory penalty in the amount of $5,500 to $11,000 for each false claim submitted by the Defendants to Medicare, New Jersey Medicaid, and New York Medicaid.

## COUNT II: VIOLATIONS OF THE NEW JERSEY FALSE CLAIMS ACT AGAINST ALL DEFENDANTS

173.    Relator incorporates the preceding and subsequent paragraphs of this Complaint as though set forth in full below.

---

[1] CMS Financial Report: FY 2016, p. 12 (Nov. 4, 2016) https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/CFOReport/Downloads/2016_CMS_Financial_Report.pdf

174.     Relator's claims under New Jersey law also arise from Defendants' noncompliance with secondary payer laws, described in detail above, and are asserted under the *qui tam* provisions of the NJFCA, N.J.S.A. § 2A:23c-5-8.

175.     Defendants, by and through their officers, agents, and employees, submitted, and caused to be submitted, claims for payment to New Jersey Medicaid.

176.     The foregoing claims were false or fraudulent because Defendants billed New Jersey Medicaid as the primary payer despite the existence of alternative coverage, thereby violating secondary payer laws, including the MSPA.  Defendants likewise violated secondary pay laws by failing to ascertain whether their patients were covered by a plan primary to New Jersey Medicaid.

177.     Defendants acted "knowingly" – as defined by N.J.S.A. § 2A:32C-2 – in submitting false claims to New Jersey Medicaid because Defendants: had actual knowledge that alternative coverage would pay for their services; deliberately ignored the existence of alternative coverage; or, recklessly disregarded the possibility that their services were payable by alternative coverage.  Defendants, moreover, acted knowingly in that they failed to make reasonable and prudent inquiries into their secondary payer compliance; specifically, whether their services were covered by a plan that was primary to the government benefits.

178.     As described above, Defendants failed to comply with secondary payer laws, including the MSPA, which prohibit New Jersey Medicaid from being billed when alternative coverage exists.  Despite violating these laws, Defendants implicitly certified their compliance when they submitted their claims to New Jersey Medicaid, thus inducing payment from the government.

179.    Defendants' noncompliance with secondary payer laws was material to the government's decision to pay for Defendants' services. *See supra* ¶ 169.

180.    Had the government known of Defendants' noncompliance with secondary payer laws, New Jersey Medicaid would not have paid the claims. Defendants' purported compliance with secondary payer laws was, moreover, material to New Jersey Medicaid's decision to pay for Defendants' services.

181.    As a direct and proximate result of Defendants' actions and omissions, the State of New Jersey was damaged by the false claims submitted to its Medicaid Program, which is partially funded by state tax dollars.

182.    The State of New Jersey is therefore entitled to three times its damages, plus a statutory penalty in the amount of $5,500 to $11,000 for each false claim submitted by the Defendants to New Jersey Medicaid.

## COUNT III: VIOLATIONS OF THE NEW YORK FALSE CLAIMS ACT AGAINST ALL DEFENDANTS

183.    Relator incorporates the preceding and subsequent paragraphs of this Complaint as though set forth in full below.

184.    Relator's claims under New York law also arise from Defendants' noncompliance with secondary payer laws, described in detail above, and are asserted under the *qui tam* provisions of the NYFCA, N.Y. State Fin. Law § 190(2).

185.    Defendants, by and through their officers, agents, and employees, submitted, and caused to be submitted, claims for payment to New York Medicaid.

186.    The foregoing claims were false or fraudulent because Defendants billed New York Medicaid as the primary payer despite the existence of alternative coverage, thereby violating

secondary payer laws, including the MSPA.  Defendants likewise violated secondary pay laws by
failing to ascertain whether their patients were covered by a plan primary to New York Medicaid.

187.    Defendants acted "knowingly" – as defined by N.Y. State Fin. Law § 188(3) – in
submitting false claims to New York Medicaid because Defendants: had actual knowledge that
alternative coverage would pay for their services; deliberately ignored the existence of alternative
coverage; or, recklessly disregarded the possibility that their services were payable by alternative
coverage.  Defendants, moreover, acted knowingly in that they failed to make reasonable and
prudent inquiries into their secondary payer compliance; specifically, whether their services were
covered by a plan that was primary to the government benefits.

188.    As described above, Defendants failed to comply with secondary payer laws,
including the MSPA, which prohibit New York Medicaid from being billed when alternative
coverage exists.  Despite violating these laws, Defendants implicitly certified their compliance
when they submitted their claims to New York Medicaid, thus inducing payment from the
government.

189.    Defendants' noncompliance with secondary payer laws was material to the
government's decision to pay for Defendants' services.  *See supra* ¶ 169.

190.    Had the government known of Defendants' noncompliance with secondary payer
laws, New York Medicaid would not have paid the claims.  Defendants' purported compliance
with secondary payer laws was, moreover, material to New York Medicaid's decision to pay for
Defendants' services.

191.    As a direct and proximate result of Defendants' actions and omissions, the State of
New York was damaged by the false claims submitted to its Medicaid Program, which is partially
funded by state tax dollars.

192.    The State of New York is therefore entitled to three times its damages, plus a statutory penalty in the amount of $6,000 to $12,000 for each false claim submitted by the Defendants to New Jersey Medicaid.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs the United States of America, the State of New Jersey, and the State of New York, through Relator, request the following relief:

A.    That Defendants be enjoined from violating 31 U.S.C. § 3729-3733, N.J.S.A. § 2A:32C, and N.Y. State Fin. Law § 187-194, as set forth in this Complaint.

B.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729-3733.

C.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of N.J.S.A. § 2A:32C.

D.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of Defendants' actions, plus a civil penalty of not less than $6,000 and not more than $12,000 for each violation of N.Y. State Fin. Law § 187-194.

E.    That Relator be awarded the maximum share allowed under the FCA, NJFCA, and NYFCA.

        F.      That Relator be awarded all costs of this action, including attorney's fees and expenses.

        G.      That Relator recover such other relief as the Court deems just and proper.

## VIII.  <u>REQUEST FOR TRIAL BY JURY</u>

Relator hereby demands a trial by jury.

Respectfully submitted,

<u>s/ Jeremy E. Abay</u>
Jeremy E. Abay
NJ ID No. 083862013
SACKS WESTON DIAMOND, LLC
1845 Walnut Street, Suite 1600
Philadelphia, Pennsylvania 19103
T: (215) 925-8200 | F: (267) 639-5422
jabay@sackslaw.com

*Attorney for Relator,*
*Jersey Strong Pediatrics, LLC*

Dated: July 14, 2017