# Exhibit 3

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO: 2015-1946-CA 06

MSPA Claims 1, LLC, a Florida Limited Liability
Company, as assignee of Florida Healthcare Plus,
on behalf of itself and all other similarly situated
Medicare Advantage Organizations in the State of
Florida,

Plaintiff,                                        **CLASS REPRESENTATION**

v.

Ocean Harbor Casualty Insurance, a Florida profit
corporation,

      Defendant.

_____/

## ORDER GRANTING
## PLAINTIFF'S, MSPA CLAIMS 1, LLC,
## MOTION FOR CLASS CERTIFICATION

**THIS CAUSE** came before the Court on June 2, 2016, and September 12-15, 2016 on

Plaintiff's, MSPA Claims 1, LLC ("Plaintiff" or "Class Representative"), Motion for Class

Certification. The Court, having conducted a full evidentiary hearing, and considered the

pleadings, depositions, discovery, stipulations, affidavits, testimony, applicable legal authorities,

memoranda, evidence presented, and the arguments of counsel, finds as follows[1]:

---

[1] *See Sosa v. Safeway Premium Fin. Co.*, 73 So.3d 91, 118 (Fla. 2011) (holding that for class
certification, a court considers the "entire case file" and "affidavits, deposition testimony,
discovery, [and] documentation").

## I. **INTRODUCTION**

Plaintiff, as the assignee of Florida Healthcare Plus ("FHCP"), a Medicare Advantage Organization ("MAO"), through the claims of R.G.,[2] an enrollee of FHCP, seeks class certification, pursuant to Florida Rule of Civil Procedure 1.220, on behalf of itself, and a class consisting of all Florida MAOs and/or their assignees to whom Defendant, Ocean Harbor Casualty Insurance Company ("Defendant"), failed to provide appropriate reimbursement of its conditional payments provided on behalf of Medicare enrollees. Particularly, Plaintiff alleges its claims arise from injuries sustained by R.G., while she was traveling in a motor vehicle (hereinafter referred to as "Accident"). The claims asserted in Plaintiff's Amended Class Action Complaint are for those services and/or supplies paid by FHCP to treat the injuries suffered by its Enrollee, as a direct result of the Accident. In addition to having been an enrollee with FHCP at the time of the Accident, Enrollee was also covered by a Florida No-Fault insurance policy issued by Defendant.

As such, Plaintiff filed this action on behalf of itself and other similarly situated class members for: (1) double damages, pursuant to the Medicare Secondary Payer private cause of action, 42 U.S.C. § 1395y(b)(3)(A) ("MSP Law"); (2) breach of contract under Plaintiff's direct right of recovery; (3) conventional subrogation; (4) equitable subrogation; and (5) conventional subrogation arising from third-party beneficiary rights. [J.A. 000059-000091, Am. Compl.].

Defendant is a no-fault insurer that issues policies of insurance pursuant to Florida's No-Fault law that provides statutorily required benefits pursuant to sections 627.733 – 627.736, Florida Statutes and is, otherwise, considered a primary plan pursuant to the Medicare Act. *See* 42 U.S.C. § 1395y(b)(2)(A) (defining "primary plan" to include no fault insurance); 42 C.F.R. §

411.21 (same); Fla. Stat. § 627.736(4) (indicating "benefits due from a [] [no-fault] insurer under ss. 627.730-627.7405 are primary").

Plaintiff asserted that Defendant issued No-Fault policies from January 29, 2009 through the date of certification (the "Class Period"), and collected premiums in the following amounts:

| | |
|---|---|
| 2009 – $57,254,725 | 2012 – 75,256,995 |
| 2010 – $57,674,148 | 2013 – $73,199,238 |
| 2011 – $50,256,279 | 2014 – $112,986,557 |

[J.A. 005670, Pl.'s Ex. 52, *Annual Report -Florida O.I.R. 2010*, 007099, Pl.'s Ex. 62, *Annual Report – Florida O.I.R. 2011*, 005795, Pl.'s Ex. 53 *Annual Report – Florida O.I.R. 2012*, 006015, Pl.'s Ex. 54, *Annual Report – Florida O.I.R. 2013*, 006171 Pl.'s Ex. 55, *Annual Report - Florida O.I.R. 2014*, 006339, Pl.'s Ex. 56, *Annual Report – Florida O.I.R. 2015*].

Thereby, Plaintiff seeks to enforce its own rights, as well as the reimbursement rights of Florida MAOs and/or its assignees (the "Class") for medical payments made on behalf of its Medicare Part C enrollees, as a result of Defendant's practice and course of conduct in failing to make primary payment, or properly providing appropriate reimbursement. *See Sosa,* 73 So. 3d at 110 (holding "the focus of a court in reviewing a finding of the commonality requirement [needed for class certification under Fla. R. Civ. P. 1.220] is on whether the class members predicated their claims on the same common course of conduct by the defendant and the same legal theory").

As an MAO, FHCP advanced Medicare payments on behalf of R.G. for medical care and treatment for which Defendant was responsible as a primary payer since R.G.'s medical bills arose from the ownership, maintenance, and/or use of a motor vehicle.  § 627.736, Fla. Stat.

---

[2] The MA enrollee (*i.e.,* Defendant's insured) shall only be referred to as "R.G." or "Enrollee." The name of R.G. is known to the Court and the Parties, but is not pled in this Order to protect

(2016). Accordingly, Plaintiff seeks damages on behalf of itself and similarly situated Florida

MAO's or its assignees, for Defendant's violation of section 627.736 and the MSP Law.

After a careful review of the Record before this Court, there is sufficient evidence to find

that Defendant was the legally required primary payer at the time of R.G.'s Accident.

Particularly, Defendant's liability arises pursuant to Florida's No-Fault Act, section 627.736,

Florida Statute, 42 C.F.R. § 1395y, and Defendant's no-fault insurance policy, which provided

coverage to R.G. [J.A. 003128:21-25, 003129:1-5, Celli Dep. May 31, 2016]. FHCP, the MAO

involved in this class action discharged its obligation and paid the medical bills for the

treatment(s) and service(s) rendered to R.G., which are related to the Accident. *See* 42 U.S.C. §

1395w-27(f); 42 C.F.R. §§ 422.214 and 422.520.

**Defendant admitted** it covered R.G. for no-fault benefits at the time of the Accident and

that the services and/or supplies paid for by FHCP **were reasonable, related, and necessary,** as

it pertained to R.G.'s medical care and treatment. [J.A. 000145, Def.'s Answers and Objections

to Pl.'s First Request for Admissions, p. 4; J.A. 004181, Pl.'s Ex. 24, *Declarations Page for R.G.*

*dated September 26, 2014*; J.A. 003129:15-22, Celli Dep. May 31, 2016]. As the assignee of

FHCP, Plaintiff's rights, and those of others similarly situated, arise from the payments made by

FHCP as a secondary payer, for which Defendant was primarily responsible and should have

itself paid, or properly reimbursed FHCP for its payments. *See* 42 U.S.C. § 1395y(b)(3)(A); 42

U.S.C. § 1395y(b)(2)(B)(ii). Accordingly, the fundamental issues common to all the claims of

all of the MAO's or its assignees is Defendant's failure to provide for primary payment on behalf

of its insureds and/or appropriately reimburse FHCP and the Class for its payments on claims

covered by Defendant's No-Fault insurance policy. As alleged by Plaintiff, Plaintiff's assignor

and the members of the Class have paid and have not been reimbursed by the Defendant.

---

her privacy.

Plaintiff seeks class certification pursuant to Rule 1.220(b)(3).  [*See* J.A. 000092, Pl.'s M. for Class Certification; JA 000488, Pl.'s Reply to Def.'s Resp. in Opp'n to Pl.'s M. for Class Certification, ¶ 5].  Following a rigorous analysis, the Court concludes Plaintiff satisfied the class certification requirements.  Plaintiff's Motion for Class Certification pursuant to Rule 1.220(b)(3) is thereby **GRANTED**, and the Court certifies the following class[3] as:

> entities that contracted directly with the Centers for Medicare and Medicaid Services ("CMS") and/or its assignee pursuant to Medicare Part C, including but not limited to, MAOs and other similar entities, to provide Medicare benefits through a Medicare Advantage plan to Medicare beneficiaries for medical services, treatment, and/or supplies as required and regulated by HHS and/or CMS as a direct payer of medical services/supplies and/or drugs on behalf of Medicare beneficiaries either for parts A, B and/or D, all of which pertain to the same medical services and/or supplies that were the primary obligation of the Defendant;
>
> have made payment(s) for medical services, treatment and/or supplies subsequent to January 29, 2009, whereby the MAO, or its assignee, as a secondary payer, has the direct or indirect right and responsibility to obtain reimbursement for covered Medicare services, for which the Defendant, as the primary payer pursuant to Defendant's contract covering the Medicare enrollee pursuant to Florida No-Fault law (section 627.736(4), Florida Statute), was/is financially responsible to a Medicare beneficiary for medical bills incurred as a result of the use, maintenance or operation of a motor vehicle; and
>
> where the Defendant failed to properly pay for medical bills on behalf of its insureds and has otherwise failed to reimburse the MAO's or its assignees for their payment(s) as calculated pursuant to the recognized Current Procedure Terminology ("CPT") codes based on the fee-for-service[4] by the primary payer,

---

[3] The class definition was modified based on the arguments of the Parties, and to demonstrate that Defendant failed to appropriately reimburse Plaintiff.  *See General Tel. Co. of SW v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a [class] certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation."); *see also McNamara v. Felderhof*, 410 F.3d 277, 280 at n.8 (5th Cir. 2005) (holding that "a trial court overseeing a class action retains the ability to monitor the appropriateness of class certification throughout the proceedings and to modify or decertify a class at any time before final judgment").

[4] 42 U.S.C. § 1395w-22(a)(4); 42 C.F.R. § 422.108(d); *Bio-Medical Applications of Tenn., Inc. v. Cent. States S.E. & S.E. Areas Health & Welfare Fund*, 656 F.3d 277, 295-96 (6th Cir. 2011); *Humana Inc. v. Medtronic Sofamor Danek USA, Inc.*, 133 F. Supp. 3d 1068, 1078 (W.D. Tenn. 2015).

as delineated by section 627.736, Florida Statues, for medical services and/or supplies for their damages.[5]

## II. THE MEDICARE ACT AND ITS BACKGROUND

### A.    The Social Security Act

The Medicare Act is found within the Social Security Act under Title XVIII.  The Social Security Act was enacted on August 14, 1935.  *See* Soc. Sec. Admin., https://www.ssa.gov/history/1930.html (last visited Oct. 27, 2016).  A few years thereafter, the law added benefits for a retiree's spouse, as well as children and disability benefits.  Id.  It is "the foundation of economic security for millions of Americans—retirees, disabled persons, and families of retired, disabled or deceased workers. About 163 million Americans pay Social Security taxes and 59 million collect monthly benefits. About one family in four receives income from Social Security."  *See* Nat. Academy of Soc. Ins., https://www.nasi.org/learn/socialsecurity/overview (last visited Oct. 27, 2016).

The Social Security System uses taxpayer money to pay benefits to retirees, the disabled, survivors of workers who have died, and dependents of beneficiaries.  *See Understanding the Benefits*, Social Security Administration, 4 (March 2016), https://www.ssa.gov/pubs/EN-05-10024.pdf.  Any unused money goes to the Social Security trust fund.  *Id.*  "Nearly 84 percent of all people 65 and older ("Seniors") receive social security."  Nat. Academy of Soc. Ins., 4 (Aug. 2016), https://www.nasi.org/sites/default/files/research/2016_Social_Security_Primer.pdf (last visited Oct. 27, 2016).  In 1965, Congress amended the Social Security Act to create the Medicare Act under Title XVIII.

---

[5] The Class has not otherwise released their right to reimbursement as secondary payers.

## B.    The Medicare Act

The Medicare Act functions as a "federally funded health insurance program for the elderly and the disabled." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506 (1993). The Medicare Act consists of five parts — Part A, B, C, D and E.  Part A and Part B "create, describe, and regulate traditional fee-for-service, government-administered Medicare."  *In re Avandia Mktg. Sales Practices and Products Liability Litigation*, 685 F.3d 353, 357 (3d Cir. 2012) (citing 42 U.S.C. §§ 1395c to 1395i-5; 1395j to 1395w).  Part C outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits to them.  42 U.S.C. §§ 1395w-21-29.  Further, Part D provides for prescription drug coverage to Medicare beneficiaries, and Part E contains miscellaneous provisions related to 42 U.S.C. §§ 1395x, 1395y.

An enrollee's health coverage with an MAO is strictly construed and regulated by CMS. Id.  So much so that CMS provides detailed templates for MAOs to use when they create documents, including an evidence of coverage that is provided to enrollees. See CMS, https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/MarketngModelsStandardDocumentsandEducationalMaterial.htm l (last visited October 27, 2016).  Notably, CMS requires that every evidence of coverage contain the following language:

> [w]e have the right and responsibility to collect for covered Medicare services for which Medicare is not the primary payer. According to CMS regulations at 42 CFR §§ 422.108 and 423.462, *[insert 2015 plan name]*, as a Medicare Advantage Organization, will exercise the same rights of recovery that the Secretary exercises under CMS regulations in subparts B through D of part 411 of 42 CFR and the rules established in this section supersede any State laws.

*Id.* at p.141 of the "MA-only HMO (and HMO-POS) templates" attachment; *see also*, [J.A. 000532, FHCP Evidence of Coverage].  As a result, a Medicare Part C enrollee must be provided

certain coverage and protections, as required by CMS that at a minimum must pay for what Original Medicare would pay.  In essence, **Medicare Part C is the functional equivalent of Original Medicare**. *See* 42 C.F.R. §§ 422.108(f), 422.101; *Honey v. Bayhealth Med. Ctr., Inc.*, 2015 Del. Super. LEXIS 378, at *18 (Del. Super. Ct. July 28, 2015) (holding "an MAO is squarely within the traditional Medicare system").

Congress has also made certain provisions of the Social Security Act applicable to the Medicare Act. *See* 42 U.S.C. § 1395ii. Particularly, the judicial review provision contained in 42 U.S.C. § 405(g), which is the Social Security Act's "sole avenue for judicial review of all claims arising under the Medicare Act." *Heckler v. Ringer*, 466 U.S. 602, 614 (1984); 42 U.S.C. § 405(h); *see also, e.g., Potts v. Rawlings Co., LLC*, 897 F. Supp. 2d 185, 191 (S.D.N.Y. 2012) (holding that under 42 U.S.C. § 405(h) no findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided in § 405(g)).

### 1.    The Medicare Part C Program

Since the 1970s, Medicare beneficiaries have had the option to receive their Medicare benefits through private health plans, mainly Health Maintenance Organizations ("HMOs"), as an alternative to the federally administered traditional Medicare programs. Kaiser Family Foundation, http://kff.org/medicare/fact-sheet/medicare-advantage/ (last visited October 26, 2016). The Balanced Budget Act of 1997 named Medicare's managed care program "Medicare+Choice" and the Medicare Modernization Act (MMA) of 2003 renamed it "Medicare Advantage." *Id., see also Collins v. Wellcare Healthcare Plans, Inc.*, 73 F. Supp. 3d 653, 659 (E.D. La. 2014). "The congressional goal in creating the Medicare Part C option was to harness the power of private sector competition to stimulate experimentation and innovation to create a

more efficient and less expensive Medicare system." D. Gary Reed, *Medicare Advantage Misconceptions Abound*, 27 Health Law 1, 3 (2014).   Congress sought to achieve this goal by implementing a program wherein the government would pay private health insurers a flat rate per enrollee to administer and provide the same basic benefits received under traditional Medicare. *See Honey v. Bayhealth Med. Ctr., Inc.*, 2015 Del. Super. LEXIS 378, at \*7-17 (Del. Super. Ct. July 28, 2015).   Pursuant to this framework, an MAO pays providers directly for the care received by Part C enrollees.  *Id.* at \*10.   To the extent that this care exceeds the flat rate received from the government, an MAO assumes the risk and cost.  *Id.*   In the event that care costs less than the flat rate received, an MAO is permitted to keep the difference as a profit.  *Id.*

To be approved to be an MAO, a private insurer must enter a bidding process, meeting certain threshold requirements. *Id.*  MAOs must also be licensed in each State in which they operate.  *Id.*   MAOs must offer an "[evidence] of coverage" annually, approved by CMS to enrollees.  *Id.*   In providing the basic benefits offered to traditional Medicare enrollees, MAOs must abide by national coverage determinations provided by CMS. *Id.*   In addition, all coverage disputes between enrollees, and MAOs must go through the traditional Medicare appeals process.  *Id.* at \*11.  The decisions coming out of the Medicare appeals process are, moreover, binding upon an MAO.  *Id.*

It is the federal government which sets the fixed rate at which MAOs will be remunerated.  *Id.* at \*12.  Likewise, the federal government establishes the basic services that each Part C private insurer participant must provide.  *Id.*   These private health insurers are, further, constrained in their ability to deny coverage, limited to the decisions of federally anointed adjudicators.  *Id.*   The discretion permitted to these private insurers is *within* this

federally created framework – not outside or even alongside it. *Id.* at *12-13. Under Part C, the contract is between the federal government and the insurer. *Id.* at *13.

By way of background, FHCP entered into a contract with CMS to provide Medicare benefits in accordance with the Medicare Part C program to Medicare-eligible enrollees and, in return, received a per capita fee from CMS. *See Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509, at *11 (11th Cir. 2016) ("Under the Medicare Advantage program, a private insurance company, operating as an MAO, administers the provision of Medicare benefits pursuant to a contract with CMS. CMS pays the MAO a fixed fee per enrollee, and the MAO provides at least the same benefits as an enrollee would receive under traditional Medicare."); *see also* 42 U.S.C. §§ 1395w-22(a), 1395w-23.

Therefore, the defining factor of a truly private insurance plan, one between insured and an insurer, is lacking. *See W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509 at *11. *Id.* Of great significance is that these contracts define the rights of insurers vis-à-vis their insureds. *Id.* Among the items contained in such contracts are provisions of services and when such services will be denied. Such basic determinations are out of the administrator's hands in Part C coverage and are instead determined by the other party to the contract – the federal government. *Id.*

In sum, MAOs are more akin to traditional Medicare, rather than a private health insurance plan. *Id.* at *16-17 ("There is no such thing as a [M]edicare Advantage insurance policy."). Medicare Advantage is, instead, a federal program. *Id.* **Just as traditional Medicare, MAOs have their recovery rights determined statutorily.** *Id.* Specifically, Part C includes a reference to the MSP Law, entitled "Organization as secondary payer," which states as follows:

Notwithstanding any other provision of law, a Medicare+Choice organization[6] may (in the case of the provision of items and services to an individual under a Medicare+Choice plan under circumstances in which payment under this subchapter is made secondary pursuant to section 1395y(b)(2) of this title) charge or authorize the provider of such services to charge, in accordance with the charges allowed under a law, plan, or policy described in such section—

(A) the insurance carrier, employer, or other entity which under such law, plan, or policy is to pay for the provision of such services, or

(B) such individual to the extent that the individual has been paid under such law, plan, or policy for such services.

42 U.S.C. § 1395w-22(a)(4). *See Humana*, 2016 U.S. App. LEXIS 14509 at *12-13. Under this framework, any dispute concerning coverage or reimbursement rights has been construed as arising under the Medicare Act. *See Humana Med. Plan, Inc. v. Reale*, 180 So. 3d 195, 204 (Fla. 3d DCA 2015).

### 2.     Payments by Medicare or an MAO are Conclusive Proof that Services Rendered are Reasonable and Necessary.

Section 1395y(a)(1)(A) of the Medicare statute states that, "no payment may be made under [the Medicare statute] for any expenses incurred for items or services which . . . are not *reasonable and necessary* for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A) (emphasis added).   Because this Section contains an express condition of payment – that is, "no payment may be made" – it explicitly links each Medicare payment to the requirement that the particular item or service be "reasonable and necessary." *United States ex. rel. Mikes v. Straus*, 2001 U.S. App. LEXIS 26923, at *30-31 (2d Cir. N.Y. 2001).   Hence, payments made by Medicare or an MAO are for services that are reasonable and necessary. *Id.*

As a result of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, the obligations previously imposed on carriers are now undertaken by Medicare Administrative Contractors ("MACs"). *See* Medicare Prescription Drug, Improvement, and

---

[6] *i.e.*, an MAO.

Modernization Act of 2003, Pub. L. No. 108-173 § 911(e), 117 Stat. 2066, 2256 (2003).  MACs operationalize the Original Medicare fee-for-service option. 42 U.S.C. § 1395kk-1.  MACs handle both Part A and Part B claims from their assigned geographic region. *See* 42 U.S.C. § 1395h(a); § 1395u(a).  For Medicare beneficiaries who elect to receive benefits under the Medicare Part C option, Part C contractors, which are called "Medicare Advantage organizations" perform the same function that MACs performs on behalf of Medicare enrollees. *See* 42 C.F.R. § 422.2.  Essentially, an MAO's processing of payments is also under the guise of CMS and the Medicare Program. Since MAOs provide the same Part A and Part B benefits as Original Medicare, an MAO must also make payment for "reasonable and necessary" items and services.  42 U.S.C. § 1395w-22(a)(1)(A); 42 C.F.R. § 422.100(c).

MAOs must process and pay or deny claims promptly to comply with the specific requirements established by federal law,[7] federal regulations,[8] and the terms of the MAOs contracts with CMS.  Under these requirements, for example, 95% of all clean claims submitted by non-participating, *i.e.,* non-contracted, providers must be paid or denied within 30 days of receipt. *See* 42 C.F.R. § 422.520(a)(1).  Further, all other claims submitted by non-participating providers must be paid or denied within sixty (60) days of receipt. *See* 42 C.F.R. § 422.520(a)(3).  For participating – *i.e.,* contracted – providers, MAOs must comply with the terms of their contracts with those providers. *See* 42 C.F.R. § 422.520(b)(2).

In sum, MAOs must provide Medicare benefits for "reasonable and necessary" items and services subject to the prompt payment requirements.  Accordingly, once an MAO makes a payment, CMS and the MAO determine whether the payment is for services that are reasonable

---

[7] *See* 42 U.S.C. § 1395w-27(f).

[8] *See* 42 C.F.R. §§ 422.214 and 422.520.

and necessary. If a beneficiary or a primary payer seeks to dispute the reasonableness or necessity of the services rendered, a dispute arises under the Medicare Act.

### 3. Arising Under the Medicare Act

#### i. *Background*

When a beneficiary or a primary payer disputes an amount paid by an MAO on behalf of the beneficiary, courts have consistently held that these disputes concern the ***reimbursement of conditional payments*** that are claims for benefits that arise under the Medicare Act. *See Reale*, 180 So. 3d at 204. Hence, whenever a beneficiary or primary payer contests a claim for reimbursement, the beneficiary or primary payer must timely exhaust all administrative remedies before it can seek judicial review in Federal Court, which has exclusive jurisdiction over the claim pursuant to 42 U.S.C. § 405(g). *Id.* at 202. A claim arises under the Medicare Act if "both the standing and the substantive basis for the presentation" of the claim is the Act, or if the claim is "inextricably intertwined" with a claim for benefits. *See Heckler*, 466 U.S. at 614; *Trostle v. Ctrs. for Medicare and Medicaid Servs.*, 206 U.S. Dist. LEXIS 143101, at *11 (M.D. Penn. Oct. 17, 2016). Accordingly, once a beneficiary or primary plan contests a reimbursement, the dispute must be administratively exhausted. *See Reale*, 180 So. 3d at 202.

#### ii. *Medicare Administrative Appeal Process*

The Code of Federal Regulations explicitly sets out the Medicare administrative process for disputing a Medicare claim. The organization determination is binding on all parties unless it seeks reconsideration. 42 C.F.R. § 422.576. An MA plan enrollee has appeal rights that may be exercised if he or she is dissatisfied with an "organization determination" made by his or her MAO, in which the enrollee may seek reconsideration of a decision by an MAO. 42 C.F.R. §§ 422.566(b), 422.578, 422.580. A reconsideration consists of a review of an adverse

determination, the evidence and findings upon which it was based, and any other evidence the parties submit or an MAO or CMS obtains. 42 C.F.R. § 422.580. A request for reconsideration must be filed within sixty (60) calendar days from the date of the notice of the organization's determination. 42 C.F.R. § 422.582.

If the reconsideration decision is unfavorable to an enrollee, the matter must be reviewed by an independent outside entity that contracts with the Secretary for this purpose. 42 C.F.R. § 422.592. If that outside entity issues an unfavorable decision, the beneficiary may then request a hearing conducted by an Administrative Law Judge ("ALJ"). 42 C.F.R. § 422.600. If the decision of the ALJ is unfavorable, the enrollee may then request that the Medicare Appeals Council ("MAC") review the ALJ's decision. 42 C.F.R. § 422.608. The MAC decision concludes the administrative appeals process. 42 C.F.R. § 422.612. If the enrollee remains dissatisfied, and if the amount in controversy exceeds a certain threshold, the enrollee may seek judicial review of the final agency decision. 42 U.S.C. § 1395w-22(g)(5); 42 C.F.R. § 422.612.

### iii.     *Beneficiary or Primary Payer Claims for Reimbursement Disputes Against the MAO Arise under the Medicare Act*

The Third District Court of Appeal has held that a beneficiary/ primary payer who contested a claim for reimbursement was so "inextricably intertwined" with a claim for benefits that exclusive jurisdiction was limited to the federal court under 42 U.S.C. § 405(g). *See Reale,* 180 So. 3d at 195. In *Reale,* a Medicare enrollee sought declaratory relief in state court challenging the amount of reimbursement that her MAO was entitled to receive. *Id.* at 198. The court went through an extensive analysis of the applicability of the Social Security Act's judicial review provision, and its applicability to claims "arising under" the Medicare Act. *Id.* at 201-205. The court in *Reale* held that where an enrollee seeks to challenge the amounts paid by an

MAO for medical treatment provided, the enrollee must first exhaust administrative remedies prior to judicial review from the federal courts. *Id.* at 205.

In *Humana vs. Western Heritage*, the United States Court of Appeals for the Eleventh Circuit ("Eleventh Circuit"), reviewed an order granting summary judgment in favor of a secondary payer MAO, and held a primary payer was barred from contesting reimbursement for failure to exhaust administrative remedies. *See W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509. As neither the enrollee nor the primary payer contested the amounts paid by the MAO within the administrative remedies period, the primary payer in *Western Heritage* was precluded from challenging the MAO's payments. *Id.* at *24; *see* 42 C.F.R. § 422.576.

In this case, Defendant disputes Plaintiff's right to reimbursement of its conditional payments on a class-wide basis; however, Defendant failed to provide any evidence that it administratively contested any of the amounts paid by any MAO. Moreover, at this point, the time for an administrative appeal expired and, therefore, Defendant is time-barred from challenging the propriety or amounts paid by the MAOs. Accordingly, all disputes by the Enrollee or primary payer "arise under the Medicare Act," and Defendant failed to follow the statutorily required procedures for contesting any reimbursement claims.

### 4.    The Medicare Secondary Payer Law

Initially, Medicare served as the primary payer and paid its beneficiaries' medical costs when other entities, such as insurances provided by private health insurance companies, were responsible for those costs. *See Taransky v. Sec'y of U.S. Dep't of Health & Human Servs.*, 760 F.3d 307, 309 (3d Cir. 2014). In 1980, Congress added the MSP Law provisions to the Medicare Act in order to counteract escalating healthcare costs. *See Bio-Medical Applications of Tenn., Inc. v. Cent. States Southeast & Southwest Areas Health & Welfare Fund*, 656 F.3d 277, 281 (6th

Cir. 2011). This means that if a primary plan "has not made or cannot reasonably be expected to make payment," the Secretary may make a conditional payment. 42 U.S.C. § 1395y(b)(2)(B)(i). Since Medicare remains the secondary payer, the primary plan must reimburse Medicare for the conditional payment. 42 U.S.C. § 1395y(b)(2)(B)(ii). Though the MSP Law uses the term "primary plan" to describe entities with a primary responsibility to pay, that term covers more than just health insurance plans. *See MSP Recovery, LLC v. Allstate Ins. Co.*, 2016 U.S. App. LEXIS 15984 (11th Cir. Aug. 30, 2016). The law defines a "primary plan" as "a group health plan or large group health plan, . . . a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance . . . ." 42 U.S.C. § 1395y(b)(2)(A). *See Mich. Spine & Brain Surgeons, PLLC v. State Farm Mut. Auto. Ins. Co.*, 758 F.3d 787, 791 (6th Cir. 2014).

### 5.     The MSP Private Cause of Action - 42 U.S.C. § 1395y(b)(3)(A)

In addition to allowing the government to bring a cause of action for the recovery of double damages anytime a primary payer fails to make required payments, the Medicare Act also provides a private cause of action to non-government entities pursuant to 42 U.S.C. § 1395y(b)(3)(A). *See In re Avandia Mktg.*, 685 F.3d at 359. Paragraph (3)(A) states:

> [t]here is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with [the requirements of the MSP Law].

42 U.S.C. § 1395y(b)(3)(A).

An MAO falls within the purview of entities that has standing to sue primary plans under 42 U.S.C. § 1395y(b)(3)(A) and thereby, can "exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP regulations in subparts B through D of part 411 of this chapter." 42 C.F.R. § 422.108(f); *see Humana*, 2016 U.S. App.

LEXIS 14509 at *21; *In re: Avandia Mktg.*, 685 F.3d at 366; *Collins*, 73 F. Supp. 3d at 665.  In this matter, Plaintiff seeks relief under 42 U.S.C. § 1395y(b)(3)(A).

As it stands in the shoes of an MAO *via* a string of assignments, Plaintiff is within the purview of parties that has standing to sue under 42 U.S.C. § 1395y(b)(3)(A).  *See MSP Recovery, LLC v. Progressive Select Ins. Co.*, 96 F. Supp. 3d 1356, 1358 (S.D. Fla. 2015) (holding that as an assignee to an MAO, plaintiff had standing to sue under § 1395y(b)(3)(A)), *vacated on other grounds by MSP Recovery, LLC,* 2016 U.S. App. LEXIS 15984.

Further, the Eleventh Circuit held a plaintiff is entitled to double damages under 42 U.S.C. § 1395y(b)(3)(A) when there is no genuine issue of material fact regarding the: (1) defendant's status as a primary plan; (2) defendant's failure to provide for primary payment or appropriate reimbursement; and (3) damages amount. *See W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509 at *21.

> A primary plan fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraph[] . . . (2)(A), when it fails to honor the underlying statutory or contractual obligation . . . . Paragraph (2)(A) [of the MSP Law] alters the priority among already-obligated entities and contemplates primary plans fulfilling their payment obligation . . . . Paragraph (3)(A), the MSP private cause of action, grants private actors a federal remedy when a primary plan fails to fulfill its payment obligation, thereby undermining the secondary-payer scheme created by paragraph (2)(A).

*Id.* at *6.

### 6.   42 U.S.C. § 1395y(b)(8) Enacted by Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 ("MMSEA")

On December 29, 2007, the Medicare, Medicaid and SCHIP Extension Act of 2007 ("MMSEA") was signed into law and codified at 42 U.S.C. § 1395y(b)(7) and (8). *See* Pub. L. No. 110-173.  The purpose of the MMSEA reporting process is to enable CMS to pay appropriately for Medicare covered items and services furnished to Medicare beneficiaries. *See*

Section 111 NGHP User Guide, Version 5.0, Chapter 1 at *6-1. Primarily, MMSEA reporting helps CMS determine primary versus secondary payer responsibility – that is, which entity has primary payment responsibility and which entities do not. *Id.*

Under MMSEA, Responsible Reporting Entities ("RREs"), including no-fault insurers (*e.g.*, Defendant), must report when one of its Medicare beneficiary insureds has been injured in an automobile accident and is required to submit certain information electronically to CMS. *See* 42 U.S.C. §§ 1395y(b)(7) and (8); *see also* Section 111 NGHP User Guide, Version 5.0, Chapter 3 at *3-1. The new reporting requirements affect all parties involved in a payment of a settlement, judgment, or award with a Medicare beneficiary after January 1, 2010. *See Seger v. Tank Connection, LLC*, 2010 U.S. Dist. LEXIS 49013, at *12 (D. Neb. Apr. 22, 2010). When reporting a case under MMSEA, an RRE must report the Medicare beneficiary's full name, Medicare Health Insurance Claim Number ("HICN"), gender and date of birth, and complete address and phone number. *See* Section 111 NGHP User Guide, Version 5.0, Chapter 3 at *3-1.

Further, RREs must be able to determine whether an injured party is a Medicare beneficiary and gather the information required for proper Section 111 reporting. *See* Section 111 NGHP User Guide, Version 5.0, Chapter 3 at *3-1. Anticipating the burden of the new reporting requirements, CMS developed a "query process" whereby an RRE can determine a claimant's Medicare status electronically and without authorization, as long as the RRE has access to the claimant's name, date of birth, gender, Social Security Number, and/or Medicare Health Insurance Claim Number. *See Seger*, 2010 U.S. Dist. LEXIS 49013, at *12. This information must be submitted "after the claim is resolved through a settlement, judgment, award or other payment, regardless of whether there is a determination or admission of liability. 42 U.S.C. § 1395y(b)(8)(C).

These reporting obligations require no-fault insurers to provide detailed information to CMS regarding any open no-fault claims with an Ongoing[9] Responsibility for Medical Treatment ("ORM") for insureds who are also Medicare beneficiaries. *See Seger, LLC*, 2010 U.S. Dist. LEXIS 49013, at *12. The trigger for reporting ORM is: (1) when the RRE has made a determination to assume responsibility for ORM; or (2) it is otherwise required to assume ORM. *See* Section 111 NGHP User Guide, Version 5.0, Chapter 6 at *6.7.

Defendant's compliance or non-compliance with MMSEA provides constructive and/or actual knowledge to Medicare Payers. However, the ultimate issue is whether there has been proper reimbursement by a primary payer. *See W. Heritage Ins. Co.*, 2016 U.S. Dist. LEXIS 14509 at *21 (holding that summary judgment is appropriate when the following are demonstrated: "(1) the defendant's status as a primary plan; (2) the defendant's failure to provide for primary payment or appropriate reimbursement; and (3) the damages amount"). Once a secondary payer has paid the lien rights become automatic. *See Porter v. Farmers Ins. Co.*, 2012 U.S. Dist. LEXIS 9862 (N.D. Okl. 2012) ("Medicare's reimbursement rights are automatic, and it is not required to give notice of its claim. 42 C.F.R. § 411.21."). MMSEA reporting provides a secondary payer with an opportunity to learn of primary payer. However, if a secondary payer pays bills that a primary payer should have paid, reimbursement is mandated.

### 7.    The Medicare Secondary Payer Act Framework

There are three paragraphs within the Medicare Act that work together to build the secondary payer framework. The first "alters the priority among already-obligated entities and contemplates primary plans fulfilling their payment obligation." *See* 42 U.S.C. § 1395y(b)(2)(A), *see also Humana*, 2016 U.S. App. LEXIS 14509, at *14. Primarily, Paragraph (2)(A) provides

---

[9] "Ongoing" refers to the RRE's ongoing responsibility to pay for the injured Medicare beneficiary's medical expenses associated with the no-fault claim. *See* Section 111 NGHP User

the circumstances under which Medicare or an MAO may not make a payment, *i.e.*, a primary plan has made or can reasonably be expected to make a payment.

Paragraph (2)(B) provides available options for when a primary plan fails to fulfill its payment obligations. *Id.* at *14. Medicare or an MAO has the authority to make a conditional payment if payment has not been made or cannot reasonably be expected to be made by the primary plan. 42 U.S.C. § 1395y(b)(2)(B)(i). This paragraph also provides for the subrogation "to any right under [the MSP Law] of an individual or any other entity to payment with respect to such item or service under a primary plan." 42 U.S.C. § 1395y(b)(2)(B)(iv).

The final component, Paragraph (3)(A), protects the secondary-payer framework by "grant[ing] private actors a federal remedy when a primary plan fails to fulfill its payment obligation, thereby undermining the secondary-payer scheme created by paragraph (2)(A)." *W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509, at *14. As discussed *supra*, this Paragraph applies equally to Original Medicare and MAOs. *Id.*

### 8. *Chevron* Deference and the Code of Federal Regulations

The Secretary's interpretation of a statute which it is charged with administering is entitled to "controlling weight unless [the Secretary's interpretations] are arbitrary, capricious, or manifestly contrary to the statute." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 844 (1984)). In fact, the United States Supreme Court has held that federal courts "must uphold the Secretary's judgment as long as it is a permissible construction of the statute, even if it differs from how the court would have interpreted the statute in the absence of an agency regulation." *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 826-27 (2013). Deference is particularly warranted where, as here, the statute governs "a complex and highly technical regulatory program." *Thomas Jefferson Univ.*,

---

Guide, Version 5.0, Chapter 6 at *6.7.

512 U.S. at 512 (internal citations omitted); *see also, e.g., Mich. Spine & Brain Surgeons, PLLC v. State Farm Mut. Auto. Ins. Co.*, 758 F.3d 787, 792-93 (6th Cir. 2014) (giving controlling deference to the Secretary's Medicare Secondary Payer regulations in a Medicare Advantage case).

This matter involves the interpretation of the U.S. Code and the following Regulations:

- 42 C.F.R. §§ 422.108(f) and 422.402 address the preemption of State laws and MAOs having the same rights as CMS.

- §§ 422.566, 422.582, 422.564 and 422.111 address the MAO organization determination procedures.

- §§ 411.21, 411.25 and 411.26(a): provide the crucial definitions for primary payers, primary plans, and conditional payments; require notice of primary payment responsibility; and grant subrogation rights to Medicare.

- § 422.108 provides that a primary payer may be billed for full charges, rather than the discounted rates received by CMS and the MAOs.

- §§ 411.20, 411.22, 411.24, and 411.28 address circumstances when CMS/MAOs shall not make payments, the reimbursement obligations of primary payers, required beneficiary cooperation in recovery actions, the recovery of conditional payments and waiver of recovery.

- § 422.520(a) requires MAOs to pay 95 percent of "clean claims" within 30 days of receipt.

- §§ 162.1002 adopted ICD codes and CPT codes as the standard medical data code sets.

- §§ 411.32 and 411.33 discuss the basis and amount of Medicare Secondary payments.

- § 411.30 provides that payment by a primary payer is credited to deductibles.

- §§ 411.35 and 411.37 limit the charges to a beneficiary when there is a primary payer and limit the amount of recovery when the primary payment is the result of a judgment or settlement.

These Regulations provide for the rights and responsibilities of CMS and the MAOs, as well as that of the primary payers.

9. **Medicare's Recovery Rights are Automatic.**

A Medicare lien is automatic, all-encompassing, and superior to all other interests. *See Pallay v. Nationwide Ins. Co.*, 165 Ohio App. 3d 242 (7th Dist. 2005) ("federal law gives Medicare very powerful subrogation rights, often referred to as a Medicare lien . . . this right of subrogation is superior to any other right, interest, judgment, or claim."); *Porter v. Farmers Ins. Co.*, 2012 U.S. Dist. LEXIS 9862 (N.D. Okl. 2012) ("Medicare's reimbursement rights are automatic, and it is not required to give notice of its claim. 42 C.F.R. § 411.21."). Pursuant to 42 C.F.R. § 411.24(f)(1), "CMS may recover without regard to any claims filing requirements that the insurance program or plan imposes on the beneficiary or other claimant such as a time limit for filing a claim or a time limit for notifying the plan or program about the need for or receipt of services." *Id.* Further,

> where the secondary payer does not know of a primary payer's obligation to pay for medical expenses and the statutory language 'cannot reasonably be expected to make payment.' In other words, if a MAO is unaware of a primary payer, the MAO would not "reasonably expect" a primary plan to provide payment.

*Collins v. Wellcare Healthcare Plans, Inc.*, 73 F. Supp. 3d 653, 669 (E.D. La. 2014). Accordingly, Medicare or an MAO may conditionally pay for the medical bills of an injured person, subject to Medicare's or an MAO's right to obtain reimbursement of those payments. *See* 42 U.S.C. §§ 1395y(b)(2)(B)(i), 1395y(b)(3)(A). Moreover, once Medicare or an MAO pays as a secondary payer, there is no law that would penalize Medicare or an MAO, even if it paid in error, since the payment was supposed to be made by the primary payer.

10. **State Laws are Preempted Pursuant to 42 C.F.R. § 422.108(f).**

To the extent that Florida's No-Fault Laws may be applicable to determine a reimbursement right, state laws are preempted by the broad, express preemption clause in Part C of the Medicare Act:

(3) Relation to State laws
The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part.

42 U.S.C. § 1395w-26(b)(3); *see also* 42 C.F.R. § 422.402; *Potts*, 897 F. Supp. 2d at 195 (finding New York anti-subrogation law preempted by 42 U.S.C. § 1395w- 27 26(b)(3)); *cf. Smith v. Travelers Indem. Co.*, 763 F. Supp. 554 (M.D. Fla. 1989) (finding that an older version of Florida's collateral source statute, section 627.7372, Florida Statute (1987), was preempted by § 1395y(b)(1) of the Medicare Act).

When federal law contains an express preemption clause, a court's task is to "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Reale*, 180 So. 3d at 208 (citing *Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1977 (2011); *Potts*, 897 F. Supp. 2d at 195 (*citing CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993)). "[W]hen Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *Reale*, 180 So. 3d at 209 (*quoting English v. Gen. Elec. Co.*, 496 U.S. 72 (U.S. 1990)). This is the case here. Part C's preemption provision is clear and unambiguous: the standards established under Part C supersede any state law or regulation with very few exceptions, none of which apply here. *See Reale*, 180 So. 3d at 204.

In *Potts*, the court explained that "[f]or the purposes of the preemption provision, a standard is a statutory provision or a regulation promulgated under the [Medicare Act] and published in the Code of Federal Regulations." *Potts*, 897 F. Supp. 2d at 195 (*quoting New York City Health & Hosps. Corp. v. WellCare of New York, Inc.*, 801 F. Supp. 2d 126, 140 (S.D.N.Y. 2011)). "Here, the federal statute contains extensive provisions with respect to reimbursement rights of MA organizations in the secondary payer context." *Potts*, 897 F. Supp. 2d at 196. In

addition, the Part C regulations eliminate all doubt that the standards in Part C govern MAO

reimbursement rights, preempting any state law affecting such rights, where in § 422.108(f) it

states,

> (f) MSP rules and State laws.
> Consistent with § 422.402 concerning the Federal preemption of State law, the
> rules established under this section supersede any State laws, regulations, contract
> requirements, or other standards that would otherwise apply to MA plans. A State
> cannot take away an MA organization's right under Federal law and the MSP
> regulations to bill, or to authorize providers and suppliers to bill, for services for
> which Medicare is not the primary payer. The MA organization will exercise the
> same rights to recover from a primary plan, entity, or individual that the Secretary
> exercises under the MSP regulations in subparts B through D of part 411 of this
> chapter.

42 C.F.R. § 422.108(f); *see* § 422.402 ("The standards established under this part supersede any

State law or regulation (other than State licensing laws or State laws relating to plan solvency)

with respect to the MA plans that are offered by MA organizations."). Defendant does not – and

cannot – argue that any state statute, as applied to MAOs in this case, concerns licensing or plan

solvency. *See* 42 C.F.R. § 422.402. On the contrary, any Florida statute that impacts or would

"take away an MA organization's right under Federal law and the MSP regulations" to seek

reimbursement would be preempted. *Id.* 42 C.F.R. § 422.108(f). "The plain language of this

regulation suggests that the Medicare Act treats MAOs the same way it treats the Medicare Trust

Fund for purposes of recovery from any primary payer." *In re Avandia Mktg.*, 685 F.3d at 366.

Accordingly, under the plain language of the express preemption provisions of the Medicare Act

and its accompanying regulations, any Florida statute is preempted as it applies to Medicare and

an MAO's reimbursement rights. *See Id.* As a result, this Court finds that Defendant's reliance

on state law defenses is inconsistent with an MAO's rights to recover claims for reimbursement

and are therefore preempted.

### III. Florida's No-Fault Law

The Florida Motor Vehicle No-Fault Law ("Florida's No-Fault Act"), sections 627.730 –

7405, Florida Statutes, was intended to expeditiously provide insurance benefits to the insured

for medical treatment regardless of fault. *See* Fla. Stat. § 627.731, (2016); *Custer Med. Ctr. V.*

*United Auto. Ins. Co.*, 62 So. 3d 1086, 1092 (Fla. 2010) (citing *Allstate Ins. Co. v. Kaklamanos*,

843 So. 2d 885, 891 (Fla. 2003)). The purpose of the no-fault statutory framework is to 'provide

swift and virtually automatic payment." *Custer*, 62 So. 3d at 1095 (citing *Ivey v. Allstate Ins.*

*Co.*, 774 So. 2d 679, 683-84 (Fla. 2000)). The Florida Supreme Court recognized that the PIP

statute is unique in that it abolished "a traditional common-law right by limiting the recovery

available to car accident victims" and in exchange, required PIP insurance that was recoverable

**without regard to fault**. *Nunez v. Geico Gen. Ins. Co.*, 117 So. 3d 388, 393-394 (Fla. 2013)

(citing *Allstate Ins. Co. v. Holy Cross Hosp., Inc.*, 961 So. 2d 328, 332 (Fla. 2007)). No-fault

insurers are primary payers of any bills for medical services and supplies incurred by its insureds

resulting from the use, maintenance, and/or operation of a motor vehicle. *See* Fla. Stat. §

627.736(4).

> PAYMENT OF BENEFITS. — Benefits due from an insurer under ss. 627.730-
> 627.7405 are **primary**, except that benefits received under any workers'
> compensation law must be credited against the benefits provided by subsection
> (1) and are due and payable as loss accrues upon receipt of reasonable proof of
> such loss and the amount of expenses and loss incurred which are covered by the
> policy issued under ss. 627.730-627.7405.

*Id.* (emphasis added).

### A.    Breach of Contract Claims

Pursuant to Florida's No-Fault Act, Plaintiff, through its rights as an MAO assignee,

asserts causes of action for breach of contract under its direct right of recovery, conventional

subrogation, equitable subrogation and conventional subrogation arising from third-party beneficiary rights. [J.A. 000059-000091, Am. Compl.].

Plaintiff has enumerated rights pursuant to law. One of those rights is a subrogation right pursuant to 42 C.F.R. § 411.26(a). [J.A. 000059-000091, Am. Compl. at ¶¶ 46, 101]. "(a) *Subrogation.* With respect to services for which Medicare paid, CMS[10] is subrogated to any individual, provider, supplier, physician, private insurer, State agency, attorney, or any other entity entitled to payment by a primary payer." *Id.* If the primary payer – or recipient of a payment from the primary payment – fails to reimburse Medicare, despite its obligation to do so, the Act provides Medicare and MAOs with two recovery mechanisms: (1) a **right of subrogation**, to step in and assume the Medicare beneficiary's right for payment of medical bills that should have been paid by the primary payer; and (2) an independent cause of action to sue and assert its own claim against the primary payer and anybody who receives payment from the primary payer, including physicians, attorneys, medical providers, or Medicare beneficiaries themselves. *See United States v. Stricker*, 524 Fed. Appx. 500, 504 (11th Cir. 2013); *see also* 42 U.S.C. §§ 1395y(b)(2)(B)(iv) and 1395y(b)(2)(B)(iii).

Further, CMS's December 5, 2011 Memorandum expresses its intent to permit MAOs the right to pursue state law claims separate and independent from a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A). *See In re Avandia*, 685 F.3d at 366. CMS's Memorandum clarifies that MAOs can neither be "limited to seeking remedy in [s]tate court" nor be restricted to a private cause of action for double damages. *Id.* ("[S]everal MAOs have not been able to take private action to collect for [MSP] services under [f]ederal law because they have been limited to seeking remedy in [s]tate court."). Here, Plaintiff may pursue its state law claims

---

[10] 42 C.F.R. § 422.108(f) ("The MA organization will exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP Regulations.").

without restriction to a private cause of action and, inversely, Plaintiff is not restricted to its state law claims to seek reimbursement of medical payments made on Enrollee's behalf. *Id.* Therefore, Plaintiff is permitted to seek reimbursement pursuant to either or both theories, *i.e.* its state law claims as well as its private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A).

## IV. FINDINGS OF FACT AND COURSE OF THE PROCEEDINGS

### A.   Claims Background of FHCP's Enrollee, R.G.

On or about February 2, 2013, Enrollee was injured while travelling in a motor vehicle (hereinafter referred to as "Accident"). [J.A. 000062, Am. Compl., ¶ 9; Pl.'s Ex. 22, *R.G. Police Report dated Feb. 2, 2013*]. The Enrollee received medical services, treatment, and/or supplies for injuries she sustained and, consequently, incurred reasonable expenses for said medical care and treatment.   [J.A. 003129:15-22, Celli Dep. May 31, 2016; J.A.002534:11-20, Celli Testimony Sept. 14, 2016].

Defendant issued a policy of insurance to Enrollee that provided PIP benefits, as well as medical and extended medical expense coverage in compliance with sections 627.730 – 627.7405, Florida Statutes. [J.A. 002306:3-11, Celli Testimony Sept. 14, 2016]. This policy was in full force and effect at the time of the Accident, and provided primary insurance coverage for Enrollee's medical expenses resulting from the Accident.   [J.A. 002306:3-11, Celli Testimony Sept. 14, 2016; J.A. 004181, Pl.'s Ex. 24, *Declarations Page for R.G. dated September 26, 2014*]. At the time of the Accident, Enrollee was also enrolled in an MA plan administered by FHCP, which provided Medicare benefits to Enrollee. [J.A. 003296-003305, Pl.'s Ex. 5, *R.G. Demand Letter*]. As described in FHCP's Evidence of Coverage ("EOC"), Enrollee's MA Plan is considered the "secondary plan" in connection with medical expense coverage for the subject Accident, and provided FHCP with reimbursement, recovery, and

subrogation rights from a "primary plan", *i.e.*, the Defendant. These rights are further described in the EOC and in the Code of Federal Regulations. Plaintiff asserts that, pursuant to Florida law and the Defendant's no-fault insurance policy, Defendant had a legal obligation to make primary payment for all medical services and/or supplies provided to R.G. as a result of the Accident, but that Defendant failed to satisfy that obligation and, otherwise, failed to appropriately reimburse Plaintiff. [J.A. 000064, Am. Compl. ¶ 19].

The medical services and/or supplies provided to Enrollee and the resulting medical bills charged to FHCP were necessary and reasonable, as they were provided as a result of the medical diagnosis, treatment, conditions, and/or injuries sustained in the Accident. [J.A. 001531:1-25, 001532:3-14, Ruiz Testimony, June 2, 2016]. It is undisputed that the medical providers, based on their training, education, experience, and knowledge, determined the medical services and/or supplies provided were reasonable and necessary to diagnose and treat Enrollee. [J.A. 001532:3-20, Ruiz Testimony, June 2, 2016; J.A. 003149:23-25, 003150:1-9, 003151:3-17, Celli Dep., May 31, 2016]. If fact, after it determined that the medical bills and other charges were for medically necessary procedures and/or services, and in accordance with its EOC, FHCP paid the medical bills for the treatment(s) and service(s) provided to Enrollee, as a result of the Accident. [J.A. 001478:5-19, 001502:23-25, 001503:1-9, 001486:23-25, 001487:1-6, 001531:4-25, 001532:1-14, Ruiz Testimony, June 2, 2016; J.A. 000064, Am. Compl. ¶ 18].

The evidence establishes that the medical bills submitted to FHCP for Enrollee's treatment were determined to be "clean claims", meaning that the claims had no defect or impropriety and contained all of the information necessary to determine that the services rendered to Enrollee were medically necessary and the related medical bills were reasonable,

and, therefore, required to be paid promptly. *See* 42 C.F.R. § 422.520(a); J.A. 001531:4-25,

001532:1-14, Ruiz Testimony June 2, 2016; J.A. 000074-000075, Am. Compl. ¶ 51].

It is undisputed that, prior to initiating this action, Plaintiff's Counsel sent Defendant two

letters ("Initial Letters"), dated September 18, 2014, wherein Plaintiff requested: (1) information

about R.G.'s Accident; and (2) a PIP Payout Sheet[11] or other Explanation of Benefits regarding

the Accident. [J.A. 001686:8-18, 001689:23-25, 001690:1-2, 001709:2-13, 001713:4-15,

001732:12-25, 001733:1-14, 001734:17-21, 001739:2-14, Ruiz Testimony, Sept. 12, 2016; J.A.

004174-004178, Pl.'s Ex. 23, *R.G. Request for Policy Information*]. In response to the Initial

Letters, Defendant sent Plaintiff a letter dated September 26, 2014, which enclosed a copy of the

Enrollee's Policy Declarations Page. [J.A. 001707:11-23, Ruiz Testimony Sept. 12, 2016; J.A.

004181, Pl.'s Ex. 24, *Declarations Page for R.G. dated September 26, 2014*].

Plaintiff's Counsel made a second request for a PIP Payout Sheet or other Explanation of

Benefits regarding the Accident on October 24, 2014. [J.A. 002439:21-25, 002440:1-9, Celli

Testimony, Sept. 14, 2016]. In response, Defendant produced a copy of a "PIP Log", which

listed benefits paid in connection with the Accident. [J.A. 002434:8-23, Celli Testimony Sept.

14, 2016; J.A. 004185-004186, Pl.'s Ex. 26, *R.G. PIP Payout Sheet*].

On January 23, 2015, Plaintiff's Counsel sent Defendant a Demand Letter under 42

U.S.C. § 1395y(b)(3)(A) and section 627.736, Florida Statute, that demanded reimbursement for

Enrollee's medical bills in the amount of $29,485.00.[12] Along with the Demand Letter,

---

[11] The terms "PIP Payout Sheet" and" "PIP log" refer to Defendant's "No Fault Payment
Register." Under section 627.736(j), Florida Statute, "[a]n insurer shall create and maintain for
each insured a log of personal injury protection benefits paid by the insurer on behalf of the
insured. If litigation is commenced, the insurer shall provide to the insured a copy of the log
within 30 days after receiving a request for the log from the insured."

[12] On May 20, 2016, Plaintiff filed its Notice of Defendant's Non-Compliance with Demand
Letter for Reimbursement of Medicare Payments, as Defendant did not respond to Plaintiff's

Defendant also received a Notice of Lien, in which Plaintiff filed a Civil Remedy Notice of Insurer Violations against Defendant.  [J.A. 002439:9-13, Celli Testimony, Sept. 14, 2016; J.A. 003296-003305, Pl.'s Ex. 5, *Demand Pursuant to 42 U.S.C. § 1395y(b)(3)(A) and Florida Statute § 627.736*; J.A. 004188-004189, Pl.'s Ex. 27, *Notice of Lien*].  Thereafter, Defendant sent Plaintiff a second "PIP Log", which listed benefits paid to American Med-Care Centers, City of Greenacres, and MSP Recovery Law Firm, for services that were provided in connection with the Accident. [J.A. 004185-004186, Pl.'s Ex. 26, *Letter Dated February, 27, 2015 and enclosed No Fault Payment Register for R.G.*]

On April 20, 2016, Plaintiff transmitted a letter to Defendant reminding it of its reporting obligations to Plaintiff under 42 C.F.R. § 411.25(a).  [J.A. 003292 – 003295, Pl.'s Ex. 4, *General Demand Letter*].  As § 411.25(a) obligates primary payers to notify CMS and MAOs, through 42 C.F.R. § 422.108(f), of any improper payment that the latter has made, Defendant is required to notify Plaintiff of every instance in which Plaintiff made an improper payment where Defendant should have paid. 42 C.F.R. § 411.25(a). The record reflects that Defendant did not: (1) produce said information as required by the Regulations and (2) made no attempt to provide notice of its primary payment obligations.

**B.    Claims Background of FHCP's Enrollees I.S., S.D., and L.B.**

In addition to R.G., Plaintiff provided Defendant with notice regarding the claims of three other enrollees (*i.e.*, I.S., S.D., and L.B.) to Defendant for which it should have provided no-fault benefits to under section 627.736, Florida Statute.  These other enrollees were identified by

---

requests.  On August 25, 2016, Plaintiff filed its Second Notice of Defendant's Non-Compliance with its Demand Letter for Reimbursement. At the hearing on class certification, Plaintiff's counsel explained that both Defendant and FHCP had the wrong figures for treatment due to the Accident as a result of its systems. The correct amount, as identified by Plaintiff's system, still exceeded the amount that had to be paid by Defendant, which was capped at $10,000.00, without the application of double damages, interest and other penalty charges.

Defendant's Claims Manager Underwriting Consultant, Joseph Celli ("Celli"). [J.A. 003237:25 – 003238:1-8, Celli Dep. Aug. 24, 2016]. Particularly, Celli references the names and claim numbers of four individuals who were insured by Defendant; R.G., I.S., L.B. and S.D. *Id.* The evidence and testimony established that each of these enrollees, at the time of their accidents, were Medicare beneficiaries enrolled in FHCP's MA plan, which provided Medicare benefits to them. These enrollees were also covered by Defendant's no-fault insurance policy. [J.A. 003306 – 003309, Pl.'s Ex. 6 *S.D. Demand Letter*, J.A. 003321 – 003330, Pl.'s Ex. 8, *I.S. Demand Letter*, J.A. 003334, Pl.'s Ex. 9, *L.B. Demand Letter*; J.A. 002306:3-11, Celli Testimony Sept. 14, 2016; J.A. 002307:20-25 – 002308:1 Celli Testimony Sept. 14, 2016]. For each of these additional claims, Plaintiff sent demand letters to Defendant on the following dates: (1) for L.B., August 28, 2015; (2) for I.S., January 6, 2015; and (3) for S.D., September 11, 2014. [J.A. 003306 – 003309, Pl.'s Ex. 6 *S.D. Demand Letter*, J.A. 003321 – 003330, Pl.'s Ex. 8, *I.S. Demand Letter*, J.A. 003334, Pl.'s Ex. 9, *L.B. Demand Letter*].

As in R.G.'s claim, Defendant failed to meet its obligation to make primary payments for all medical services provided, and failed to appropriately reimburse Plaintiff. As to all four beneficiaries addressed herein:

1. they all were the drivers and owners of vehicles insured by Defendant. [J.A. 003316 Pl.'s Ex. 7 – *I.S. Police Report*, 004171 Pl.'s Ex. 22 – *R.G. Police Report*, 003341 Pl.'s Ex. 12 – *L.B. MyAbility Report*, 007926 Def.'s Ex. T – *Ocean Harbor's Claim File - S.D.*];

2. each of the enrollees was involved in an automobile accident, which resulted in medical treatment[13];

3. all four enrollees were given the same medical diagnostic code by physicians who provided the medical treatment. [J.A. 003296 – 003305, Pl.'s Ex. 4, *R.G.*

---

[13] [J.A. 008182, Def.'s Ex. GG – *Ocean Harbor's R.G. Claim File*; J.A. 007409, Def.'s Ex. R – *Ocean Harbor's Claim File – I.S.*; J.A. 007484, Def.'s Ex. S – *Ocean Harbor's Claim File – L.B.*; J.A. 007926, Def.'s Ex. T – *Ocean Harbor's Claim File – S.D.*].

*Demand Letter*, J.A. 003306 – 003309, Pl.'s Ex. 6, *S.D. Demand Letter*, J.A. 003321 – 003330, Pl.'s Ex. 8, *I.S. Demand Letter*, J.A. 003334, Pl.'s Ex. 9, *L.B. Demand Letter*];

4. the medical data consists of billing codes that physicians, pharmacies, hospitals, and other health care providers submit to payers which identify the situation that brought patients to the hospital;

5. all four enrollees had similar diagnostic codes, *e.g.*, E812.0[14] and E849.5[15]; and

6. FHCP made primary payments before Defendant in every instance;[16]

These facts further establish the commonality between R.G.'s claim and the claims of the other enrollees.

As previously indicated, R.G. was involved in Accident on Feb. 2, 2013, wherein FHCP made its first payment on April 2, 2013, and continued to make payments through April 7, 2014. However, Defendant made its first and final payment on February 26, 2015 for $9,355.30. [J.A. 008282, Def.'s Ex. GG – Ocean Harbor's R.G]. Notably, Defendant was legally responsible to exhaust $10,000.00 in medical bills pursuant to section 627.736, Florida Statute, before FHCP made its payments. Defendant failed to meets its obligation. Defendant did not make a payment until February 26, 2015, more than 700 days after Enrollee received her medical treatment.

I.S. was involved in an automobile accident on August 29, 2012. [J.A. 007456-007464, Def.'s Ex. R – *Ocean Harbor's Claim File – I.S.*]. As with R.G., FHCP was the first to pay for the medical treatment provided. However, from October 25, 2012 through March 4, 2013, Defendant was legally responsible for making the first payment and failed to do so. In fact,

---

[14] Code E812.0 encompasses "other motor vehicle traffic accident involving collision with motor vehicle injuring driver of motor vehicle other than motorcycle".

[15] Code E849.5 encompasses "street and highway accidents."

Defendant did not make a payment until January 26, 2015, 880 days after I.S. received medical treatment.  [J.A. 007481, Def.'s Ex. R – *Ocean Harbor's Claim File – I.S.*].

S.D. was also involved in an automobile accident on June 11, 2012, wherein FHCP was the first to pay for the medical treatment provided.  [J.A. 007926, Def.'s Ex. T – *Ocean Harbor's Claim File – S.D.*].  On August 13, 2012, Defendant made its first and final payment on February 25, 2013.  Defendant was legally responsible for making the first payment and failed to do so. In fact, Defendant denied this claim and refused to make any payment. [J.A. 007980, Def.'s Ex. T – *Ocean Harbor's Claim File – S.D.*].

L.B. was involved in an automobile accident on February 04, 2014.  [J.A. 007484, Def.'s Ex. S – *Ocean Harbor's Claim File – L.B.*].  FHCP made payments to L.B.'s medical providers from February 28, 2014 through June 30, 2014.  The first time Defendant made payments to L.B.'s medical providers was on April 8, 2014.  [J.A. 007907, Def.'s Ex. S – *Ocean Harbor's Claim File – L.B.*].

## V. **THE LITIGATION**

On January 26, 2015, Plaintiff filed its Complaint against Defendant wherein it alleged causes of action for: (1) double damages pursuant to 42 U.S.C. §1395y(b)(3)(A); and (2) damages. [J.A. 000001-000042, Compl.].  After the filing of the initial lawsuit, on February 25, 2015, Defendant voluntarily paid Plaintiff the sum of $9,355.30, which represented no-fault benefits under the insurance policy, plus $41.39 in interest, and $256.69 in maximum penalty and postage.  [J.A. 002436:19-25, 002437:1-7, Celli Testimony, Sept. 14, 2016].  Thereafter, Defendant sent Plaintiff a copy of its Declarations Page dated February 27, 2016, along with a

---

[16] [J.A. 003296, Pl.'s Ex. 5 – *R.G. Demand Letter*; J.A. 003306, Pl.'s Ex. 6 – *S.D. Demand Letter*; J.A. 003321, Pl.'s Ex. 8 – *L.S. Demand Letter*; J.A. 003334, Pl.'s Ex. 9 – *L.B. Demand Letter*].

"PIP Log", dated February 27, 2015, that listed benefits paid for medical services provided in connection with the Accident, as follows:

       a.  American Med-Care Centers
          $267.18, in no-fault benefits, plus $25.66 in interest

       b.  City of Greenacres
          $377.52, in no-fault benefits, plus $33.85 in interest

       c.  MSP Recovery Law Firm
          $9,355.00, in no-fault benefits, plus $41.39 in interest

[J.A.002436:1-25, 002437:1-25 Celli Testimony Sept. 14, 2016; J.A. 003155:5-14, Celli Dep., May 31, 2016].

Prior to receiving Plaintiff's demand for no-fault benefits, Defendant did not make any payment(s) for Enrollee's medical expenses that were incurred as a result of the Accident. [J.A. 002435:1-24, Celli Testimony, Sept. 14, 2016].

On April 18, 2015, Defendant filed its Motion to Dismiss wherein it asserted Plaintiff failed to attach an assignment from FHCP to its Complaint; lacked standing to bring its action; and Plaintiff failed to attach Enrollee's insurance contract. [J.A. 000047-000048]. On December 1, 2015, Plaintiff filed an Amended Class Action Complaint ("Amended Complaint"). [J.A. 000059-000091]. In its Amended Complaint and Motion for Conditional Class Certification, Plaintiff sought to certify a class wherein the entities directly contracted with CMS and/or its assigns, such as MAOs, HMOs, and other similar entities that made conditional payments as a secondary payer, and where Defendant failed to pay or reimburse the entities resulting in monetary damages. [J.A. 000096-000114]. Subsequent thereto, on January 26, 2016, Plaintiff filed its Motion for Substitution of Party-Plaintiff, where it provided notice that, as of November 6, 2014, MSPA Claims 1, LLC was assigned MSP Recovery's claims and causes of action subject to all the rights, title, and interest, in and to, all rights and entitlements.

[J.A. 000115-000119].   Two days later, Plaintiff filed its Motion to Correct Scriveners Error to correct the date of assignment previously referred to in the Motion for Substitution of Party-Plaintiff from November 6, 2014 to November 6, 2015.  [J.A. 000120-000127].

On February 5, 2016, following a status conference, the Court entered an Agreed Order wherein it was acknowledged that, among other things, MSP Recovery was substituted by MSPA Claims 1, LLC.  [J.A. 000128-000130].   On February 22, 2016, Defendant filed an Answer to the Amended Class Action Complaint. [J.A. 000131-000132]. In its Answer to the Amended Complaint, Defendant admitted it was a primary payer of any medical bills for services and/or supplies incurred by R.G. that arose from the use, maintenance, and/or operation of a motor vehicle. [J.A. 000131 at ¶ 1].  The Defendant's Answer did not raise any affirmative defenses.  [J.A. 000131-000132].

On May 11, 2016, Defendant filed its Answer and Objections to Plaintiff's Request for Admissions.  [J.A. 000142-000151].  Defendant admitted that it issued an insurance policy to Enrollee, which provided PIP benefits in compliance with sections 627.730 – 627.7405, Florida Statutes. [J.A. 000145, Defendant's Answers and Objections to Plaintiff's First Request for Admissions, p. 4; J.A. 004181, Pl.'s Ex. 24, *Declarations Page for R.G. dated September 26, 2014*].

On June 1, 2016, Defendant filed its Response in Opposition to Plaintiff's Motion for Class Certification.  [J.A. 000206-000247].   In its response, Defendant asserted Plaintiff was not an MAO, lacked subject matter jurisdiction, lacked standing on various grounds, and failed to satisfy the requirements to certify the Class.  [J.A. 000206-000247 at ¶¶ 1, 4].   The hearing for Plaintiff's Motion for Conditional Class Certification was specially set for one day, June 2, 2016. [J.A. 000183]. However, due to the complexity and length of the proceedings, the class

certification hearing did not conclude on June 2, 2016, and it was specially set the hearing for September 12, 2016.

On June 10, 2016, Defendant filed a Motion to Dismiss the Class Action Complaint for Lack of Subject Matter Jurisdiction, in which it argued Plaintiff's claims were subject to the exclusive jurisdiction of the federal courts.[17]   [J.A. 000248-000256].   Despite Defendant's claims, it did not seek to remove the proceedings.  After hearing arguments from both Parties, Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction was denied.   [J.A. 000323].

On July 25, 2016, Defendant filed a Motion for Leave to File Amended Answer, Affirmative Defenses, and Demand for Jury Trial wherein it sought to add thirty-seven affirmative defenses.  [J.A. 000325-000340].  Plaintiff opposed said relief for untimeliness and waiver based on Defendant's post-suit payment and Defendant's confession of judgment.  [J.A. 000341-000342]. The Court has not ruled on said Motion.

On September 7, 2016, Plaintiff filed its Reply to Defendant's Response in Opposition to Plaintiff's Motion for Class Certification.  [J.A. 000464-000494].  Plaintiff also filed its Motion to Strike Expert Reports and Testimony of Defendant's Witness, Jennifer Jordan, Motion in Limine to Exclude Expert Witness, and Motion to Disgorge Expert Witness Fees.  [J.A. 000523-000531].  Additionally, Plaintiff, on September 11, 2016, filed its Motion to Foreclose Defendant from again raising standing.

The hearing on Plaintiff's Motion for Conditional Class Certification resumed on September 12, 2016, and concluded on September 15, 2016.  Prior to the continuance of the class certification hearing, the Parties exchanged information via a Secure File Transfer Protocol

---

[17] Defendant's Motion to Dismiss did not raise any argument that Plaintiff lacked standing and/or that Plaintiff was unable to demonstrate Defendant was a primary payer.  [J.A. 000248-000256].

("sFTP") portal.  The sFTP portal allowed for virtual storage of large documents and is only accessible to individuals with proper access credentials.  Further, this portal ensured compliance with the Health Insurance Portability and Accountability Act ("HIPAA") in order to protect the privacy and security of medical records and other personal health information.  The sFTP portal also contained documents entered into evidence at the hearing on Plaintiff's Motion for Conditional Class Certification and summarized traffic crash data compiled and prepared by Plaintiff.

Throughout the class certification hearing, the Court heard sworn testimony from: (a) John H. Ruiz, Plaintiff's witness; (b) Jennifer Jordan, Defendant's expert witness; (c) Victor Pestien, Plaintiff's expert witness; and (d) Joseph Celli, Defendant's witness.

Upon conclusion of the class certification hearing, Defendant filed its Supplemental Memorandum on the Putative Class Representative's Standing on Class Certification, which reasserted Plaintiff allegedly lacked standing.  [J.A. 000754-000766].  Thereafter, Plaintiff filed its Response to Defendant's Supplemental Memorandum, which asserted: (1) Plaintiff had standing to pursue its claims against Defendant, since Plaintiff suffered an injury in fact that is traceable to Defendant's conduct, and Plaintiff's injury was redressable; (2) Defendant waived the affirmative defense of standing by not raising it in its responsive pleading to the Amended Complaint; (3) the Eleventh Circuit held Plaintiff had standing pursuant to its valid assignment agreements; (4) Plaintiff properly alleged a cause of action for double damages under the MSP Law; (5) Plaintiff was entitled to damages on its breach of contract claims; and (6) the dismissal in *MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co.*, was irrelevant to whether this Court could certify the Class.  [J.A. 000767-001167].

## VI. <u>PREREQUISITES FOR CERTIFICATION PURSUANT TO RULE 1.220 AND STANDARD OF REVIEW</u>

When determining whether to certify a class, a trial court should focus on the prerequisites for class certification and not the merits of a cause of action. *Sosa*, 73 So. 3d at 105. Accordingly, the Court makes no determination as to the merits of Plaintiff's claims or Defendants defenses. Instead, it is Plaintiff's burden in seeking class certification to show that the requirements contained in Rule 1.220 have been met. Rule 1.220(a) states that one or more members of a class may sue or be sued as representative parties on behalf of all, only if:

1)    <u>Numerosity</u> – the members of the class are so numerous that separate joinder of each member is impracticable;

2)    <u>Commonality</u> – the claim or defense of the representative party raises questions of law or fact common to the questions of law or fact raised by the claim or defense of each member of the class;

3)    <u>Typicality</u> – the claim or defense of the representative party is typical of the claim or defense of each member of the class; and

4)    <u>Adequacy of Representation</u> – the representative party can fairly and adequately protect and represent the interest of each member of the class.

This Rule is based on Federal Rule of Civil Procedure 23, which has been construed and applied, where appropriate, by Florida courts. *See Broin v. Phillip Morris Companies*, 641 So.2d 888, 889 n.l (Fla. 3d DCA 1994) (finding that, as Rule 1.220 is patterned after Federal Rule of Civil Procedure 23, federal cases are persuasive authority).

Plaintiff must also satisfy the requirements of Rule 1.220(b)(1)(A), Rule 1.220(b)(2) and/or Rule 1.220(b)(3). *See* Fla. R. Civ. P. 1.220. To comply with Rule 1.220(b)(1)(A), Plaintiff must demonstrate that "the prosecution of separate claims or defenses by or against individual members of the class would create a risk of . . . inconsistent or varying adjudications

concerning individual members of the class which would establish incompatible standards of conduct for the party opposing the class." *See* Fla. R. Civ. P. 1.220(b)(1)(A). Rule 1.220(b)(2) requires a showing that Defendant acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. Further, Rule 1.220(b)(3) requires that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods to the fair and efficient adjudication of the controversy. *See* Fla. R. Civ. P. 1.220(b)(3).

In *Sosa*, the Florida Supreme Court held that the trial court "render an order on class certification as soon as practicable, with that order separately detailing the trial court's factual findings and conclusions of law, and, if proceeding with a class, specifically designating the applicable section of rule 1.220." *Sosa,* 73 So. 3d at 117–18. "A trial court's findings of fact are presumptively correct unless clearly erroneous." *Basulto v. Hialeah Auto.*, 141 So. 3d 1145, 1155-56 (Fla. 2014) (citing *Tobin v. Michigan Mut. Ins. Co.*, 948 So. 2d 692, 696 (Fla. 2006)). This presumption is due to the fact that the Court must conduct a "rigorous analysis" before determining the facts that justify class certification, which may entail "[evaluating] written arguments for and against class certification…consider[ing] affidavits, deposition testimony, as well as all discovery, documentation, and court filings that constituted the entire case file." *Sosa*, 73 So. 3d at 118.

An order granting certification may be conditional and may be altered or amended before entry of a judgment on the merits of an action. Fla. R. Civ. P. 1.220(d)(1). "The certification of a class follows the parameters of the class action rule and the theory upon which the rule is based when the court is faced with a multiplicity of individual actions. The class action rule has a real

and meaningful position in the administration of justice to address the ever-increasing caseload burden placed upon our trial courts." *Sosa*, 73 So. 3d at 103. "To certify a class, a trial court must engage in an analysis with regard to whether the class representative and putative class members meet the requirements for class certification promulgated in Florida Rule of Civil Procedure 1.220." *Id.* at 105. "A trial court should resolve doubts with regard to certification in favor of certification, especially in the early stages of litigation." *Id.* "In undertaking the initial analysis, a trial court may look beyond the pleadings and, without resolving disputed issues, determine how disputed issues might be addressed on a classwide basis." *Id.* at 117.

## VII. FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Court finds that Plaintiff has met its burden of demonstrating that the requirements of Rule 1.220 have been met, as delineated below:

### A.   Rule 1.220(a)

#### 1.   Numerosity

##### i.   *Applicable Law*

The law requires a low threshold for numerosity and does not require the identification of every single claim and every single enrollee that is a member of each MAO within the Class Period. *See Connor B. v. Patrick*, 272 F.R.D. 288, 292 (D. Mass. 2011) ("To satisfy [the numerosity] element, [p]laintiffs must overcome a relatively 'low threshold,' which does not impose a precise numerical requirement.").

"[C]lasses as small as 25" satisfy the numerosity requirement. *Estate of Bobinger v. Deltona Corp.*, 563 So. 2d 739, 743 (Fla. 2d DCA 1990); *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (holding "generally less than [21] is inadequate, more than [40] adequate, with numbers between varying according to other factors"). Both Florida and federal

courts recognize the "relatively low threshold to meet the numerosity requirement," in which they have held that "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40," then "the first prong of Rule 23(a) has been met." *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009) (quoting *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)). Essentially, fewer than 100 members may satisfy the numerosity requirement. *See George v. Nat'l Water Main Cleaning Co.*, 286 F.R.D. 168, 173 (D. Mass. 2012).

Moreover, where the existence of an ascertainable class has been shown, there is no need to be able to specifically identify the individual members of the class prior to class certification. *See Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983) (holding that the party seeking certification does not need to establish the precise number of members of the proposed class). "Rather, class certification is proper if the class representative does not base the projected class size on mere speculation." *Sosa*, 73 So. 3d at 114.

*ii.*   ***Findings of Fact and Conclusions of Law as to Numerosity***

Plaintiff and the putative class members demonstrated by substantial competent evidence the numerosity requirement, as "the members of the proposed class [are] so numerous as to make joinder impractical." *Sosa*, 73 So. 3d at 114; Fla. R. Civ. P. 1.220(a). The potential class includes the thirty-seven (37) MAOs administering an MA plan in Florida. [J.A. 003886-003927, Pl.'s Ex. 19, *Florida Office of Insurance Regulation Managed Care Report – Quarterly Data Summary as of June 30, 2016, http://www.floir.com/siteDocuments/HMO2Q2016.pdf*; J.A. 001491:13-24, Ruiz Testimony, June 2, 2016; J.A. 001835:18-21, 001836:10-13, Ruiz Testimony, Sept. 12, 2016; J.A. 000078-79, Am. Compl. ¶65]. Additionally, each of the 37

MAOs insure thousands of Medicare beneficiaries that are enrolled in their MA plans under Medicare Part C. [J.A. 001560:17-22, Ruiz Testimony, June 2, 2016].

As set forth in the MSP Law,[18] each Class Member is a secondary payer of medical expenses made on behalf of a Medicare-eligible enrollee, and Defendant is a primary payer for thousands of Medicare Part C beneficiaries enrolled throughout the 37 MAOs. [*See* J.A. 000078-79, Am. Compl. ¶65; J.A. 001492:1-5, 001493:18-25, Ruiz Testimony June 2, 2016]. Each MAO in the Class has paid claims to medical providers as a result of the injuries sustained from automobile accidents within the Class Period on behalf of a Medicare enrollee, which the Defendant should have paid or otherwise reimbursed the MAO as a secondary payer. [*See* J.A. 001491:3-25, 001492:1-5, Ruiz Testimony, June 2, 2016]. Consequently, each Class Member MAO has hundreds of instances in which Defendant failed to provide primary payment in violation of the Medicare Secondary payer laws and section 627.736, Florida Statutes, which require for no-fault benefits to be primary, and/or reimburse the MAO when payments have been made by these secondary payers. *See Sosa*, 73 So. 3d at 114 (finding that the plaintiff had "assuredly satisfie[d] the numerosity requirement" where the plaintiff "asserted a projected class of at least several hundred, if not thousands, of aggrieved class members").

Plaintiff obtained from the Florida Department of Motor Vehicles all automobile crash reports from 2006 through the first quarter of 2016. [J.A. 003885, Pl.'s Ex. 18 – *Florida Crash Report Data 2006-2016*; J.A. 001836:17-25, 001837:1-12, Ruiz Testimony, Sept. 12, 2016]. Plaintiff funneled this data by searching for every instance where Defendant's enrollees were either the driver or passenger in an automobile accident that occurred between January 2009 through the first quarter of 2016. From this subset of the data, Plaintiff pulled 107 random

---

[18] *See supra* Part II. B. 4-9.

automobile crash reports and ran the information through CMS' MMSEA reporting database. [J.A. 003633 Lopez Depo., Ex. 5; J.A. 001488:13-25; 001584:1-22; 001598:2-001599:4, Ruiz Testimony June 2, 2016; J.A. 003089:21 – 003090:1, Celli Dep. May 31, 2016]. This random sample included Defendant's enrollees that were also the beneficiaries of Humana Insurance Company, Simply Healthcare Plans, Careplus Health Plans, Inc., Healthspring of Florida, Humana Medical Plan, Inc., HealthSun Health Plans, Inc, Coventry Health Plan of Florida, Coventry Summit Health Plan, Florida Healthcare Plus, Inc. [J.A. 003633 Lopez Depo., Ex. 5].[19] For 104 of these 107 selected reports, Defendant neither reported these instances to CMS nor did it know that these beneficiaries were Medicare eligible. [J.A. 001584:10-14 Ruiz Testimony, June 2, 2016, J.A. 002452:19-25, 002453:1-7 Celli Testimony, Sept. 14, 2016]. Plaintiff demonstrated that Defendant had a practice and course of conduct in failing to report to CMS, failing to identify its enrollees that are also Medicare beneficiaries, and ultimately failing to reimburse Florida MAOs. [J.A. 002326:9-25 Celli Testimony, Sep. 14, 2016; J.A. 003633 Lopez Depo., Ex. 5].

Plaintiff ultimately offered evidence of over 3,300 instances whereby Defendant's Medicare eligible enrollees were involved in Florida automobile accidents. [J.A.001303:5-12, 001488:13-25; 001584:1-22; 001598:2-001599:4, Ruiz Testimony, June 2, 2016; J.A. 003089:21 – 003090:1, Celli Dep. May 31, 2016; J.A. 004191-007213, Pl.'s Exs. 28-63]. In addition, any absent Class Members may be identified from readily available data in the Parties' possession and control. [J.A. 001491:13-24, 1504:21-1505:25, Ruiz Testimony, June 2, 2016]. Collectively, the State of Florida has approximately 40% of all Medicare beneficiaries enrolled in Medicare Part C plans and Miami-Dade County has approximately 60% of its Medicare

---

[19] Any absent class members may be identified from readily available data in the Parties' possession and control. [J.A. 001491:13-24, 1504:21-1505:25, Ruiz Testimony, June 2, 2016].

population enrolled in Part C plans. *See* CMS website, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Dashboard/Medicare-Enrollment/Enrollment%20Dashboard.html (last visited October 24, 2016). This accounts for millions of Medicare Part C Beneficiaries that are enrollees of one or more of the MAO's in Florida throughout the Class Period. The MAO's themselves are identified and any Medicare Part C enrollee can be identified by the MAO, as well as each insured with Defendant that had an accident within the claims period where the MAO's paid for medical bills associated with an automobile accident that Defendant was required to pay or reimburse.

Based upon the evidence presented, the Court finds that Plaintiff satisfies the numerosity requirement for certification, and that the joinder of all of these claims would be impracticable.

### 2.   Commonality

#### i.   *Applicable Law*

The commonality requirement is met when the moving party can show that the claims or defenses present common questions of either law or fact. *Sosa*, 73 So. 3d at 107-8. The Florida Supreme Court in *Sosa* analyzed all of the prerequisites and the quantum of proof necessary to meet the requirements for certification of a claim. *Id.* at 107.

"The primary concern in the consideration of commonality is whether the representative's claim arises from the same practice or course of conduct that gave rise to the remaining claims and whether the claims are based on the same legal theory." *Id.* at 107. "The threshold of the commonality requirement is not high. A mere factual difference between class members does not necessarily preclude satisfaction of the commonality requirement. Individualized damage inquiries will also not preclude class certification." *Id* (internal citations omitted). "[T]he commonality prong only requires that resolution of a class action affect all or a

substantial number of the class members, and that the subject of the class action presents a question of common or general interest." *Id.* In fact, the

> commonality requirement is satisfied if the common or general interest of the class members is in the object of the action, the result sought, or the general question implicated in the action. This core of the commonality requirement is satisfied if the questions linking the class members are substantially related to the resolution of the litigation, even if the individuals are not identically situated.

*Id.* at 107-8 (internal citations omitted).

### ii. Applicable Law to Determine when a Primary Payer is Required to Reimburse a Secondary Payer

In *Humana vs. Western Heritage*, the Eleventh Circuit established the necessary elements for a claim by a secondary payer to recover against the primary payer regarding a claim where the primary payer failed to reimburse. *See Humana*, 2016 U.S. App. LEXIS 14509, at *21. The court stated that a secondary payer was entitled to recover from a primary payer by establishing: (1) the defendant was a primary payer; (2) the defendant failed to provide for primary payment or appropriate reimbursement; and (3) damages. *Id.*

In determining whether a primary payer is required to reimburse a secondary payer for medical bills paid by a secondary payer for injuries resulting from the use, maintenance or operation of a motor vehicle, this Court must determine certain questions of law consistent with the necessary elements as enunciated in *Western Heritage*. There is no difference for a secondary payer to recover from a primary payer on a breach of contract claim; the only significant difference is the imposition of double damages pursuant to the MSP Law. The MSP Law private cause of action was legislated to created attorney generals of anyone that had an injury in fact so that the Medicare Trust Fund could be preserved and recover money that should not be paid by a secondary payer. *See In re Avandia Mktg.*, 685 F.3d at 365 (holding that "when MAOs spend less on providing coverage for their enrollees, as they will if they recover

efficiently from primary payers, the Medicare Trust Fund does achieve cost savings"); *see*

*Citizens Ins. Co. of Am. v. United States*, 102 Fed. Cl. 733, 744 (2011) ("Congress enacted the

MSPA in order to permit Medicare to recoup its own payments when it is not the primary payer,

thereby reducing federal healthcare costs.").

Accordingly, the Court finds that the questions of law common to the resolution of all

claims as asserted by Plaintiff, as well as the absent class members, are as follows:

A. Did Defendant provide no-fault benefits to individual enrollees during the Class Period as advanced by Plaintiff?

B. How many of these individuals had Medicare Part C benefits through one or more of the MAOs in the State of Florida throughout the Class Period?

C. How many of the individuals with Medicare Part C benefits during the Class Period, were involved in automobile accidents wherein they incurred medical bills as a result of the use, maintenance or operation of a motor vehicle?

D. How many of the individuals that had Medicare Part C and insured by Defendant at the time of their automobile accident had their medical bills paid by the Plaintiff and/or absent class members instead of Defendant?

E. What is the amount of damages that the secondary payers would be entitled to receive as a result of the failure of Defendant to pay for medical bills incurred by the Medicare Part C beneficiaries and paid by the MAO or it's assignee?

F. What is the amount of coverage for no-fault benefits extended for each of the Medicare Part C beneficiaries by Defendant?

These questions of law would need to be decided to adjudicate a claim by a secondary payer

alleging that the primary payer failed to pay or otherwise reimburse.

### iii. *Common Questions of Fact to Determine Whether a Primary Payer has Failed to Pay or Reimburse*

The Court's analysis is not limited to common questions of law; it may certify a case if

the claim involves common questions of fact. *See Sosa*, 73 So. 3d at 107-8. In this regard, the

Court reviewed the common questions of fact that would apply to the claims asserted by the

Plaintiff, as well as the absent Class Members. The common questions of fact include:

A. What was the amount of coverage available to the Medicare Part C enrollee as afforded by Defendant to pay for medical bills incurred as a result of the use, maintenance or operation of a motor vehicle?

B. What were the applicable coverage dates of the policy of insurance providing no-fault benefits to the Medicare Part C enrollee?

C. Was the Medicare Part C enrollee the driver, passenger, or non-motorist at the time of the accident?

D. Did the driver, passenger or non-motorist own a vehicle that was required to carry security pursuant to sections 627.733 – 627.736, Florida Statutes?

E. If the driver, passenger or non-motorist did not own a vehicle which was required to carry security, did they live with a resident relative who owned a vehicle which was required to carry security?

F. Which vehicle was the driver or passenger occupying, at the time of the accident, if the driver or passenger did not own a vehicle which was required to carry security and did not reside with a relative who owned a vehicle required to carry security?

G. Which vehicle struck the non-motorist at the time of the accident, if the non-motorist did not own a vehicle which was required to carry security and did not reside with a relative who owned a vehicle required to carry security?

H. Did the Medicare Part C Enrollee incur medical bills which the primary payer should have paid?

I. Was the Medicare Part C MAO charged for medical bills which were the responsibility of the primary payer?

J. Did the Medicare Part C MAO pay for medical bills which were the responsibility of the primary payer?

K. Has the primary payer reimbursed the Medicare Part C MAO for medical bills which were the responsibility of the primary payer?

L. What is the total amount of damages that the primary payer must pay the Medicare Part C MAO as the reimbursement amount?

*iv.*     ***Findings of Fact and Conclusions of Law as to Commonality***

As set forth below, Plaintiff's claims arise from the same practice, course of conduct in

Defendant's claims processing procedure, and methodology are based on the same legal theory.

*See Sosa*, 73 So. 3d at 107 (finding commonality where the plaintiff's claims "arose from the

same course of conduct and routine billing practice by [defendant] and were based on the same

legal theory").

*a.*     ***Defendant's Common Practice and Course of Conduct***

Plaintiff has established by substantial competent evidence that Defendant's common

practice and course of conduct in processing no-fault claims pertaining to any and all of its

claims within the Class Period is the same. Specifically, Defendant processes its no-fault claims

by:

A. maintaining PIP payout sheets that contain identical fields [J.A. 003272, Pl.'s
Composite. Ex. 1; J.A. 001686:8-001687:4, 001699:21-25, 001700:1-8, Ruiz
Testimony Sept. 12, 2016; J.A.002349:7-20, 002353:15-25, Celli Testimony
September 14, 2016], including, but not limited to, the following fields: name
of the claimant; date of birth; claim number; date of loss; coverage status;
deductible amount; provider number; service dates; billed amount; bill date of
receipt; and paid amount [J.A. 001690:3-001694:9, Ruiz Testimony
September 12, 2016; J.A.002349:7-25 Celli Testimony September 14, 2016;
J.A. 003272, Pl.'s Composite Ex. 1];

B. maintaining the information in its PIP payout sheets in electronic format, both
the field titles and data within the fields [J.A. 002353:15-19, Celli Testimony
Sept. 14, 2016];

C. maintaining insurance "declarations pages" that contain identical fields and
data within the fields, including, but not limited to:  name of the insured;
address of the insured; policy period; year, make, and model of the vehicle;
vehicle identification number; personal injury protection coverage status;
amount of coverage; and deductible amount [J.A. 002354:15-21, 002355:14-
25, 002356:1-8, 002357:4-20, 002358:18-24, Celli Testimony Sept. 14, 2016 ;

D. maintaining the information in its "declarations page" in an electronic format,
which can be recreated [J.A. 001686:8-25; 001687:1-4, Ruiz Testimony Sept.
12, 2016; J.A. 002359:14-16, Celli Testimony Sept. 14, 2016];

E. maintaining the information in its "explanation of benefits" in an electronic format, which can be recreated [J.A. 002359:17-21, Celli Testimony Sept. 14, 2016];

F. has knowledge of its obligation to report to CMS regarding the Medicare eligibility of its injured insureds [J.A. 003186:24-25, 003187:1, Celli Dep. May 31, 2016; J.A.002535:8-12, Celli Testimony Sept. 14, 2016];

G. sending form letters to its insureds to inquire whether they are Medicare eligible, which are limited to inquiring only about Medicare Part A, Part B, and group health insurance, and not Medicare Part C (*i.e.*, Medicare Advantage) [J.A. 003287, Pl.'s Ex. 3 – *R.G. Reporting Compliance Letter*; J.A. 002313:9-25, 002314:1-6, 002321:2-6, 002536:6-19, Celli Testimony Sept. 14, 2016.; J.A. 003130:8-13, 23-25, 003131:1-10, Celli Depo May 31, 2016];

H. only reporting to CMS if its insured informs it of its Medicare eligibility [J.A. 001598: 2-23, Ruiz Testimony June 2, 2016; J.A. 003094:14-25, 003095:1-3, Celli Dep. May 31, 2016; J.A. 002543:11-24, Celli Testimony Sept. 14, 2016];

I. using ISO in an attempt to satisfy its Medicare reporting responsibility [J.A. 002326:2-8, 14-25, 002327:1-2, Celli Testimony Sept. 14, 2016.];

J. failing to utilize any specific guidelines for determining whether or not its insureds are Medicare eligible.   [J.A. 001390:22-25, 001391:1-9, Celli Testimony June 2, 2016]. In fact, Defendant processes claims involving its Medicare eligible insureds no different than the claims involving its non-Medicare eligible insureds. [J.A. 001390:7-21, Celli Testimony June 2, 2016; J.A. 003090:7-19, Celli Dep. May 31, 2016];

K. Joseph Celli, Defendant's claims adjuster, admits he makes the final determination as to whether medical treatment is reasonable, related, or necessary as a result of the use, maintenance, or operation of a motor vehicle [J.A. 003144: 12-17, Celli Dep. May 31, 2016]. As it pertains to the car accident of R.G., Mr. Celli agrees that all the medical bills that were submitted to the Defendant were reasonable, related and necessary. [J.A. 003129: 15-19, Celli Dep. May 31, 2016];

L. not requiring its insureds to provide social security numbers [J.A. 002345:1-13, Celli Testimony Sept. 14, 2016] or maintaining a guideline or protocol to determine whether an insured of the Defendant, making a PIP claim, was also a Medicare beneficiary.   [J.A. 001390:22-25, 001391:1-9, Celli Testimony June 2, 2016];

M. not performing paper reviews [J.A. 002342:4, Celli Testimony Sept. 14, 2016];

N. routinely failing to notify CMS about every instance in which it receives a no-fault claim from a Medicare beneficiary. [J.A. 003094:14-25, Celli Depo May 31, 2016]; and

O. only informing CMS of its insured's Medicare eligibility if it is made aware that its insured is Medicare eligible. [J.A. 003094:25, 003095:1-3, Celli Dep. May 31, 2016; J.A. 001598:2-23, Ruiz Testimony June 2, 2016; J.A. 002543:11-24, Celli Testimony Sept. 14, 2016].

    **b.**   ***There is a Common and General Interest as to Both the Law and Facts as it Pertains to the Class Representative and the Absent Class Members Claims***

   Plaintiff demonstrated by substantial competent evidence that the questions of common or general interest apply to all class members, *i.e.*, the right to reimbursement for payments made for Medicare enrollees' medical expenses. *See W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509 at *21 (finding "the primary plan's failure to make primary payment or to reimburse the MAO causes the MAO an injury in fact. Therefore, an MAO may avail itself of the MSP private cause of action and/or state law claims when a primary plan fails to make primary payment or to reimburse the MAO's secondary payment."). Defendant is primarily responsible in all instances when there is a Medicare beneficiary that has been involved in a car accident and incurred medical expenses. [J.A. 002458:22-25, 002459:3-6, 002462:17-23, Celli Testimony Sept. 14, 2016].

    **c.**   ***Similar Interest in Relief Sought and Common Right of Recovery***

   Plaintiff demonstrated by substantial competent evidence that the Class Members have a similar interest in the relief sought and a common right of recovery, *i.e.*, reimbursement for payments made as a result of Defendants' failure to comply with section 627.736, Florida Statutes, and 42 U.S.C. § 1395y(b)(3)(A). [J.A. 001470:16-25, 001471:1-5, Ruiz Testimony June

2, 2016; J.A. 002123:19-25, 002124:1-5, Jordan Testimony, Sept. 13, 2016].

### d.    Common Issues to All Class Members

Defendant's conduct raises common issues of law and fact, affecting all Class Members, mainly the the: (1) defendant's status as primary plan; (2) defendant's failure to provide for primary payment or appropriate reimbursement; and (3) damages amount. *W. Heritage Ins. Co.,* 2016 U.S. App. LEXIS 14509 at *21.

### e.    Common Issues of Law as Alleged in the Amended Complaint

The Amended Complaint identifies additional questions of law and fact that are common to Plaintiff's and the Class Members' claims[20], including whether:

A.    the Enrollee received emergency medical services, hospital inpatient services and/or other medical treatment or supplies as a result of the use, maintenance or operation of a motor vehicle that rendered Defendant primarily responsible to satisfy such expenses before Plaintiff and the Class were obligated to make secondary payments on behalf of the enrollee;

B.    pursuant to 42 C.F.R. § 411.25, Defendant was required to provide notice or otherwise inform Plaintiff, and the Class, that it is a primary payer, and to further provide specifics as to the accident or injury for which it is primarily responsible;

C.    Plaintiff and the Class are authorized to bill Defendant full charges. *See* 42 U.S.C. § 1395w-22(a)(4); 42 C.F.R. § 422.108(d); *Bio-Medical Applications of Tenn., Inc. v. Cent. States S.E. & S.E. Areas Health & Welfare Fund,* 656 F.3d 277, 295-296 (6th Cir. 2011); *Humana Inc. v. Medtronic Sofamor Danek USA, Inc.*, 133 F. Supp. 3d 1068, 1078 (W.D. Tenn. 2015); and

D.    the evidence established the following relevant factors common to all members of the Class: (i) injuries to their enrollees that arose out of the use, maintenance or operation of a motor vehicle [J.A. 001488:13-25, 001584:1-22, 001598:2-25, 001599:1-4, Ruiz Testimony June

2, 2016; J.A. 003089:21-25, 003090:1, Celli Depo May 31, 2016; J.A. 003272-003283, Pl.'s Composite Ex. 1]; (ii) resulting in charges for medical treatments and/or supplies [*Id.*]; (iii) a single statute that, for all material purposes, applies to all claims [J.A. 000078, Am. Compl. ¶ 65; J.A. 002315:23-25, 002316:1-25, 002317:1-10, Celli Testimony Sept. 14, 2016]; and (iv) a single no-fault insurer, Defendant, for all the Medicare enrollees. [J.A. 001421: 11-21, Celli Testimony June 2, 2016; J.A. 003128:21-25, J.A. 003129:1-5, Celli Dep. May 31, 2016].

Accordingly, this Court finds that Plaintiff satisfied the commonality requirement.

### 3.   Typicality

#### i.   Applicable Law

"The *key inquiry* for a trial court [to] determine[] whether a proposed class satisfies the typicality requirement is whether the class representative possesses *the same legal interest* and has endured *the same legal injury* as the class members." *Sosa*, 73 So. 3d at 114; *Morgan v. Coats*, 33 So. 3d 59, 65 (Fla. 2d DCA 2010). "The test for typicality, like the test for commonality, is not demanding and focuses on the general similarity between the named plaintiff[s]' legal and remedial theories and the theories of those whom they purport to represent." *Morgan*, 33 So. 3d at 65; *see also Clausnitzer v. Fed. Exp. Corp.*, 248 F.R.D. 647, 656 (S.D. Fla. 2008) (holding that "[a]s is the case with commonality, the requirements of typicality are not high."). "Because the test for typicality is not demanding, this Court looks at the requirement in the light most favorable to the [P]laintiff[]." *Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592, 600 (E.D. La. 2002). As held by the Florida Supreme Court,

> *[m]ere factual differences between the class representative's claims and the claims of the class members will not defeat typicality.* Rather, the typicality requirement is satisfied when there is a strong similarity in the legal theories upon which those claims are based and when the claims of the class representative and class members are not antagonistic to one another.

---

[20] *See* J.A. 000080, Am. Compl., ¶ 67.

*Sosa*, 73 So. 3d at 114-15 (internal citations omitted) (emphasis added). Further, typicality is not defeated by differing damages among class members and their representatives. *Id.* at 115. Accordingly, the main purpose of the typicality requirement is to aid the court in its duty to protect the absent class members. *Id.* A named plaintiff's claim will be found to be typical if it arises from the same event or conduct giving rise to the claims of absent class members. *See Basco*, 216 F. Supp. 2d at 599 (holding that "[o]ne of the purposes of the typicality requirement is to ensure that the representative's interest is "aligned with those of the represented group, and in pursing his own claims, the named plaintiff will also advance the interests of the class members").

##                    ii.    *Findings of Fact and Conclusions of Law as to Typicality*

Plaintiff and the putative class have similar interests in the relief they seek and their common rights of recovery, *i.e.*, reimbursement for payments made as a result of Defendant's failure to comply with 42 U.S.C. § 1395y(b)(3)(A) and section 627.736, Florida Statutes. [J.A. 002123:19-25, 002124:1-5, Jordan Testimony Sept. 13, 2016]; *see Sosa*, 73 So. 3d at 114 (holding that the key inquiry in determining whether a class satisfies the typicality requirement is whether the class representative "possesses the same legal interest and [have] endured the same legal injury as the class members"); *see also* Fla. R. Civ. P. 1.220(a)(3). Thus, Plaintiff's claims are typical of the Class claims since every single class member has a right to reimbursement from Defendant as it pertains to every one of its Medicare Part C enrollees who had an accident during the claims period and for which the Class Members made payments and have not been reimbursed. *See Sosa*, 73 So. 3d at 114.

Defendant's common practice and course of conduct in processing its no-fault claims gives rise to the claims of Plaintiff and the putative class members. *See Basco*, 216 F. Supp. 2d

at 599 (holding the typicality requirement was met "because the representative plaintiffs ha[d] been affected by the same [] [pattern and] practices that affect[ed] all members of the Class"); *supra* Part VII.A.2., *Commonality*. It is Plaintiff's theory that its rights, and those of others similarly situated, arise through the payments made by the MAOs as secondary payers for which Defendant was primarily responsible and should have itself paid, or properly reimbursed MAOs, for their payments. [J.A. 000081-000082, Am. Compl. ¶ 71; J.A. 001560:13-22, Ruiz Testimony, June 2, 2016; J.A. 002101:7-11, Ruiz Testimony, Sept. 13, 2016; J.A. 002458:22-25; 002459:3-4; 002460:17-21, Celli Testimony, Sept. 13, 2016; J.A. 002462:18-23, Celli Testimony Sept. 14, 2016].

As such, Plaintiff's interest is "aligned with those of the represented group, and in pursing [its] own claims, the [] [P]laintiff will also advance the interests of the class members." *See Basco*, 216 F. Supp. 2d at 599. The Court thereby finds that Plaintiff satisfied the typicality requirement for class certification, as: (1) Defendant is an insurance company that provides no-fault coverage to Medicare Part C enrollees [J.A. 000131 at ¶ 1 Defendant's Answer to Amended Class Action Complaint]; (2) Defendant is a primary payer in the event that a Medicare Part C enrollee is injured in an automobile accident and incurs medical expenses due to personal injuries [J.A. 002459:3-6, Celli Testimony Sept. 14, 2016; J.A. 000131 at ¶ 1]; and (3) Plaintiff's assignor and class members are secondary payers that seek reimbursement from Defendant for conditional payments made, which should have been paid by Defendant as a primary payer [J.A. 001478:5-19, 001502:23-25, 001503:1-9, 001486:23-25, 001487:1-6, 001531:4-25, 001532:1-14, Ruiz Testimony, June 2, 2016; J.A. 000064, Am. Compl. ¶ 18]. Further, Defendant also violated 42 U.S.C. § 1395y(b)(3)(A) and section 627.736, Florida Statute, by failing to:

a.  determine whether Plaintiff and the Class Members' enrollees were Medicare beneficiaries [J.A. 002311:14-18, 25, 002312:1-22, Celli Testimony Sept. 14, 2016;

b.  pay for Plaintiff and the Class Members' enrollees' medical expenses stemming from an automobile accident [J.A. 002457:16-22, 25, 002458:4];

c.  notify Plaintiff and the Class Members made payments that they should not have pursuant to 42 C.F.R. § 411.25(a) [J.A. 002456:6-25, Celli Testimony Sept. 14, 2016]; and

d.  reimburse Plaintiff and the Class Members for the payment of medical expenses of Medicare Part C enrollees stemming from an automobile accident [J.A. 002460:3-8, Celli Testimony Sept. 14, 2016.

As a result, Plaintiff and the absent class members all have identical rights pertaining to the causes of action that may be pursued to obtain reimbursement from Defendant, as a primary payer.    As asserted in the Amended Complaint, Plaintiff's claim under 42 U.S.C. § 1395y(b)(3)(A), and breach of contract claim for Defendant's failure to pay PIP benefits' claims are typical of the causes of action that would be asserted by every absent class member. [J.A. 000085-000091, Am. Compl.].  Thereby, the typicality requirement is satisfied.

## 4.   Adequacy of Representation – Class Counsel and Class Representative

### i.    *Applicable Law*

"[T]he Constitution's Due Process Clause and the rules of class action procedure both insist that the class be 'adequately' represented."  Newberg on Class Actions § 3:50 (5th ed.); *see also Grosso v. Fid. Nat. Title Ins. Co.*, 983 So. 2d 1165, 1170 (Fla. 3d DCA 2008) (holding that "[b]ecause the certification of a class and settlement of the class representative's claims will ultimately bind absentee class members, there are constitutional due process implications which must be satisfied.")  "A trial court's inquiry concerning whether the adequacy requirement is satisfied contains two prongs. The first prong concerns the qualifications, experience, and ability of class counsel to conduct the litigation. The second prong pertains to whether the class

representative's interests are antagonistic to the interests of the class members." *Sosa,* 73 So. 3d at 115 (internal citations omitted). "The relationship between the class and class representatives must be free from conflicts of interest, and the adequacy analysis serves to uncover conflicts of interest between named parties and the class they seek to represent." *Grosso,* 983 So. 2d at 1173 (internal quotations omitted).   However, "the existence of minor conflicts alone will not defeat a party's claim to class certification; *the conflict must be a 'fundamental'* one going to the specific issues in controversy."   *United Wis. Servs. v. Abbott Labs. (In re Terazosin Hydrochloride Antitrust Litig.),* 220 F.R.D. 672, 688 (S.D. Fla. 2004) (emphasis added).   The Plaintiff and its counsel in the instant matter have met these legal standards.

### ii.    *Findings of Fact and Conclusions of Law as to Adequacy*

#### a.    *Adequate Class Counsel*

##### 1.    **Plaintiff's Counsel Possesses Sufficient Experience and Resources to Serve as Class Counsel.**

Plaintiff established that John H. Ruiz, Frank C. Quesada, and Gonzalo Dorta have the experience, resources, and commitment to prosecute this case vigorously to a successful resolution[21] as they possess:

a.   the requisite knowledge and experience in the MSP Law necessary to prosecute this case by virtue of their representation an active participation in other significant cases [*MSP Recovery, LLC v. Allstate Ins. Co.,* 26 Fla. L. Weekly Fed. C738 (U.S. 11th Cir. August 30, 2016); Brief for MSP Recovery, LLC as Amicus Curiae, *W. Heritage Ins. Co.,* 26 Fla. L. Weekly Fed. C591 (U.S. 11th Cir. August 8, 2016)];

b.   the financial resources necessary to prosecute this case.   [J.A. 001509:12-24 001510:1-5 Ruiz Testimony, June 2, 2016; 001838: 10-15 Ruiz Testimony Sept. 12, 2016]; and

c.   the personnel and staff to litigate this case. [J.A. 001507: 3-25 Ruiz Testimony, June 2, 2016].

---

[21] [J.A. 001449:8-25, 001452:24-25, 001453:1-17 Ruiz Testimony, June 2, 2016; 004085:4-5, Pl.'s Ex. 20, *Jenifer Jordan Deposition Tr.*].

In addition, attorney John H. Ruiz, has successfully certified a substantial number of no-fault class action cases that were later affirmed by the Third District Court of Appeal. [J.A 003284, Pl.'s Ex. 1 *(June 2, 2016 Hearing) Previous Cases Certified by Class Counsel*; J.A. 001449:8-25, 001454:24-25, 001455:1-25, 001530:2-16, Ruiz Testimony, June 2, 2016]. A substantial number of these cases received final settlement approval from the court finding the settlements to be fair, reasonable, and adequate to the class members. Moreover, Mr. Ruiz and Mr. Quesada have significant experience litigating MSP cases, serving as counsel for multiple landmark cases decided by the Eleventh Circuit and Third District Court of Appeal. Finally, Mr. Dorta has extensive trial practice in complex commercial litigation, and has served as lead trial counsel in various public interest class action claims. Accordingly, the evidence established that Plaintiff's Counsel is uniquely qualified to effectively represent the proposed class and hence is adequate counsel to prosecute this class action.

### b.  *Adequate Class Representative*

#### 1.  Plaintiff's Interests Are Parallel to The Interests of The Class Members.

By assignment, Plaintiff is the owner of FHCP's and other MAOs' reimbursement claims, and seeks class certification to enforce the reimbursement rights of the Class for medical payments made on behalf of its Medicare enrollees. [J.A. 003465:6-10 Jorge Lopez Depo. Tr., Aug. 31, 2016; 003540:12-16 Stipulation of Ruiz at Lopez Dep; 001460:21-25, 001461:1-7, 001520:19-25, 001521:1-5 Ruiz Testimony, June 2, 2016 Tr.]. Plaintiff demonstrated that it is "willing and able to take an active role as class representative and advocate on behalf of all class members." *See Sosa*, 73 So. 3d at 115; *but cf. Weinberger v. Jackson*, 102 F.R.D. 839, 844 (N.D. Cal. 1984) (holding that "[p]ersonal qualifications or motives of the proposed class representative are not determinative of the adequacy of the representative"). For instance,

Attorney Jorge A. Lopez, as the corporate representative of Plaintiff, MSPA Claims 1, LLC, [J.A. 001468:16-19 Ruiz Testimony, June 2, 2016], testified that he actively cooperates with Plaintiff's Counsel to protect the best interests of the absent class members and their reimbursement claims. [J.A. 001469: 1-17 Ruiz Testimony June 2, 2016].

Notably, Defendant focused much of its argument on the interrelationship between Plaintiff and Mr. Ruiz, the implication being that Mr. Ruiz is too closely related to the Plaintiff, which might in turn incentivize Plaintiff "to place the interests of Mr. Ruiz above those of the class." [J.A. 000234 Def.'s Response in Opposition to M. for Class Cert., 001472;1-25 Ruiz Testimony, June 2, 2016]. However, "to question [Plaintiff's] adequacy is to be unrealistic about the role of the class representative in a class action suit .... [T]he class action suit ... is in fact entirely managed by class counsel. For 'class action attorneys are the real principals and the class representative/clients their agents' in class action suits." *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1080 (7th Cir. 2013). "It has long been understood that class counsel control class actions, perhaps even selecting the class representatives themselves, thereby reversing, not inscribing, the standard attorney/client relationship. Newberg on Class Actions § 3:52 (5th ed.); *see also New Directions Treatment Services v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) (holding that "[e]xperience teaches that it is counsel for the class representative, and not the named parties, who direct and manage these actions."). Furthermore, the Southern District of Florida has held that "but for [the] requirement that there be a named class representative", where "proving either Plaintiff's case or that of other class members, [] will [] be established through expert testimony based on [] computer data", "[the] [p]laintiff is basically irrelevant to the case." *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 697 (S.D. Fla. 2015).

Such is the case here, where as described at length below, Plaintiff has the ability to prove its case and that of the other class members, using computer data and analysis.

Plaintiff also demonstrated that there is no hostility of interests between Plaintiff and the Class Members, as Plaintiff has no objectives that are antagonistic to the claims of the Class Members it seeks to represent and/or claims it will pursue. On the contrary, Plaintiff demonstrated that its interests are parallel to the interests of the Class Members and that it seeks the same relief for itself as it does for the Class. [J.A. 001470: 16-25, 001471; 1-5 Ruiz Testimony, June 2, 2016; 003547:16-25, 003548:10 Lopez Dep.].

### 2.      Absence of Any Fundamental or Substantial Conflicts.

Defendant alleged the existence of potential conflicts of interest between Plaintiff and its counsel, which they contended render Plaintiff an inadequate class representative. The Court is unpersuaded by this assertion.

"A named class representative and [its counsel] serve[s] the class in a fiduciary capacity because class plaintiffs undertake the litigation to protect and benefit the dependent class members they serve." *Grosso*, 983 So. 2d at 1173. Notwithstanding Plaintiff's fiduciary duty, the Southern District of Florida explained that the Defendant has the burden of proving the existence of a conflict, and stated in pertinent part,

> class certification cannot be defeated merely because Defendants assert unsupported allegations of conflict between potential class members. *When Defendants come forward with an alleged conflict, the Court must scrutinize the record citations Defendants cite to determine whether such evidence establishes the existence of a conflict, or whether it provides a basis for the Court to imply that a realistic possibility of antagonism exists.*

*In re Terazosin*, 220 F.R.D. at 690 (emphasis added). "[T]he existence of minor conflicts alone will not defeat a party's claim to class certification; *the conflict must be a 'fundamental'* one going to the specific issues in controversy." *Id.* at 688 (emphasis added).

> A fundamental conflict exists where some party members claim to have been
> harmed by the same conduct that benefitted other members of the class. In such a
> situation, the named representatives cannot 'vigorously prosecute the interests of
> the class through qualified counsel' because their interests are actually or
> potentially antagonistic to, or in conflict with, the interests and objectives of other
> class members.

*Id.* at 688.  Further, "perfect symmetry of interest is not required and not every discrepancy

among the interests of class members renders a putative class action untenable . . . . Put another

way, to forestall class certification *the intra-class conflict must be so substantial as to*

*overbalance the common interests of the class members as a whole*."  *Matamoros v. Starbucks*

*Corp.*, 699 F.3d 129, 138 (1st Cir. 2012) (emphasis added) (rejecting Defendant's contention

"that an insurmountable intra-class conflict destroys any hope of adequacy of representation").

  Defendant inaptly relied on several cases for the proposition that "financial or family ties

between the class representative and class counsel may cause substantial conflicts of interest".

[*See* J.A. 000231-000232, Defendant's Opposition to Class Cert Mtn.].  "The primary concern in

these cases is whether there is a threat the class representative may have an interest in the

attorneys' fees the class counsel may ultimately receive." *Werlinger v. Champion Healthcare*

*Corp.*, 598 N.W.2d 820, 828 (N.D. 1999).  Where "[t]here is no evidence in the record, other

than the [close] relationship itself, to support a charge of collusion between counsel and the

representative", there is no conflict of interest. *See id.* at 828 (explaining that there is no conflict

of interest where the only evidence in the record was the familial relationship between the class

representative and class counsel, as they were husband and wife).   As noted by the Southern

District of Florida, "[c]ourts across the country have certified classes where the lead plaintiff was

closely related to class counsel — *provided that the class representative demonstrated sufficient*

*economic or decision-making independence from class counsel to mitigate the potential for*

*conflicted interests. Alhassid v. Bank of Am., N.A.*, 307 F.R.D. 684, 700 (S.D. Fla. 2015) (emphasis added).

There is no evidence in the Record to support any of Defendant's speculative contentions regarding the relationship between the Class Representative and Class Counsel. Courts across the country agree that conflicts that are merely speculative or hypothetical will not affect the adequacy inquiry. *See Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 430 (4th Cir. 2003) (holding that "[t]o defeat the adequacy requirement [], a conflict 'must be more than merely speculative or hypothetical'"); *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 296 (E.D.N.Y. 1998); *Newman v. Eagle Bldg. Techs.*, 209 F.R.D. 499, 501-502 (S.D. Fla. 2002) (citing *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 296 (E.D.N.Y. 1998); *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975) (noting that "courts have generally declined to consider conflicts...sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suit.") [22].

Defendant's assertions that there is a conflict of interest between Plaintiff's Co-Counsel, John H. Ruiz, and the putative class were unsupported and were rebutted by Plaintiff. The Defendant failed to show the existence of any conflict that would seriously call into question Mr. Ruiz's interest in representing the absent Class Members with the same vigor with which he would represent the Class Representative. The fact that Mr. Ruiz's son is a member of Plaintiff's

---

[22] The Court finds no "apparent, imminent . . . issue at the very heart of the suit" affecting Plaintiff's ability to adequately represent the Class related to Plaintiff's former employee, Walter Lista, as he: (1) does not have a direct financial interest in Plaintiff; (2) is not the Class Representative; and (3) is not involved in this case, as his sole role is that of an I.T. consultant [J.A. 001526:4-17, June 2, 2016; J.A. 001526:18-20, June 2, 2016; J.A. 002043:21-25, 002044:1-25, 002045:1-9, September, 13, 2016; 002521:6-8, Response to Court Question, September 14, 2016; J.A. 001525:23-25, 001526:1-20, June 2, 2016]; *see Sosa*, 73 So. 3d at 115; *Newman v. Eagle Bldg. Techs.*, 209 F.R.D. 499, 505 (S.D. Fla. 2002) ("[s]imply doing business with [a person] is insufficient for [the] Court to judge [a Plaintiff's] moral character or to place blame on [a Plaintiff] for [that person's] violations of [the law].").

parent company, MSP Recovery Services, LLC,[23] does not, without more, support the disqualification of Mr. Ruiz as Co-Class Counsel. [J.A. 001456:1-25, 001457:1-25, 001458:1-24, 001461:20-25, 001462:1-25, 01528:16-23, 001529:1-15 Ruiz Testimony, June 2, 2016]. Neither Mr. Quesada nor Mr. Ruiz have a direct financial interest in the Class Representative's parent company, MSP Recovery Services, LLC, as evidenced by the company's corporate filings and the testimony presented. [J.A. 001521:6-16, 001522:2-16, Ruiz Testimony, June 2, 2016]. In addition, Plaintiff established that any resolution or settlement in this action would be reached with the participation and approval of Plaintiff's Counsel[24] and counsel for Plaintiff's assignor, FHCP. [J.A. 001463:19-25, 001464:1-4, Ruiz Testimony, June 2, 2016]. Further, Mr. Ruiz testified that Plaintiff and Plaintiff's Counsel entered into a contingency fee agreement whereby Plaintiff's Counsel's entitlement to attorney's fees would be contingent on whether Plaintiff prevails on the merits, which would be sought from Defendant. [J.A. 001832:9-25, 146:5, Ruiz Testimony, September 12, 2016]. Accordingly, Plaintiff "demonstrated sufficient economic or decision-making independence from Class Counsel to mitigate the potential for conflicted interests." See *Alhassid*, 307 F.R.D. at 700.

Ultimately, Defendant's principal argument is that if Plaintiff and Plaintiff's counsel has any familial, business, or otherwise close relationship with each other, and/or any financial interest in the litigation, they cannot be adequate representatives for the putative class. This

---

[23] MSP Recovery Services, LLC owns Plaintiff, MSPA Claims 1, LLC. [J.A. 001461:20-25, Ruiz Testimony, June 2, 2016].

[24] [J.A. 003541:9-15, 003542:3-13, Ruiz Stipulation, August 31, 2016 (Stipulating that a legal services retainer agreement exists between MSP Recovery Law Firm and Plaintiff, MSPA Claims 1, LLC, which: (1) establishes an attorney-client relationship between these two entities; and (2) permits hiring co-counsel)].

argument is unpersuasive in light of Plaintiff's evidence to the contrary and is unsupported by the applicable law.

The Court concludes notwithstanding that, "the addition of new and impartial counsel can cure a conflict of interest even where previous counsel continues to be involved in the case." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). "The addition of an impartial attorney ensures that vigorous prosecution of the class claims will continue. Further, this course of action protects the Class, which certainly would be prejudiced if compelled to retain new counsel, unfamiliar with the pending litigation." *E. Me. Baptist Church v. Regions Bank*, 2007 U.S. Dist. LEXIS 76430 (E.D. Mo. Oct. 12, 2007) (holding that "there is no per se rule that the continued participation by [conflicted counsel] constitutes inadequate representation under Rule 23, so long as new and impartial counsel can be added to cure the conflict of interest."). Further, Plaintiff retained Gonzalo R. Dorta to serve as co-counsel in order to avoid any potential conflict of interest between Class Counsel and the Class Members. *See Linney*, 151 F.3d at 1239. Mr. Dorta is the managing partner of Dorta Law, and is not employed or associated in any manner with MSPA Claims 1, LLC, MSP Recovery Services, LLC, MSP Recovery, LLC or La Ley Recovery, Inc.

Finally, Defendant's assertion that the alleged conflicts between Plaintiff's Counsel and Plaintiff will prejudice other class members fails to account for the Court's broad authority over class action settlement terms in the event of a settlement.[25] "To approve a class action settlement, the trial court must find that the agreement [is] fair, reasonable, and adequate."

---

[25] The Court acts as a "gatekeeper" to the proper administration of justice in class actions. The legislature endowed courts with a broad range of authority to scrutinize settlements. Hillary A. Sale, *Judges Who Settle*, 89 Wash. U.L. Rev. 377, 390 (2011); *see* Elizabeth Chamblee Burch, *Disaggregating*, 90 Wash. U.L. Rev. 667, 678–79 (2013); *see also* Managing Class Action Litigation: A Pocket Guide for Judges, 2005 WL 5672417.

*Grosso*, 983 So. 2d at 1173.  When making this determination, the Court must consider several factors, including, but not limited to the: (1) reaction of the class to the settlement; and (2) reasonableness of the settlement in light of the best recovery. *Id.*  Further, the Court must also consider the reasonableness of attorneys' fees and costs, as well as the adequacy of notice to the class.  *See id.* at 1175-76 (holding that "the reviewing court must require that notice be given to the class of the proposed attorneys' fees as well as the rest of the settlement agreement and afford anyone who objects an opportunity to be heard"); *Fung v. Fla. Joint Underwriters Ass'n*, 840 So. 2d 1101, 1102 (Fla. 3d DCA 2003) (holding that "the trial court is allowed to conduct whatever investigation it feels appropriate before approving a class action settlement.  Where . . . the court ha[s] a concern that the attorney's fee might be excessive, the court ha[s] the latitude to conduct whatever proceedings it [feels are] appropriate.").  Accordingly, because class actions settlements are subject to the Court's scrutiny, review and approval, any risk that Plaintiff would neglect or fail to protect the interests of the Class in favor of Class Counsel is eliminated.

### 4.    *No Conflict Representing Class Member MAOs*

Defendant alleges an existing conflict based on the presumption that, because John Ruiz previously brought suit against certain insurers, the proposed class counsel is inadequate to represent this Class.  Defendant requests that the Court take judicial notice of several civil remedy notices filed by Mr. Ruiz against various insurers which may potentially be class members in the instant litigation. Defendant's argument has been rejected by many Florida courts and federal circuit courts throughout the country.

In a securities fraud action by a customer against a brokerage firm, evidence that customer's counsel had represented the brokerage firm in ten prior matters involving securities did not create a conflict of interest substantial enough to disqualify counsel from the case. *See*

*Duncan v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 646 F. 2d 1020, 1028 (5th Cir. Unit B 1981). The Southern District of Florida also held that an attorney's prior representation of a defendant in a patent infringement suit did not preclude representation of plaintiff in the instant suit against defendant for alleged infringement of the same patents. Courts also acknowledge that a finding of inadequacy to every class counsel who may have served in an adversarial role to one or more class members would effectively eliminate class actions entirely. "The strict application of rules on attorney conduct that were designed with simpler litigation in mind might make the class-action device unworkable in many cases, the courts insist that a serious conflict be shown before they will take remedial or disciplinary action." *Bash v. Firstmark Standard Life Ins. Co.,* 861 F.2d 159, 161 (7th Cir. 1988). Courts have also required that some evidence must be provided to support a defendant's position that a conflict of interest exists between class counsel and class representatives. *See Diakos v. HSS Sys., LLC,* 137 F. Supp. 3d 1300, 1309 (S.D. Fla. 2015) (holding that as to counsel's adequacy, "[a]bsent specific proof to the contrary, the adequacy of class counsel is presumed"). The Third District Court of Appeal has held a party lacks standing to allege a conflict of interest when that party has no privity of contract with the counsel and is not the party which could potentially be prejudiced by the alleged conflict. *See Cont'l Cas. Co. v. Przewoznik,* 55 So. 3d 690, 691 (Fla. 3d DCA 2011).

There is neither legal nor factual support for Defendant's argument that the proposed class counsel in the instant case possesses a potential conflict in representing the Class Members merely because some class members may have been involved in litigation with class counsel. The civil remedy notices Defendant relies on have no relation to the facts or law relevant to this case since they involved group health plans and not the Class Member's Medicare Advantage Plans. Further, MAOs have to contract with CMS. None of the civil remedy notices deal with

Medicare benefits, Medicare beneficiaries, or MAOs. Even if the civil remedy notices had been directly related to the recovery of no-fault benefits owed to MAOs, the court in *Duncan* held that past representation in litigation directly related to the lawsuit in question is insufficient to establish a conflict. *See Duncan*, 646 F. 2d at 1028. Moreover, the court in *Bash* recognized that a class action would be reduced to a meaningless procedural device if all attorneys who may have previously represented one of the many potentially thousands of class members were found to be inadequate. *See Bash*, 861 F.2d at 161.

Defendant has presented no credible evidence of a conflict of interest between class counsel and the Class Members. Furthermore, because there is no privity of contract between Defendant and class counsel and is not the party which could potentially be prejudiced by any alleged conflict, Defendant lacks standing to challenge counsel's adequacy in this manner.

## B.      Rule 1.220(b)(3)

In addition to meeting the preliminary requirements of Florida Rule of Civil Procedure 1.220(a), Plaintiff must also meet one of the standards under Rule 1.220(b). Plaintiff's Motion for Class Certification is based on Rule 1.220(b)(3), which requires that questions of law or fact common to the claim of the representative party and the claims of each Class Member predominate over any questions of law or fact affecting only individual members of the Class, and that class representation is superior to other methods for the fair and efficient adjudication of the controversy.

### 1.      Predominance

#### i.      *Applicable Law*

Plaintiff sought certification pursuant to Rule 1.220(b)(3), which requires that the questions of law or fact common to the claim of the representative party and the claims of each

member of the class predominate over any questions of law or fact affecting only individual members of the class, and that class representation is superior to other methods for the fair and efficient adjudication of the controversy. *See Sosa*, 73 So. 3d at 111, 116. The predominance inquiry focuses on liability, not damages. *Id*. at 113; *see also Morgan v. Coats*, 33 So. 3d 59, 66 (Fla. 2nd DCA 2010) (holding that predominance is met where "the actual claims [were] based on the same legal theories and [were] based on the same course of conduct by the [Defendant]).

"Florida courts have held that common questions of fact predominate when the defendant acts toward the class members in a similar or common way." *Sosa*, 73 So. 3d at 111. "The methodology employed by a trial court in determining whether class claims predominate over individual claims involves a proof-based inquiry. More specifically, a class representative establishes predominance if he or she demonstrates a reasonable methodology for generalized proof of class-wide impact." *Id*. at 112.

Plaintiff's claims sought to be presented on a class-wide basis are predicated on a single common theory of liability, *i.e.*, violations of section 627.736, Florida Statutes. [J.A. 000079-000080, Am. Compl. ¶¶ 66-67].

In this case, each class member's claim would require proof of the same material and substantive facts. *Sosa*, 73 So. 3d at 112. While each claim will have minor factual differences, "it is not the burden of the class representative to illustrate that all questions of fact or law are common . . . . [r]ather, the class representative must only demonstrate that some questions are common, and that they predominate over individual questions." *Id*. (citations omitted). Further, the predominance inquiry focuses on liability, not damages. Thus, if [Plaintiff was] able to prove the elements of its claims, it would necessarily be able to prove the elements of the claims of each of the other class members. The required proof, as set out in *Western Heritage*, is: "(1) the

defendant's status as a primary plan; (2) the defendant's failure to provide for primary payment

or appropriate reimbursement; and (3) the damages amount." *Humana v. W. Heritage*, 2016 U.S.

App. LEXIS 14509, at *21 (11th Cir. 2016) ("[W]hen the primary insurer later pays, Medicare's

prior payment will normally be a matter of ascertainable fact.") (citing *United States v. Baxter

Int'l, Inc.*, 345 F.3d 866, 901 (11th Cir. 2003).

ii.    ***Factual Findings and Conclusions of Law as to Predominance***

a.    <u>***Defendant's Common Treatment of the Class Members***</u>

The primary focus of this case is the operation of Florida's No-Fault law and Defendant's

failure to reimburse the MAOs for payments made pursuant to the MSP cause of action, as well

as the state law claims.   Plaintiffs' claims are being pursued on a class-wide basis and are

predicated on a single common theory of liability, *i.e.,* the defendant's failure to pay and/or

reimburse, which gives rise to the Plaintiff's causes of action sounding in 1395y(b)3, as well as

state law causes of action pursuant to section 627.736, Florida Statutes.   [J.A. 000079-000080,

Am. Compl. ¶¶ 66-67].

Ultimately, the individual cases arise out of the same nucleus of operative facts, *i.e.*, that

Defendant has uniformly failed to: (1) provide primary payment for medical expenses incurred

by its insured, *i.e.* the Medicare enrollees; and/or (2) reimburse the secondary payer, the MAO,

for payments provided for Medicare enrollees' medical expenses whereby the Defendant was

primarily liable causing liquidated damages.  In none of the cases, neither the beneficiary nor the

primary payer contested the amount of reimbursement by exhausting administrative remedies,

which are now time barred.  *See* Section VII herein, *infra.*  Each Class Member will have

incurred the same type of injury proximately caused by the same Defendant based on the same

general factual scenario, a failure to pay or reimburse as a primary payer for medical bills that resulted from an automobile accident during the claims period.

Defendant admittedly uses the same process every time to determine whether it should pay a claim [J.A. 002350:17-25, 002351:1-2, Celli Testimony, Sept. 14, 2016].  Defendant's process is always consistent and amounts to its common course of conduct, which includes, but is not limited to:

a) maintaining PIP payout sheets that contain identical fields, including, but not limited to: name of the claimant; date of birth; claim number; date of loss; coverage status; deductible amount; provider number; service dates; billed amount; bill date of receipt; and paid amount [J.A. 003272, Pl.'s Composite Ex. 1; J.A. 001686:8-001687:4, 001699:21-25, 001700:1-8, Ruiz Testimony Sept. 12, 2016; J.A.002349:7-20, 002353:15-25, Celli Testimony September 14, 2016; J.A. 001690:3-001694:9, Ruiz Testimony September 12, 2016; J.A.002349:7-25 Celli Testimony September 14, 2016; J.A. 003272, Pl.'s Composite Ex. 1];

b) maintaining insurance "declarations pages" that contain identical fields and data within the fields, including, but not limited to:  name of the insured; address of the insured; policy period; year, make, and model of the vehicle; vehicle identification number; personal injury protection coverage status; amount of coverage; and deductible amount [J.A. 002354:15-21, 002355:14-25, 002356:1-8, 002357:4-20, 002358:18-24, Celli Testimony Sept. 14, 2016 ;

c) sending form letters to its insureds to inquire whether they are Medicare eligible, which are limited to inquiring only about Medicare Part A, Part B, and group health insurance, and not Medicare Part C (*i.e.*, Medicare Advantage) [J.A. 003287, Pl.'s Ex. 3 – *R.G. Reporting Compliance Letter*; J.A. 002313:9-25, 002314:1-6, 002321:2-6, 002536:6-19, Celli Testimony Sept. 14, 2016.; J.A. 003130:8-13, 23-25, 003131:1-10, Celli Depo May 31, 2016];

d) only reporting to CMS if its insured informs it of its Medicare eligibility [J.A. 001598: 2-23, Ruiz Testimony June 2, 2016; J.A. 003094:14-25, 003095:1-3, Celli Dep. May 31, 2016; J.A. 002543:11-24, Celli Testimony Sept. 14, 2016];

e) using ISO in an attempt to satisfy its Medicare reporting responsibility [J.A. 002326:2-8, 14-25, 002327:1-2, Celli Testimony Sept. 14, 2016.];

f) failing to utilize any specific guidelines for determining whether or not its insureds are Medicare eligible. [J.A. 001390:22-25, 001391:1-9, Celli Testimony June 2, 2016]. In fact, Defendant processes claims involving its Medicare eligible insureds no different than the claims involving its non-Medicare eligible insureds. [J.A. 001390:7-21, Celli Testimony June 2, 2016; J.A. 003090:7-19, Celli Dep. May 31, 2016];

g) not requiring its insureds to provide social security numbers [J.A. 002345:1-13, Celli Testimony Sept. 14, 2016] or maintaining a guideline or protocol to determine whether an insured of the Defendant, making a PIP claim, was also a Medicare beneficiary. [J.A. 001390:22-25, 001391:1-9, Celli Testimony June 2, 2016];

h) not performing paper reviews [J.A. 002342:4, Celli Testimony Sept. 14, 2016];

i) routinely failing to notify CMS about every instance in which it receives a no-fault claim from a Medicare beneficiary. [J.A. 003094:14-25, Celli Depo May 31, 2016].

j) only informing CMS of its insured's Medicare eligibility if it is made aware that its insured is Medicare eligible. [J.A. 003094:25, 003095:1-3, Celli Dep. May 31, 2016; J.A. 001598:2-23, Ruiz Testimony June 2, 2016; J.A. 002543:11-24, Celli Testimony Sept. 14, 2016].

Accordingly, the Court finds that common issues of law and fact concerning liability and causation involved in the action clearly predominate over issues of individual concern.

### b. *Reasonable Methodology for Generalized Proof of Class-Wide Impact*

Using a software system (the "MSP System" or "System") designed and developed by Plaintiff and its counsel, Plaintiff has demonstrated by substantial evidence that it implemented a methodology to capture, compile, synthesize and funnel large amounts of data in order to identify claims class-wide. [J.A. 001480:13-25, 001481:1, 6-11, 001503:4-22, Ruiz Testimony, June 2, 2016; J.A. 002076:16-24 Celli Testimony, Sept. 13, 2016]. This System captures data from different sources to identify the Class-Member enrollees' medical expenses incurred as a result of an automobile accident and which should have been paid for by Defendant. The System

can also identify the amounts owed by using the Defendant's electronic data, the MAO's data and data acquired from outside sources like the Department of Motor Vehicles, ISO and CMS. [J.A. 001484:13-18, Ruiz Testimony, June 2, 2016; J.A. 002000:15-25, 002001:1-3, Ruiz Testimony, Sept. 13, 2016].  The evidence presented demonstrated that the System captures and manages the following types of data:

 a.  CMS reports [J.A. 001481:6-11, Ruiz Testimony, June 2, 2016];

 b.  Florida Department of Motor Vehicles automobile crash reports [J.A. 001709:7-13, Ruiz Testimony, Sept. 12, 2016];

 c.  offense incident reports [J.A. 001776:6-12, Ruiz Testimony, Sept. 12, 2016];

 d.  ambulance records [J.A. 001481:6-11, Ruiz Testimony, June 2, 2016];

 e.  insurance declaration sheets [J.A. 001709:7-13, Ruiz Testimony, Sept. 12, 2016];

 f.  no-fault PIP payout sheets [J.A. 001709:7-13, Ruiz Testimony, Sept. 12, 2016];

 g.  explanation of benefits [J.A. 001709:7-13, Ruiz Testimony, Sept. 12, 2016]; and

 h.  ISO reports [J.A. 001776:6-12, Ruiz Testimony, Sept. 12, 2016].

Plaintiff merges the Defendant's own data with the information available on the MSP System to discover and identify a Medicare eligible person for whom primary medical payments should have been made along with any information stored as to potential class members. [J.A. 001440:10-24, 001502:23-25, 001503:1-3, 001596:17-25, 001597:1-14, Ruiz Testimony, June 2, 2016].  Although "every health plan has its own nomenclature, so all of the fields are different[,]" the MSP System stores and manages numerous fields of data to differentiate the data received from various MA Plans, such as United, Coventry, and Florida Healthcare Plus to organize the mass amount of information gathered.  [J.A. 001487:18-25, 001488:1-12, Ruiz Testimony, June 2, 2016].

### 1.  Plaintiff's Use of ICD and CPT Codes

Plaintiff's claims analysis methodology utilizes International Classification of Diseases Codes ("ICD Codes") and Current Procedural Terminology Codes ("CPT Codes") commonly used in the healthcare and automobile insurance industries, [45 C.F.R. § 162.1002; J.A. 002359:22-002360:5, Celli Testimony, Sept. 14, 2016], to identify and obtain any information regarding an enrollees' underlying case, such as the type of injury suffered, the circumstances that caused the injury, whether the listed primary insurance provider made payment, and whether the insurance carrier was a no-fault provider.  [J.A. 002000:11-23, 002003:10-22, 001596:17-23, Ruiz Testimony, June 2, 2016].

The "International Classification of Diseases" ("ICD") is "the standard diagnostic tool for epidemiology, health management and clinical purposes." [http://www.who.int/classifications/icd/en/ (last visited Oct. 24, 2016)]. ICD codes are promulgated by the World Health Organization and have been adopted by over 100 countries, and is available in 43 languages.[26]  Use of the ICD codes allows for the standardization of defining and reporting health conditions and diseases.  *Id.* ICD-9 and ICD-10 codes indicate the type of treatment the Enrollee received and, as such, are the same codes commonly used across the nation to decipher the medical services and/or supplies provided to an enrollee as a result of a car accident.  [J.A. 002171:5-25, 002172:1-9, Celli Testimony, Sept. 13, 2016].

Current Procedural Terminology, commonly known as CPT codes, are five digit codes with brief descriptions of more than six thousand medical procedures.[27]  CPT codes pertain to

---

[26]  World Health Organization [WHO]. 2010a. History of development of the ICD. http://www.who.int/classifications/icd/en/HistoryOfICD.pdf (last visited Oct. 24, 2016).

[27] In 1977, Congress instructed the Health Care Financing Administration ("HCFA") to establish a standardized system to identify physicians' services for Medicare and Medicaid claim forms. HCFA contracted with the American Medical Association to "adopt and use" the CPT codes.

whether an enrollee received lab work or imaging; however, typically the CPT codes related to an automobile accident will be consistent. [J.A. 002169:16-25, 002170:1-7, Celli Testimony, Sept. 13, 2016].

### 2. *Plaintiff's Use of CMS Data*

Plaintiff's claims analysis methodology uses the Ability[28] software system.[29] Access to this software system allows Plaintiff to determine whether a primary plan[30] is in compliance with reporting requirements pursuant to 42 U.S.C. § 1395y(b)(8) and 42 C.F.R. § 411.25. [J.A. 001540:17-25, 001541:1-18, Ruiz Testimony, Sept. 13, 2016; J.A. 003340-003350, Pl.'s Ex. 12, *L.B. MyAbility Report*; J.A. 003351-003361, Pl.'s Ex. 13, *R.G. MyAbility Report*]; J.A. 003362-003372, Pl.'s Ex. 14, *S.D. MyAbility Report*]. These reporting requirements:

> help[] CMS determine when other insurance coverage is primary to Medicare, meaning that it should pay for the items and services first before Medicare considers its payment responsibilities . . . . Upon receipt of this information, CMS checks whether the injured party associated with the claim report is a Medicare beneficiary, and determines if the other insurance is primary to Medicare. CMS then uses this information in the Medicare claims payment process and, if Medicare paid first when it should not have, uses it to seek repayment from the other insurer or the Medicare beneficiary.

---

HCFA agreed "not to use any other system of procedure nomenclature . . . for reporting physicians' services" and to require use of the CPT in programs administered by HCFA, its agents, and by other agencies whenever possible. *See Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 517-18 (9th Cir. 1997) (internal citations omitted).

[28] Ability is an authorized health information handler for CMS. CMS website, https://www.cms.gov/Research-Statistics-Data-and-Systems/Computer-Data-and-Systems/ESMD/Downloads/2015esMDAnnualProgramReport10-01-2014-09-30-2015_508.pdf (last visited Oct. 27, 2016).

[29] *See Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 494-95 (C.D. Cal. 2006) (standard software is a plausible method for class wide proof).

[30] "An organization that must report under Section 111 is referred to as a responsible reporting entity (RRE) . . . . RREs include . . . no-fault insurers . . . ." CMS (Dec. 14, 2015), https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/Overview.html.

[https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/Overview.html (last visited Oct. 19, 2016)]. A primary payer's failure to comply with these reporting requirements results in the primary provider not being found in the government's records and hence, prevents learning about the existence of an underlying no-fault policy. However, in this case, Plaintiff's further investigation uncovered the fact that Defendant was Enrollee's PIP insurance carrier. [J.A. 001494:6-12, Ruiz Testimony, June 2, 2016].

Upon obtaining said data from CMS, Plaintiff uses complex algorithms to place the extracted electronically stored information into separate data fields. [J.A. 001717:3-19, Ruiz Testimony, June 2, 2016; J.A. 001826:11-20, Ruiz Testimony, Sept. 12, 2016]. These algorithms "a mathematical rule[s] or procedure[s] for solving a problem." *Infection Preventions Techs., LLC v. Lumalier Corp.*, No. 2013 U.S. Dist. LEXIS 66233 (E.D. Mich. Aug. 8, 2012). The information Plaintiff obtained includes data on whether Defendant reported a claim for a Class Member's enrollee. [J.A. 001541:11-25, 001542:1-15, 001544:18-22, Ruiz Testimony, June 2, 2016]. Plaintiff then matches the data with other publicly available data, such as, car crash reports, ISO reports, and the MAOs' claims data. [J.A. 001481:6-11, Ruiz Testimony June 2, 2016, public available data; J.A. 001709:7-13, Ruiz Testimony, Sept. 12, 2016, car crash reports; J.A. 001776:6-12, Ruiz Testimony, Sept. 12, 2016, ISO reports; J.A. 0020000:15-25, 0020001:1-3, Ruiz Testimony, Sept. 13, 2016, MAO claims data].

### 3.  *Plaintiff's Use of ISO Data*

Insurance Services Office ("ISO"), is a database that stores information about property/casualty insurance risk.[31]  "ISO provides advisory services and information to many

---

[31] Verisk Analytics, http://www.verisk.com/iso/about-iso/about-iso.html (last visited Oct. 24, 2016).

insurance companies."[32] For example, "ISO develops and publishes policy language that many insurance companies use as the basis for their products."[33] Further, No-Fault insurance companies like Defendant use ISO ClaimSearch as its agent for CMS Section 111 reporting.[34] *See Ave T MPC Corp. v. Progressive Ins. Co.*, 851 N.Y.S. 2d 56 at *2 (N.Y.C. Civ. Ct. 2007) (citing to testimony for Progressive that described Progressive's "routine reliance" on information in ISO. The witness testified that she "fully incorporate[d] said information into her records made in the regular course of [Progressive's] business").

Specifically, Defendant indicated that it uses ISO reports to submit information and report and investigate claims. [J.A. 002309:1-23, 002310:5-9, 002319:1-9, Celli Testimony Sept. 14, 2016]. Defendant inputs information about car crashes and their enrollees into ISO. [J.A. 002312:8-9, Celli Testimony Sept. 14, 2016].

Plaintiff's system cross-references the information in its possession with common source documents, such as ISO reports, that no-fault insurers and Defendant utilize by common practice and custom to find "any other claim that had been made by the Medicare beneficiary, irrespective of whether it's a slip and fall or a trip and fall, or a car accident so long as that insurance company subscribes to that service." [J.A. 001492:18-19, 001493:8-20, Ruiz Testimony June 2, 2016].

### 4. *Plaintiff's Use of Crash and Police Report Data*

Plaintiff also obtained from the Florida Department of Motor Vehicles all automobile crash reports for every automobile crash that occurred in the State of Florida from 2006 to the

---

[32] Verisk Analytics, http://www.verisk.com/iso/faq/iso-faq/frequently-asked-questions.html (last visited Oct. 24, 2016).

[33] *Id.*

[34] Verisk Analytics, ISO as Your Reporting Agent, http://www.verisk.com/iso/faq/iso-

present.   [J.A. 001584:23-25, 001585:1-4, 001599:5-13, Ruiz Testimony June 2, 2016; J.A.

001770:2-9, Ruiz Testimony Sept. 12, 2016]. Plaintiff purchased, managed and stored police

reports for any enrollee that pertained to the underlying Medicare claim incident. [J.A.

001488:18-25, 001489:1-2, Ruiz Testimony, June 2, 2016; J.A. 001776:6-12, 001770:2-9, Ruiz

Testimony, Sept. 12, 2016; J.A. 003314-003320, Pl.'s Ex. 7, *I.S. Police Report*; J.A. 003885.

Pl.'s Ex. 18, *State of Florida Crash Report Data*; J.A. 004167-004173, Pl.'s Ex. 22, *R.G. Police

Report*].

### 5.   *Plaintiff's Use of PIP Related Records*

A PIP payout sheet is a document prepared by an automobile insurance company which

lists, among other information, claims against the account, bills that have been paid, and

deductible amounts, which would allow a medical provider to monitor available PIP benefits.

*See Progressive Am. Ins. Co. v. Rural/Metro Corp.*, 994 So. 2d 1202, 1204 (Fla. 5th DCA 2008).

Defendant maintains PIP payout sheets in electronic format for each of its enrollees. [J.A.

002353:15-19, Celli Testimony Sept. 14, 2016].   Particularly, Defendant's PIP payout sheets

contain information related to: claimant, date of birth, claim number, date of loss, coverage clear,

deductible, no-show, and provider number. [J.A. 002349:12-17, 002350:8-25, 002351:1-25,

002352:24-25, 002353:1, Celli Testimony, Sept. 14, 2016].   Plaintiff integrates this information

into its system to identify whether PIP benefits for an insured have been exhausted and whether

the benefits have been paid properly. [J.A. 001596:14-25, 001597:1-14, Ruiz Testimony, June 2,

2016; J.A. 002211:9-13, Pestien Testimony, Sept. 13, 2016; J.A. 002355:14-25, 002356:1-8,

Celli Testimony, Sept. 14, 2016].

Plaintiff's ability to capture data in large volumes, and to simultaneously, categorize,

normalize, and utilize the captured data, along with data from outside sources, is a common,

---

faq/medicare-secondary-payer-reporting-service.html (last visited Oct. 24, 2016).

reasonable and very effective methodology for generalized proof of class-wide impact for Plaintiff and its potential class members. [J.A. 001474:23-25, 001475:1-9, Ruiz Testimony, June 2, 2016].

### 6. *Plaintiff's Use of Other Data Sources*

Plaintiff's System also accesses federal, state and county court dockets throughout Florida to identify additional instances in which an enrollee of Defendant or a putative class member may be involved in a lawsuit related to a recoverable claim. [J.A. 001494:21-25, 001495:1-6, 001497:4-11, Ruiz Testimony, June 2, 2016].

### 7. *Class Wide Proof*

Plaintiff demonstrated it can utilize these systems to prove, on a class wide basis, Defendant's liability, as well as the amount owed for liquidated damages for Defendant's failure to pay or reimburse. [*See* J.A. 002215: 2-14, 002216:13-19, Pestien Testimony, Sept. 13, 2016]. Plaintiff further elicited testimony from Dr. Victor Pestien who testified that the data available could also be used to establish statistical damage amounts, as well as a methodology to be able to handle this matter class wide. [J.A. 002217:3-4, Pestien Testimony, Sept. 13, 2016].

### 2. <u>Superiority</u>

#### i. *Applicable Law*

Courts consider three factors when deciding whether a class action is the superior method of adjudicating a controversy. They are: "(1) a class action would provide the class members with the only economically viable remedy; (2) there is a likelihood that the individual claims are large enough to justify the expense of separate litigation; and (3) a class action cause of action is manageable." *Sosa*, 73 So. 3d at 115. In *Sosa*, the plaintiff "satisfied rule 1.220(b)(3)'s

superiority requirement because a class action is the most manageable and efficient way to resolve the individual claims of each class member." *Id.* at 116.

### ii.    *Factual Findings and Conclusions of Law as to Superiority*

#### a.    *Summary*

##### 1.    *Economically Viable Remedy*

Since an MAO's claim may be worth as little as a few hundred dollars, the costs associated with pursuing such a claim, such as the hiring of an attorney and the costs of purchasing necessary public record data from data vendors and the state and federal governments, would likely exceed the value of the claim and the potential recovery, hence resulting in an MAO's decision to pursue reimbursements on an individual basis very unlikely. [J.A. 001490:1-3, 001833:6-9, 001834:3-14,24-25, 001835:1, 001837:13-25, 001838:1-9, Ruiz Testimony, June 2, 2016]. Here, aggregating thousands of claims provides the Class Members with the benefit of economies of scale where the identification of claims and the pursuit of recovery costs are lower than the recoverable amounts. [J.A. 001837:13-25, 001838:1-9, Ruiz Testimony, June 2, 2016].

##### 2.    *Justification of Separate Litigation*

As no individual claim exceeds the statutory $10,000.00 maximum no-fault payment amount, there is no individual claim large enough to justify the expense of separate litigation considering standard attorneys fee rates in this jurisdiction and the collection costs set forth *supra.* [Fla. Stat. § 627.736(1); J.A. 001838:1-9, Ruiz Testimony, June 2, 2016].

##### 3.    *Manageability*

It is the custom and practice of the Parties, the State of Florida and CMS to maintain records in a detailed electronic format. [J.A. 002353:15-19, Celli Testimony, Sept. 14, 2016; J.A.

001590:17-25, 001592:11-15, 001772:11-19, Ruiz Testimony, June 2, 2016; J.A. 2000:15-18, Ruiz Testimony, Sept. 13, 2016].  Based on these practices, Plaintiff's counsel designed and developed its System to store and funnel the records and data, addressed *supra* in Section VII(B)(1)(ii)(a), *supra*, to identify the subject claims.  [J.A. 001480:13-25; 001481:1, Ruiz Testimony, June 2, 2016; J.A. 002126:16-24, Celli Testimony, Sept. 13, 2016].  Accordingly, identifying and managing the claims for which the Defendant may be liable for reimbursement is automatic and only limited by the specific parameters delineated by this Court.

As the issues presented will be resolved by the review of data and by examining and interpreting Florida's No-Fault law and the MSP Law, there will be no need for fact-specific individual analysis of intent or causation, and damages will be calculated based upon the total fee-for-service amounts.  *See W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509 at *21 ("a plaintiff is entitled to summary judgment in its favor when there is no genuine issue of material fact regarding (1) the defendant's status as a primary plan; (2) the defendant's failure to provide for primary payment or appropriate reimbursement; and (3) the damages amount."); Fla. Stat. § 627.736, *et seq.*

Further, this case will not present manageability problems as compared to non-electronic data driven class actions.  There is no need for a fact-specific individual analysis of intent or causation, and damages will be calculated based upon the total fee-for-service amounts associated with the payments made on behalf of an enrollee by an MAO.  *See* Fla. Stat. § 627.736, *et seq.*

In this case, class representation is superior to other available methods for the fair and efficient adjudication of the controversy. Individual joinder of each Class Member would be impractical.  As a class action will preserve judicial resources, reduce the overall expense of

litigation, streamline legal questions common to the identical legal claims of all Class Members, and result in an expeditious resolution of the claims. Furthermore, a class action will concentrate all the litigation against Defendant (based on primary payer responsibility derived from its no-fault insurance policy) in one forum with no unusual manageability problems. And, Defendant's liability and the nature of the Class Members' damages may be readily proven through common class-wide proofs.

In addition, there are a number of management tools available which the Court may use to address any individualized damage issues that might arise out of a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damage proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class. *See Ouellette v. Wal-Mart Stores, Inc.*, 888 So. 2d 90, 91-92 (Fla. 1st DCA 2004).

## C.     Standing Requirements

### 1.     Injury in Fact

A threshold inquiry in a motion for class certification is whether the class representative has standing to represent the putative class members. *See Sosa*, 73 So. 3d at 116. Particularly, to satisfy the standing requirement for class certification,

> the class representative must illustrate that a case or controversy exists between him or her and the defendant, and that this case or controversy will continue throughout the existence of the litigation. In deciding if a party has alleged a justiciable case or controversy, "the trial court is *not* required to determine the merits of the case." Rather, the trial court must determine if the class representative has alleged sufficient facts to establish a legal issue for the court's resolution.

*Id.* at 116-7. "A case or controversy exists if a party alleges an actual or legal injury." *Id.* at 117.

"An actual injury includes an economic injury for which the relief sought will grant redress. That injury must be distinct and palpable, not abstract or hypothetical." *Id.* (internal citations omitted).

The Amended Complaint contains detailed allegations to establish a *prima facie* case that the Plaintiff, as assignee of FHCP's claims reimbursement rights, suffered an actual injury by having paid medical expenses as a result of the injuries suffered by Enrollee from the Accident. [J.A. 000062-000077, Am. Compl., ¶¶ 10-37]. This injury is "distinct and palpable" as FHCP made payments of Medicare benefits on behalf Enrollee, for which FHCP was not primarily liable. As the Enrollee's no-fault insurer, Defendant was primarily liable for the payment of medical expenses for Enrollee. *Id.* Further, FHCP did not receive proper reimbursement from the Defendant for the payments it actually made for Enrollee's medical expenses. Section 627.736, Florida Statutes, requires that the Defendant make primary payment in this case. Therefore, the injury suffered by Plaintiff is not a hypothetical injury but, instead, is an actual economic injury resulting from Defendant's failure to comply with its primary payer obligations under Florida's No-Fault law and as applied to the facts alleged in the Amended Complaint. *Id.* A "primary plan's failure to make primary payment or to reimburse the Medicare Advantage Organization causes the MAO an injury in fact." *W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509 at *26. The injury for which Plaintiff seeks redress was caused by Defendant's conduct, and therefore, a decision in Plaintiff's favor under Counts I - IV would redress this economic injury.

However, Plaintiff must not only demonstrate individual standing, but must also "[possess] the same legal interest and [have] endured the same legal injury as the [putative] class

members." *Sosa*, 73 So. 3d at 114; *see* Fla. R. Civ. P. 1.220(a)(3). Plaintiff possesses the same legal interest and suffered the same legal injury as the Class Members. Thus, Plaintiff may serve as class representative since Plaintiff's claims are typical of the Class claims.

Further, the fact that Defendant made a payment after the filing of the lawsuit does not affect the Class Representative's standing to pursue these claims. The claims as asserted would subject Defendant to double damages as well as additional no-fault benefits for paying improperly. *See W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509 at *21 ("[W]hen the primary insurer later pays, Medicare's prior payment will normally be a matter of ascertainable fact.") (citing *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 901 (11th Cir. 2003).

If a primary plan reimburses an MAO after an MSP Law based lawsuit is filed, it does not absolve the primary plan of liability for double damages under the MSP Law. *See Estate of McDonald v. Indem. Ins. Co. of N. Am.*, 46 F. Supp. 3d 712, 717 (W.D. Ky. 2014) (holding that defendant was still liable for double damages even though it reimbursed plaintiff after the suit was filed); *Hull v. Home Depot United States*, 2016 Mich. Cir. LEXIS at *1 (Mich. Cir. Ct. 2016) ("[o]nly after the instant action was filed [that] [Defendant] finally pa[id] the amounts owed . . . . This course of conduct is not permitted in light of the clear intent and purpose of the MSP."). Moreover, Defendant paid less than its policy limit of $10,000.00 to Plaintiff for reimbursement, and the payments made to other providers other than for reimbursement also creates an issue that the Court must resolve as to Defendant's exhaustion of policy limits. *See Estate of McDonald*, 46 F. Supp. 3d at 717.

### 2.    **Plaintiff's Assignments**

As FHCP's assignee, Plaintiff has standing to assert the claims raised in its Amended Complaint, to pursue the claims on behalf of the Class and to pursue FHCP's reimbursement

claims against Defendant as a no-fault primary payer under section 627.736, Florida Statutes. [J.A. 000075, Am. Compl., ¶¶ 52-54]. As the ultimate assignee of FHCP's rights, Plaintiff is the proper party in interest to prosecute this action.

An assignment is defined as "a transfer or setting over of property, or of some right or interest therein, from one person to another; the term denoting not only the act of transfer, but also the instrument by which it is effected." Black's Law Dictionary (7th ed. 1999). A valid and enforceable assignment requires that the: (1) assignor intended to transfer a present interest in the subject-matter of the contract; and (2) assignor and assignee mutually assented to the assignment. *See Wingard v. Lansforsakringer AB*, 2013 U.S. Dist. LEXIS 141572, at * 52 (M.D. Ala. 2013). Florida law provides that an assignee's rights vest immediately upon the execution of an assignment, and thereafter the assignor has no further rights. *See Price v. RLI Ins. Co.*, 914 So. 2d 1010, 1013-14 (Fla. 5th DCA 2005).

The April 15, 2014 assignment from FHCP to La Ley Recovery Systems, Inc., (the "FHCP Assignment") and the subsequent assignments are valid. The FHCP Assignment gives La Ley "all of FHCP's rights" "to recover, shift, and/or bill on a fee for service for all medical services," with respect to any of FHCP's members or participants *etc*. Accordingly, the FHCP Assignment is valid, enforceable, and irrevocable. FHCP approved La Ley's assignments of its claims to its affiliates pursuant to the assignment. Specifically, La Ley assigned certain claims to Plaintiff and MSP Recovery, LLC with FHCP's approval. Accordingly, La Ley's assignments are valid.

Moreover, even if the Florida Department of Financial Services, as Receiver for FHCP ("Receiver"), had the power to terminate the vested assignments, the fact that the parties are performing under the terms of the assignments constitutes a waiver. In particular, the Receiver

accepted payments in accordance of the assignments, an action that is inconsistent with termination. "Waiver is either an intentional or voluntary relinquishment of a known right, or conduct giving rise to an inference of the relinquishment of a known right." *Air Prod. & Chems., Inc. v. La. Land & Exploration Co.*, 867 F.2d 1376, 1379 (11th Cir. 1989). In view of the Receiver's acceptance of funds under the terms of the assignments, the Receiver waived its prior objections to the assignments, and neither the Receiver nor Defendant can legitimately argue that the contracts have been effectively terminated.

Notably, the Receiver expressly acknowledged and affirmed the FHCP Assignment in a settlement agreement entered into with the Plaintiff and its related entities and approved by the court in *State of Florida ex rel., the Department of Financial Services of the State of Florida v. Florida Healthcare Plus, Inc.*, Case No. 2014 CA 2762 (Leon County) on June 14, 2016 ("Order Approving Settlement"). [J.A. 003373-003374, Pl.'s Ex. 15 *Order Approving Settlement*]

The Settlement Agreement with the Receiver recognized Plaintiff as a valid assignee of FHCP's claims as of April 2014, [J.A. 003375-003445, Pl.'s Ex. 16, *Settlement Agreement*], and affirmed that Plaintiff possessed the right to recover on such claims by virtue of the FHCP Assignment. Referring to the FHCP Assignment, the Settlement Agreement provides:

> the terms and conditions of the Initial Agreement...shall remain in full force and effect from April 15, 2014.... Receiver hereby agrees that Receiver shall not object to, or seek to terminate for any reason, the Initial Agreement, and expressly acknowledge and agrees that as of the execution of the Initial Agreement, all rights, title, and interest held by FHCP to recoveries, including any rights, title and interest held by FHCP to contractual agreements with FHCP members, related to accidents or incidents recoverable pursuant to the Medicare Secondary Payer Act...and/or any other applicable Federal or State subrogation laws...were and continue to be irrevocably assigned to La Ley.

*Id.*

In addressing the issue of whether Plaintiff has standing to bring its claims against various defendant insurance carriers based on a series of assignment agreements, in a recent opinion issued by the Eleventh Circuit, the FHCP Assignment was found to be valid and the Court held that Plaintiff had standing to bring its lawsuit. *MSP Recovery, LLC,* 2016 U.S. App. LEXIS 15984 at *12, 14.

Despite Defendant's arguments challenging the validity of the FHCP Assignment, Defendant itself lacks standing to challenge the validity of the assignments because it is not a party to the assignments. *See Rhodes v. JP Morgan Chase Bank, N.A.,* 2012 U.S. Dist. LEXIS 158988, at *9 (S.D. Fla. Nov. 6, 2012) (standing to challenge validity of assignment requires status as a party to that agreement); *In re Canellas,* 2012 U.S. Dist. LEXIS 33996, at *3 (M.D. Fla. Mar. 14, 2012) (holding that a party who is without privity has no standing to challenge the validity of an assignment agreement); *Altier v. Fannie Mae,* 2013 U.S. Dist. LEXIS 172214, at *9 (N.D. Fla. Nov. 8, 2013).

Assuming, *arguendo*, that Defendant does have standing to challenge the validity of the assignments, it waived its right to do so.  On February 5, 2016 the Court entered an Agreed Order on Plaintiff's Motion for Status Conference.  In entering this Agreed Order, MSPA Claims 1, LLC was substituted into the action as the Plaintiff.  In agreeing to the entry of the Order, the Defendant conceded that Plaintiff is the proper party in interest to prosecute this action through its valid assignment.

The Defendant's arguments challenging Plaintiff's standing, by specifically disputing the validity of the assignment agreements, have been carefully considered by this Court. Because an assignee has standing to prosecute a claim for damages[35] and because Defendant has failed to

---

[35] A common strategy in defending class and collective actions is "picking off" named plaintiffs through offers for complete relief of their individual claim, thereby eliminating the case or

show that the assignments are invalid, the Court rejects Defendant's arguments and finds that

Plaintiff has standing. *Sprint Commc'n Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269 (2008).

## VIII. In Addition to Defendant's Failure to Plead Affirmative Defenses, Any Dispute by Defendant as to Claims for Reimbursement Is Barred as a Result of Failing to Exhaust Administrative Remedies and Jurisdictional Limitations.

### A. Defendant is Barred from Contesting Reimbursement Amounts.

Defendant's failure to exhaust administrative remedies via the Medicare appeals process

bars Defendant from disputing Plaintiff's entitlement to reimbursement. *See Reale*, 180 So. 3d at

205); *W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509 at *24. In the *Reale* and *W. Heritage*,

the Florida Third District Court of Appeal and the Eleventh Circuit established that, before a

defendant may challenge a plaintiff's right to reimbursement and the amount thereof, defendant

must first exhaust administrative remedies. *Id.* Only after the exhaustion of administrative

remedies may the Defendant seek judicial review in federal court. *See Reale*, 180 So. 3d at 204

(holding that disputes concerning reimbursement of conditional payment must be exhausted

through the administrative appeals process before an enrollee invokes judicial review in a federal

court). No judicial review is available prior to the exhaustion of administrative remedies, as

described herein.

### 1. Defendant Has Not and Can No Longer Exhaust Administrative Remedies.

Defendant is precluded from contesting the amount of Plaintiff's reimbursement claims.

Any challenge to Plaintiff's entitlement to reimbursement "arise[s] under the Medicare Act," and

Defendant or the Medicare enrollee must first proceed with an administrative appeal prior to

judicial review. *See, e.g., W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509, at *24 (holding

---

controversy and rending the case "moot" before prospective members join the suit. In a recent decision, *Campbell-Ewald Co. v. Gomez*, No. 14-857, slip op. (2016), the United States Supreme Court ruled that an offer for full relief of a class representative's individual claim in a class action does not moot the case.

that a primary plan must exhaust the Medicare administrative appeals process prior to disputing

the amount due to an MAO); *Collins v. Wellcare Healthcare Plans, Inc.*, 73 F. Supp. 3d 653

(E.D. La. 2014) (holding that a Medicare Advantage enrollee's state court action seeking a

declaration that an MAO was not entitled to reimbursement was a claim arising under the

Medicare Act that must be exhausted before any judicial review); *Einhorn v. CarePlus Health*

*Plans, Inc.*, 43 F. Supp. 3d 1329 (S.D. Fla. 2014) (holding that a Medicare Advantage enrollee's

Florida Consumer Practices Act claim against an MAO for demanding reimbursement greater

than what was due was a claim arising under the Medicare Act that must be brought through the

administrative appeals process before it could be taken to federal court); *Cupp v. Johns*, 2014

U.S. Dist. LEXIS 30537 at *6-8 (W.D. Ark. 2014) (holding that a Medicare Advantage enrollee's

Arkansas subrogation law action seeking a declaration that an MAO did not have a right to

reimbursement arose under the Medicare Act, and the appropriate remedy was to go through the

administrative review and appeals process required by the Medicare Act); *Potts*, 897 F. Supp. 2d

185 (holding that Medicare Advantage enrollees' action seeking declaratory judgment regarding

MAO reimbursement rights pursuant to a New York anti-subrogation statute arose under the

Medicare Act and was subject to the requirements of § 405(g)); *Phillips*, 953 F. Supp. 2d at 1081

(holding that a Medicare Advantage enrollee's California consumer protection claim against an

MAO seeking reimbursement was a disguised claim for benefits and arose under the Medicare

Act).

Section 405(g) limits jurisdiction of claims arising under the Medicare Act to the federal

courts, but only after exhaustion of administrative remedies:

> [a]ny individual, after any final decision of the [Secretary of Health and Human
> Services] made after a hearing to which he was a party . . . may obtain a review of
> such decision by a civil action . . . . Such action shall be brought in the district
> court of the United States for the judicial district in which the plaintiff resides, or

> has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia.

*Id.* When read together, 42 U.S.C. §§ 405(h) and 405(g) create an exclusive review process for all claims arising under the Medicare Act, including claims brought in the context of the Medicare Advantage program.

An MAO must establish and maintain appeal[36] procedures that meet the requirements of this subpart for issues that involve organization determinations. 42 C.F.R. §§ 422.564(b), 422.111(b)(8). When MAOs provide payment for a Medicare enrollee's medical treatment, such payment is an organization determination pursuant to the Code of Federal Regulations. 42 C.F.R. § 422.566(b).[37] An MAO makes an organization determination[38] when it determines: (1) coverage for a Medicare enrollee; and (2) how much the MAO pays. 42 C.F.R. § 422.566(b); [J.A. 000686, FHCP Evidence of Coverage]. Further, an "MAO's refusal to provide or pay for services, in whole or in part" is also considered an organization determination. 42 C.F.R. §

---

[36] *Appeal* means any of the procedures that deal with the review of adverse organization determinations on the health care services the enrollee believes he or she is entitled to receive, including delay in providing, arranging for, or approving the health care services (such that a delay would adversely affect the health of the enrollee), or on any amounts the enrollee must pay for a service, as defined under § 422.566(b). These procedures include reconsiderations by the MA organization, and if necessary, an independent review entity, hearings before ALJs, review by the Medicare Appeals Council (MAC), and judicial review. 42 C.F.R. § 422.561.

[37] **(b) *Actions that are organization determinations.*** An organization determination is any determination made by an MA organization with respect to any of the following:

> **(1) <u>Payment</u>** for temporarily out of the area renal dialysis services, emergency services, post-stabilization care, or urgently needed services.
>
> **(2) <u>Payment</u>** for any other health services furnished by a provider other than the MA organization that the enrollee believes -
>
>> **(i)** are covered under Medicare; or
>>
>> **(ii)** if not covered under Medicare, should have been furnished, arranged for, or reimbursed by the MA organization.

[38] In its Evidence of Coverage, FHCP refers to an "organization determination" as a "coverage decision."

422.566(b)(3); *see Reale*, 180 So. 3d at 205 (Fla. 3d DCA 2015) (holding that an MAO's reimbursement determination is an organization determination under 42 C.F.R § 422.566(b)(3) because it is a "refusal to . . . pay for services" where there is a primary payer).

Pursuant to 42 C.F.R. § 422.582(b), a party has sixty (60) days to contest an organization determination. If a Medicare enrollee disagrees with the organization determination, it can appeal MAOs decision. *See* 42 U.S.C. § 1395w-22(g); *see also, W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509 at *24 (holding that a primary plan could not contest the amount due to an MAO, as no party administratively appealed the organization determination).

The Third District Court of Appeal in *Reale* held that the Medicare Act creates an exclusive federal administrative process under which an MA plan enrollee appeals, through CMS, an MAO's denial of benefits or **request for reimbursement**. *Reale*, 180 So. 3d 195 at 204-05. The mandatory exhaustion requirement applies to primary plans as well. *W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509, at *24. In *W. Heritage*, a primary payer sought to contest the amount of reimbursement being claimed by an MAO, Humana. *Id.* However, the Eleventh Circuit held that a primary plan cannot seek judicial review of its dispute of the reimbursement amounts due to an MAO unless it first exhausted administrative remedies. *Id.* at *24 ("[t]he amount that [an MAO] may recover is [] fixed," as a result of the primary payer's failure to administratively appeal the reimbursement claim). Upon exhaustion of the administrative process, the Medicare Act provides for exclusive federal judicial review and expressly preempts state law. *Reale*, 180 So. 3d 195 at 204-05.

Here, FHCP and the putative class members' request for reimbursement arises from an organization determination under 42 C.F.R § 422.566(b)(2), as they provided "payment for [..] health services furnished by a provider other than the MA organization" where there is a primary

payer. *See Reale*, 180 So. 3d at 205. Similar to *W. Heritage*, Plaintiff, a secondary payer, seeks reimbursement from Defendant, a primary payer, and Defendant contests the reimbursement amounts. Defendant failed to contest any organization determination. As all the claims sought in this matter involve historical data, the sixty (60) days have expired for an enrollee to contest an organization determination. 42 C.F.R. § 422.582(b); *Trostle*, 2016 U.S. Dist. LEXIS 143101, at *16-18 (stating that if an unfavorable decision is not administratively appealed, it becomes binding, and no final decision may be obtained which would allow for federal judicial review). "[E]xceptions do not apply . . . to a statutorily-mandated exhaustion requirement like the one involved in this case." *Cochran v. United States Health Care Fin. Admin.*, 291 F. 3d 775, 780 (11th Cir. 2002). Therefore, Defendant is foreclosed from disputing the reimbursement amounts, as no party timely appealed the organization determination to FHCP or the other putative class member determinations. *W. Heritage*, 2016 U.S. App. LEXIS 14509 at *24.

### i. *Even if this Court Accepts Defendant's Purported Affirmative Defense, Defendant's Arguments Continue to be Unavailing.*

Defendant failed to plead any affirmative defenses in its Answer to the Class Action Complaint. On the eve of resuming the class certification hearing, on September 12, 2016, Defendant moved to amend its Answer to add affirmative defenses. However, this Court has yet to rule on said amendment, but disallowed the purported defenses for purposes of class certification. However, even if Defendant's affirmative defenses were considered, Defendant's argument would be unavailing as: (1) Defendant would still have needed to exhaust the Medicare administrative review process prior to seeking judicial review of its dispute, as set forth *supra*; (2) Plaintiff's rights supersede any state law or regulation with respect to the MA plans that are offered by MAOs (*see* 42 C.F.R. §§ 422.402, 422.108(f)); and (3) Defendant admits that it fails to comply with section 627.736(7), Florida Statutes, to contest reimbursement.

This Court already discussed Defendant's failure to exhaust administrative remedies and will now discuss other reasons why Defendant's arguments are futile.

### a.   Plaintiff's Rights Supersede Florida's No Fault Act's Notice Requirement.

The Code of Federal Regulations explicitly preempts any state law that takes away an MAOs right to recover conditional payments made for services for which Medicare was not the primary payer. *See* 42 C.F.R. §§ 422.402, 422.108(f). Particularly, section 627.736(10)(a), Florida Statutes, requires that as a "condition precedent to filing any action for benefits under this section, written notice of an intent to initiate litigation must be provided to the insurer." Fla. Stat. § 627.736(10)(a). The language of this subsection requires precision in a demand letter by its requirement of an "itemized statement specifying each exact amount." *MRI Assocs. of Am., LLC v. State Farm Fire & Cas. Co.*, 61 So. 3d 462, 465 (Fla. 4th DCA 2011); *see* Fla. Stat. § 627.736(10)(a). However, this is inapplicable to MAOs seeking reimbursement of its conditional payments. The demand letter requirement in Florida's No-Fault Act would "take away an MA organization's right under Federal law and the MSP regulations" to seek reimbursement. 42 C.F.R. § 422.108(f). Further, the Code of Federal Regulations exempts CMS, and thus MAOs, from any time filing requirements a primary plan imposes on the enrollee. *See* 42 C.F.R. § 411.24(f)(1). Accordingly, under the plain language of the express preemption provisions of the Medicare Act and its accompanying regulations, the PIP statute's demand letter requirement is preempted as it applies to Medicare and MAO reimbursement rights.

Even if this Court were to impose the demand letter requirement upon Plaintiff, Plaintiff's Counsel properly sent Defendant a final Demand Letter demanding reimbursement of $29,485.00 for Enrollee's overdue medical bills and on April 20, 2016, notified Defendant of its

obligations to reimburse Plaintiff for all identified claims.  [*See* J.A. 003292 Pl.'s Ex. 4 –
*General Demand Letter*, 003296 Pl.'s Ex. 5 – *R.G. Demand Letter*].

>           *b.*     ***Defendant May Not Withdraw or Deny Payment on the Ground***
>                    ***that Medical Treatment is Not Reasonable, Related or Necessary,***
>                    ***Without First Obtaining a Medical Report Pursuant to Section***
>                    ***627.736(7), Florida Statutes.***

Section 627.736(7), Florida Statutes, requires that whenever "the mental or physical
condition of an injured person covered" by PIP insurance coverage is "material to any claim that
has been or may be made for past or future" PIP benefits, such person must "submit to mental or
physical examination by a physician or physicians."  § 627.736(7)(a), Fla. Stat. (2016). Further,
this subsection expressly states,

> [a]n insurer *may not withdraw payment of a treating physician* without the
> consent of the injured person covered by the personal injury protection, *unless the*
> *insurer first obtains a valid report by a Florida physician* licensed under the
> same chapter as the treating physician whose treatment authorization is sought to
> be withdrawn, *stating that treatment was not reasonable, related, or necessary.*

*Id.* (emphasis added).  In effect, Defendant is statutorily prohibited from failing to pay for
medical bills without this report.  *Id.*

Defendant's adjuster, Joseph Celli, testified that even though he requested, but never
obtained, a medical report for the claim of R.G., he personally determined that: (1) R.G.'s
medical bills were "reasonable, related or necessary", based solely on his review of the medical
bills in the claim file and Plaintiff's demand for payment; (2) coverage would be extended; and
(3) payment would be made.  [J.A. 003129:15-22, 003147:3-10, 003148:14-25, 003149:1-25,
003150:1-9, Celli Dep., May 31, 2016].  For all other claims, Defendant routinely relies on Mr.
Celli to determine whether or not the claims are reasonable, related or necessary; and Mr. Celli
routinely makes such a determination, irrespective of whether or not he obtains a medical report.
[J.A. 003144:7-19, 003145:15-24, 003146:1-9, 003147:11-20, Celli Dep., May 31, 2016].

     *c.*     ***Defendant's Partial Payment to Plaintiff of R.G.'s Reimbursement does not Affect Plaintiff's Standing to Serve as the Class Representative.***

After the filing of the initial lawsuit on February 25, 2015, Defendant voluntarily paid Plaintiff the sum of $9,355.30, which represented no-fault benefits under the insurance policy, plus $41.39 in interest, and $256.69 in maximum penalty and postage. [J.A. 002436:19-25, 002437:1-7, Celli Testimony, Sept. 14, 2016]. However, the amount paid failed to include double damages and failed to include the total amount available under the policy of $10,000. Additionally, the Defendant failed to acknowledge entitlement and a sum certain to attorneys' fees. Therefore, still in dispute are the following amounts: (a) benefits of $644.70, representing the difference between the $10,000.00 available in no fault benefits minus the $9,355.20; and (b) the double damages related to both the $9,355.30 and the $644.70.

In addition to R.G.'s claim, Plaintiff has identified over 3,300 instances in which Defendant's Medicare eligible enrollees were involved in automobile accidents. [J.A.001303:5-12, 001488:13-25; 001584:1-22; 001598:2-001599:4, Ruiz Testimony, June 2, 2016; J.A. 003089:21 – 003090:1, Celli Dep. May 31, 2016; J.A. 004191-007213, Pl.'s Exs. 28-63]. Out of a random sample of 107 automobile accidents, the Defendant had only registered three (3) with CMS. [J.A. 003633 Lopez Depo., Ex. 5; J.A. 001488:13-25; 001584:1-22; 001598:2-001599:4, Ruiz Testimony June 2, 2016; J.A. 003089:21 – 003090:1, Celli Dep. May 31, 2016]. Of the four (4) files that Defendant chose to produce to Plaintiff, all four (4) were instances that the MAO paid prior to the primary payer. [J.A. 003296, Pl.'s Ex. 5 – *R.G. Demand Letter*; J.A. 003306, Pl.'s Ex. 6 – *S.D. Demand Letter*; J.A. 003321, Pl.'s Ex. 8 – *L.S. Demand Letter*; J.A. 003334, Pl.'s Ex. 9 – *L.B. Demand Letter*].

It is well settled that the payment of a claim following the initiation of an action for recovery, but prior to the issuance of a final judgment, constitutes the functional equivalent of a confession of judgment. *Johnson v. Omega Ins. Co.*, 171 So. 3d 117 (Fla. 2016); *see, e.g., Pepper's Steel & Alloys, Inc. v. U.S.*, 850 So. 2d 462, 465 (Fla. 2003). Voluntary payment by a party after suit is filed is the "functional equivalent of a confession of judgment" against that party. *Ivey v. Allstate*, 774 So. 2d 679 (Fla. 2000); *Avila v. Latin American Property and Casualty Ins. Co.,* 548 So. 2d 894 (Fla. 3d DCA 1989). However, it is clear that the Defendant has failed to pay the entirety of its liability on the reimbursement rights resulting from the claim of R.G.

Moreover, for the four claims produced by Defendant, on some, the Defendant confessed judgment but has failed to pay double damages, as allowed by law and has failed to pay its policy limits to the Plaintiff. Additionally, Plaintiff has a right to collect attorney's fees pursuant to section 627.428, Florida Statutes, which Defendant has failed to pay or otherwise agree to pay. As a result, the Plaintiff's claim through R.G. has not been fully resolved or otherwise fully adjudicated and Plaintiff still has standing to serve as the Class Representative.

**B.      The Disallowed Affirmative Defenses**

After the certification hearing began and approximately seven months after Plaintiff filed its Amended Complaint, Defendant sought leave to amend its Answer to include thirty-seven affirmative defenses. Over this seven month span, Defendant filed several motions and attended various hearings, but did not raise any affirmative defenses. Defendant's Motion for Leave to Amend its Answer neither provides a basis for excusable neglect nor does it address the seemingly obvious prejudice Plaintiff would incur in addressing thirty-seven new defenses raised subsequent to the commencement of the certification hearing. *See Humphrey v. United Way of*

*Texas Gulf Coast*, 2007 WL 2688431 (S.D. Texas 2007) (holding that because the class action had been pending for a similarly significant period of time without these defenses being raised, they were untimely and therefore stricken).

Even if this Court were to allow Defendant to assert its untimely defenses, the Court finds that virtually all of Defendant's proposed defenses are either legally insufficient or immaterial to class certification.[39]

### 1.   Defendant's Affirmative Defenses Lack The Requisite Specificity Under The Florida Rules of Civil Procedure.

Generally, a properly pled affirmative defense includes ultimate facts sufficient to provide notice of the proof the defendant intends to rely upon to defeat a plaintiff's claim. *Zito v. Wash. Fed. Savings & Loan Ass'n of Miami Beach*, 318 So.2d 175, 176 (Fla. 3d DCA 1975). However, Florida Rule of Civil Procedure 1.120(c) requires affirmative defenses, which deny the performance of a condition precedent to be plead with specificity and particularity. *See United Bonding Ins. Co. v. Dura-Stress, Inc.*, 243 So.2d 244, 246 (Fla. 2d DCA 1971). "[C]ertainty is required when pleading defenses, and pleading conclusions of law unsupported by allegations of ultimate fact is legally insufficient." *Thompson v. Bank of N.Y.*, 862 So. 2d 768, 771 (Fla. 4th DCA 2003). This strict standard required by the Florida Rules of Civil Procedure mandates affirmative defenses must be "proven by very clear and positive evidence." *Kornaker v. Payor*, 565 So. 2d 899, 900 (Fla. 5th DCA 1990). Further, when a Defendant fails to deny a condition precedent with specificity, that defense is waived. *Griffin v. American General Life and Ace. Ins. Co.*, 752 So. 2d 621, n. 1 (Fla. 2d DCA 1999). The Fourth District Court of Appeal held that the "failure to plead specifically and with particularity appellee's nonperformance of [a] condition precedent as required by rule 1.120(c), Florida Rules of Civil Procedure, constitutes a

---

[39] Defendant's Affirmative Defenses 1-10 all allege standing issues which the Court has already

waiver." *Davie Westview Developers, Inc. v. Bob-Lin, Inc.,* 533 So.2d 879, 880 (Fla. 4th DCA 1988).

Defendant alleges Plaintiff failed to satisfy various conditions precedent in its purported Affirmative Defenses 11, 16, 17, 18, 19, 25, 26, and 27.  Upon review, the Court finds all aforementioned defenses devoid of the requisite specificity and particularity required by Rule 1.120(c).  For example, Defense 25 states "bills were not submitted in the proper form and/or were not submitted within the required time limit."  This conclusory allegation points to no supporting evidence and fails to specify which bills in particular were untimely and the specific formatting deficiency reflected in the bills. The remainder of Defendant's challenges to conditions precedent reflect similar pleading deficiencies and, as a result, the Court finds that these defenses are legally insufficient.

## 2.    Defendant's Affirmative Defenses are Immaterial For Class Certification.

It is well established that a court may not consider merits issues in ruling on class certification. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78 (1974).  Thus, at the class certification stage, courts "have generally refused to consider the impact of affirmative defenses." *International Woodworkers of Am. v. Chesapeake Bay Plywood* Corp., 659 F.2d 1259, 1270 (4th Cir. 1981).  The Eleventh Circuit noted "several federal courts have determined that the appropriate time for a class action defendant to raise affirmative defenses and set-off claims is during the damages phase." *Allapattah Services, Inc. v. Exxon,* 333 F. 3d 1248 (11th Cir. 2003).  Moreover, denial of some or all of the elements of a plaintiff's claim is not an affirmative defense. *Gatt v. The Keyes Corp.,* 446 So. 2d 211, 212 (Fla. 3d DCA 1984) (holding that an affirmative defense which "simply denie[s] the facts contained in the . . . complaint and

disposed of *supra.*

[does] not raise any new matters to defeat the complaint is properly stricken as being legally insufficient").

Affirmative defenses 13, 14, 15, 20, 21, 28, 29, 30, 31 32, and 33 constitute mere denials of the allegations contained in Plaintiff's Amended Complaint and, therefore, are insufficient as a matter of law. Moreover, these denials pertain exclusively to the merits of the current litigation and have no bearing on the procedural requirements of class certification. The aforementioned defenses allege Defendant has no duty to reimburse the proposed class under the applicable state and federal statutes as well as the relevant contractual agreements. Because these issues go to the merits of Plaintiff's claims they have no bearing on the Court's analysis for class certification. *See Plubell v. Merck & Co.*, 289 S.W.3d 707, 716 (Mo. App. 2009) ("Defenses that go to the merits of the case and are not properly considered in class certification.").

Finally, Affirmative Defenses 22, 23, 24, 35, 36 and 37 relate exclusively to damages, which are again irrelevant at the class certification stage. Defendant contends Plaintiff is barred from collecting double damages under the MSP Law and also alleges it is entitled to off-set any damages which may be awarded to Plaintiff. As noted in *Allapattah*, affirmative defenses which pertain primarily to damages rather than liability, are immaterial to the issue of class certification. *Allapattah Services, Inc. v. Exxon,* 333 F. 3d 1248 (11th Cir. 2003).

> **3.** **Section 627.736(10) of the PIP Statute is Preempted by 42 C.F.R. §§ 411, 422 as There are no Claims Filing Requirements on Medicare Secondary Payer Claims.**

As addressed in Section II(B)(9), *supra*, CMS may recover reimbursement claims without a claims filing requirement. The Defendant's contention is misplaced, as state statutes inconsistent with the recovery rights are preempted by § 422.108(f), as addressed by the Third

District Court of Appeal in *Reale*. *See Reale*, 180 So. 3d 195. Accordingly, there is no requirement that Plaintiff or the Class send a letter prior to filing suit.

Notwithstanding, Plaintiff in this case sent a letter on January 13, 2015, demanding payment, and thereafter, sent another letter on April 20, 2016 demanding that Defendant provide notice of all of its primary payer obligations to which Defendant failed to respond. [J.A. 003296, Pl.'s Ex. 5 – *R.G. Demand Letter*].

**C.** **42 C.F.R. § 411.53**

An MAO can make a conditional payment "if a primary plan...has not made or cannot reasonably be expected to make payment with respect to such item or service promptly (as determined in accordance with regulations)." 42 U.S.C. § 1395y(2)(B)(i). There is nothing in the statute to support Defendant's assertion that an MAO is limited as to when it can make a conditional payment. Pursuant to subparagraph (a), 42 C.F.R. § 411.53(a), which is reprinted as follows:

> (a) A conditional Medicare payment **may** be made in no-fault cases under either of the following circumstances:
>
> > (1) The beneficiary has filed a proper claim for no-fault insurance benefits but the intermediary or carrier determines that the no-fault insurer will not pay promptly for any reason other than the circumstances described in § 411.32(a)(1). This includes cases in which the no-fault insurance carrier has denied the claim.
> >
> > (2) The beneficiary, because of physical or mental incapacity, failed to meet a claim-filing requirement stipulated in the policy.

*Id.* (emphasis added). The explicit language of the federal regulation is permissive and as such, does not exclusively limit a conditional payment in the enumerated scenarios. *See Saltzman v. Hadlock*, 112 So. 3d 772, 774 (Fla. 5th DCA 2013) ("[i]t is well-settled that the word '**may**' 'denotes a **permissive** term rather than the mandatory connotation of the word 'shall.'"). If this

Court were to accept Defendant's position, it would be contradictory to the accepted definition of a "conditional payment." *See* 42 C.F.R. § 411.21.

Pursuant to the federal regulations, a "conditional payment means a Medicare payment for services for which another payer is responsible, made either on the bases set forth in subparts C through H of this part, or because the intermediary or carrier **did not know that coverage existed**." 42 C.F.R. § 411.21 (emphasis added). This Court does not interpret any conflict in the situation where the secondary payer does not know of a primary payer's obligation to pay for medical expenses and the statutory language "cannot reasonably be expected to make payment." In other words, if an MAO is unaware of a primary payer, the MAO would not "reasonably expect" a primary plan to provide payment. *See Collins v. Wellcare Healthcare Plans, Inc.*, 73 F. Supp. 3d 653, 669 (E.D. La. 2014). Here, FHCP did not know the existence of a primary payer. Accordingly, the fact that FHCP did not know of the primary plan when it funded its Medicare enrollees' medical expenses does not undermine the fact that those payments constituted conditional payments. Thus, the Court finds that FHCP made a conditional payment and satisfies paragraph 42 U.S.C. §§ 1395y(b)(2)(A), 1395y(b)(2)(B)(i).

## IX. CONCLUSION

Based upon the foregoing, the Court concludes that the class action should be certified, and it is hereby,

> **ORDERED AND ADJUDGED** that:
>
> 1. Plaintiff's Amended Motion for Class Certification is hereby **GRANTED**; and
>
> 2. The Court certifies a class defined to include entities that:
>
>     entities that contracted directly with the Centers for Medicare and Medicaid Services ("CMS") and/or its assignee pursuant to Medicare Part C, including but not limited to, MAOs and other

similar entities, to provide Medicare benefits through a Medicare Advantage plan to Medicare beneficiaries for medical services, treatment, and/or supplies as required and regulated by HHS and/or CMS as a direct payer of medical services/supplies and/or drugs on behalf of Medicare beneficiaries either for parts A, B and/or D, all of which pertain to the same medical services and/or supplies that were the primary obligation of the Defendant;

have made payment(s) for medical services, treatment and/or supplies subsequent to January 29, 2009, whereby the MAO, or its assignee, as a secondary payer, has the direct or indirect right and responsibility to obtain reimbursement for covered Medicare services, for which the Defendant, as the primary payer pursuant to Defendant's contract covering the Medicare enrollee pursuant to Florida No-Fault law (section 627.736(4), Florida Statute), was/is financially responsible to a Medicare beneficiary for medical bills incurred as a result of the use, maintenance or operation of a motor vehicle; and

where the Defendant failed to properly pay for medical bills on behalf of its insureds and has otherwise failed to reimburse the MAO's or its assignees for their payment(s) as calculated pursuant to the recognized Current Procedure Terminology ("CPT") codes based on the fee-for-service by the primary payer, as delineated by section 627.736, Florida Statues, for medical services and/or supplies for their damages.[40]

Further, Gonzalo Dorta, Esq., John H. Ruiz, Esq., and Frank Quesada, Esq. shall serve as a committee of counsel for the entire above-defined class.

Within 20 days, class counsel shall submit for the court's approval a proposed notice of the pendency of this action. The proposed notice shall inform the Class of the matters set forth in Florida Rule of Civil Procedure 1.220(d)(2).

**DONE AND ORDERED** in chambers at Miami-Dade County, Florida on this ___ day of November 2016.

THE HONORABLE SAMANTHA RUIZ-COHEN
CIRCUIT COURT JUDGE

---

[40] The Class entities have not otherwise released their right to reimbursement as secondary payers.

*Copies furnished to*:

Gonzalo Dorta, Esq.
grd@dortalaw.com

Frank Quesada, Esq.
fquesada@msprecovery.com

John H. Ruiz, Esq.
jruiz@msprecovery.com

Shannon McKenna, Esq.
smckenna@conroysimberg.com

Dale Friedman, Esq.
dfriedman@conroysimberg.com